## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CECELIA WALLACE, individually, and as the executor of the estate of  WILLIAM M. WALLACE (deceased) | ) ) ) ) | |
| Plaintiffs, | ) ) | Cause No. 1:06-cv-1560-RLY-TAB |
| v. | ) ) ) | |
| JERRY HOUNSHEL, in his individual capacity, MARC LAHRMAN,  in his individual and official capacity AS SHERIFF OF JACKSON COUNTY AND FORMER JAIL COMMANDER OF THE JACKSON COUNTY JAIL; DR. FAISAL AHMED; ADVANCED  CORRECTIONAL HEALTHCARE, INC.; MISSY (MISER) ROBINSON, NURSE, in her individual capacity; DAVID RIDLEN, in his individual capacity; JOSH TEIPEN, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

Come now Plaintiffs, by counsel, and respectfully submit their brief in support of motion for summary judgment.  Because Plaintiffs are entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56, summary judgment should be entered in favor of Plaintiffs on all claims.

## TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………ii

TABLE OF AUTHORITIES………………………………………………………………..iv

STATEMENT OF ISSUES…………………………………………………………………...vii

   I.    INTRODUCTION……………………………………………………………1

   II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE…………………………...4

          A.  Jackson County Jail…………………………………………………………4

          B.  Enacting the Jackson County Jail's Cost Cutting Policies………………………6

          C.  William Wallace is Booked Into Jackson County Jail……………………14

          D.  March 25, 2006—Wallace's First Coronary Attack……………………15

          E.  April 2, 2006—Wallace's Second Coronary Attack……………………19

          F.  April 11, 2006—Wallace's Final Coronary Event……………………...23

   III.  ARGUMENT…………………………………………………………26

          A.  Summary Judgment Standard……………………………………………...26

          B.  Standard of Review for Eighth Amendment Claims……………………27

          C.  Federal Claims Against Advanced Correctional Health and the
              Jackson County Sheriff in his Official Capacity………………………29

          D.  Federal Claims Against Individual Defendants…………………………39

              1. Sheriff Hounshel……………………………………………40

              2. Jail Commander Lahrman……………………………………42

              3. Nurse Robinson………………………………………………43

              4. Jail Officer Teipen……………………………………………45

              5. Jail Officer Ridlen……………………………………………...47

6. Jail Physician Dr. Faisal Ahmed…………………………………………48

E.   State Wrongful Death Claims……………………………………………...50

IV.   CONCLUSION…………………………………………………………………51

CERTIFICATE OF SERVICE……………………………………………………...52

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………………………26

*Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997)……………35, 36, 38

*Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686 (7th Cir. 2005)……………………27

*Cahoon v. Cummings*, 734 N.E.2d 535 (Ind. 2000)…………………………………………...50

*Canton v. Harris*, 489 U.S. 378 (1989)…………………………………………………...35, 38

*Carter v. City of Detroit*, 408 F.3d 305 (6th Cir. 2005)………………………………………29, 46

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)……………………………………………………26

*Chortek v. City of Milwaukee*, 356 F.3d 740 (7th Cir. 2004)………………………………...30, 33

*Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993)…………..35

*Cox v. District of Columbia*, 821 F. Supp. 1 (D.D.C. 1993)……………………………………35

*Davis v. Zirkelbach*, 149 F.3d 614 (7th Cir. 1998)……………………………………………39

*Donald v. Cook County Sheriff's Dept.*, 95 F.3d 548 (7th Cir. 1996)……………………………28

*Dunn v. City of Elgin, Illinois*, 347 F.3d 641 (7th Cir. 2003)………………………………...35, 38

*Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir. 2000)…………………………27, 31

*Estelle v. Gamble*, 429 U.S. 97 (1976)…………………………………………………………27

*Farmer v. Brennan*, 511 U.S. 825 (1994)………………………………………27, 28, 34, *passim*

*Forton v. County of Ogemaw*, 435 F. Supp. 2d 640 (E.D. Mich. 2006)…………………28, 34, 47

*Franklin v. Zaruba*, 150 F.3d 682 (7th Cir. 1998)………………………………………………30

*Gossmeyer v. McDonald*, 128 F.3d 481 (7th Cir. 1997)………………………………………...40, 42

*Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494 (7th Cir. 1999)……………………………27

*Haley v. Gross*, 86 F.3d 630 (7th Cir. 1996)……………………………………………………28, 46

iv

*Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014 (7th Cir. 2003)............39, 42

*Hull v. Fletcher*, 2006 WL 4013799 (W.D. Mich. 2006)....................................28, 34, 46

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007)....................................................40, 42

*Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760 (7th Cir. 2002)............................31

*Janowiak v. City of South Bend*, 836 F.2d 1034 (7th Cir. 1987)...............................26

*Kelly v. Mun. Courts of Marion County*, 97 F.3d 902 (7th Cir. 1996).............................39

*Kentucky v. Graham*, 473 U.S. 159 (1985).......................................................30

*Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467 (7th Cir. 1997).....................40, 42

*Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985)..............................................40, 42

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005)...................................................28

*Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003)...............................27, 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).........................26

*Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658 (1978)................................30

*Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003).........................................39

*Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997)............................................35, 38

*Payne for Hicks v. Churchich*, 161 F.3d 1030 (7th Cir. 1998)...................................27, 46

*Plemmons v. Roberts*, 439 F.3d 818 (8th Cir. 2006).............................................28

*Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751 (7th Cir. 2006)..................................30

*Rasche v. Vill. of Beecher*, 336 F.3d 588 (7th Cir. 2003)......................................30, 34

*Rascon v. Hardiman*, 803 F.2d 269 (7th Cir. 1986).............................................39

*Robles v. City of Fort Wayne*, 113 F.3d 732 (7th Cir. 1997)....................................35, 38

*Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000)...........................................29

*Sides v. City of Champaign*, 496 F.3d 820 (7th Cir. 2007)......................................27

*Smith v. Rowe*, 761 F.2d 360 (7th Cir. 1985)……………………………………………………39

*Solon v. Kaplan*, 398 F.3d 629 (7th Cir. 2005)……………………………………………...27

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987)……………………………………………36

*Spring v. Durflinger*, 518 F.3d 479 (7th Cir. 2008)…………………………………………26

*Sutton v. Utah State School for Deaf and Blind*, 173 F.3d 1226 (10th Cir. 1999)………..…40, 42

*Vitug v. Multistate Tax Comm'n*, 88 F.3d 506 (7th Cir. 1996)………………………………...26

*Walker v. Benjamin*, 293 F.3d 1030 (7th Cir. 2002)………………………………………28, 46

*Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990)……………………………………………40, 42

*Williams v. Heavener*, 217 F.3d 529 (7th Cir. 2000)………………………………………35, 38

*Woodward v. Correctional Medical Services of Illinois, Inc.*,
      368 F.3d 917 (7th Cir. 2004)………………………………………………………..27, 31, 46

*Wynn v. Southward*, 251 F.3d 588 (7th Cir. 2001)……………………………………………28

*Zentmyer v. Kendall County, Ill.*, 220 F.3d 805 (7th Cir. 2000)………………………………39

*Zimmerman v. Tribble*, 226 F.3d 568 (7th Cir. 2000)…………………………………………39

**STATUTES**

Ind. Code § 34-23-1 *et seq*……………………………………………………………………50

**RULES**

Fed. R. Civ. P. 56(c)……………………………………………………………………………26

## <u>STATEMENT OF ISSUES</u>

I.   Whether Plaintiff is Entitled to Summary Judgment on her Federal Claims
     Against Advanced Correctional Health and the Jackson County Sheriff in his
     Official Capacity.

II.  Whether Plaintiff is Entitled to Summary Judgment on her Federal Claims
     Against Individual Defendants Hounshel, Lahrman, Robinson, Teipen, Ridlen,
     and Ahmed.

III. Whether Plaintiff is Entitled to Summary Judgment on her State Wrongful Death
     Claims.

## I. INTRODUCTION

On April 11, 2006 an unassuming prisoner in the Jackson County Jail named William Wallace succumbed to his third heart attack in less than 20 days.  In the last seventeen (17) days of his life, William Wallace never saw the inside of an emergency room.  William Wallace never saw a doctor.  A nurse never examined William Wallace.  Despite suffering through two (2) heart attacks and pleading for help, William Wallace received only indifference in his final days at Jackson County Jail.

For Jackson County in 2005, jailing was big business. Housing out-of-county & Department of Correction inmates, Jackson County Jail turned an annual profit to the tune of $500,000.  However, medical costs for the inmates continued to substantially exceed the county council appropriations. To correct this cost concern, Sheriff Jerry Hounshel and Jail Commander Marc Lahrman decided to replace the inmates' current local medical care with a more cost-effective solution.

The answer to Hounshel and Lahrman's medical care cost concerns appeared in the form of Advanced Correctional Healthcare, Inc. (ACH). With a $3,000,000 insurance policy, a binder of 84 listed medical protocols that promised to turn jail officers into nurses, and a timeshare doctor, ACH cut the current costs in half, saving Jackson County Jail around $100,000.  To implement its cost cutting scheme, ACH employed Dr. Faisal Ahmed.  ACH and Dr. Ahmed were to provide a doctor-by-phone service, 24-hours a day. Dr. Faisal Ahmed would also "ride circuit," visiting over 20 jails across three (3) states to provide a couple hours of direct medical service once a week.  Jail Nurse, Melissa "Missy" Robinson, would screen the inmates that needed to see Dr. Ahmed, assuming they could pay the $15 co-pay from their commissary. Getting on Nurse Robinson's list, however, was a daunting task.

On the night of March 25, 2006, William Wallace found himself at the mercy of the ACH system.  Wallace, sweating profusely and clutching his chest in pain, desperately needed a doctor.  What Wallace got was a young, untrained Jail Officer thrust into the ill-fitting shoes of a medical professional.  Josh Teipen, using the ACH system, feebly tried to diagnose Wallace's medical condition with the guidance of only a single page of questions.  Despite Wallace's obvious suffering, Teipen simply jotted down Wallace's answers and then left the sheet in Nurse Robinson's folder.  Teipen never gave Wallace a second thought.  Nurse Robinson claims she never even saw the filled out protocol sheet.  No doctor was called.

Miraculously, Wallace survived through the night.  Listless and disengaged, Wallace received no further treatment over the next eight days. Teipen and Nurse Robinson conducted no follow-up.

Early in the morning of April 2, 2006, Wallace suffered another devastating coronary episode.  Pale, sweating, and gasping for air Wallace again pleaded for some form of medical care.  Presenting himself to Sergeant David Ridlen, Wallace had an astonishing blood pressure of 236/165.  Ridlen, following the ACH protocol, phoned Dr. Ahmed, waking him up. Dr. Ahmed cut Ridlen off halfway through his description of Wallace's symptoms, prescribed Wallace some blood pressure medication, and then went back to bed.  Ridlen, unsure even as to the medications Dr. Ahmed prescribed, called Nurse Robinson to verify.  Nurse Robinson simply clarified the name of the medications and then went back to sleep.  Wallace was again left without any effective medical care. Nine days later, without once having ever seen a doctor, William Wallace died.

William Wallace's estate and the mother he left behind, now seek justice for the complete and unconstitutional disregard for Wallace's inevitably fatal coronary episodes.  Sheriff

Hounshel and Jail Commander Marc Lahrman acted with willful indifference to the health of the inmates of Jackson County Jail in adopting a system of medical care based entirely on cutting costs, with the logical and foreseeable consequence of the death of an inmate.  The Sheriff, Jail Commander, and Advanced Correctional Healthcare (ACH) further failed to properly train the Jail Officers and staff on the proper handling of the ACH protocols. Advanced Correctional Healthcare acted with callous indifference to the health and lives of inmates, by designing and implementing a system with the overriding purpose of saving money. Dr. Faisal Ahmed adopted an unresponsive and unconstitutional approach to medical care by attempting to service over 20 jails across three (3) states every week, conducting no follow-up care, and ignoring the severity of William Wallace's presented condition.  Nurse Robinson acted without any concern for inmate health by failing to conduct follow-up care and by failing to appropriately send Wallace to the hospital.  Jail Officer Teipen failed to provide even a scintilla of medical care to an obviously suffering inmate.  Sergeant Ridlen also failed to properly inform Dr. Ahmed of the severity of the situation and simply passed the buck on what he could plainly see was an inmate in severe cardiac distress.  Each of these Defendants independently violated Wallace's rights secured under the United States Constitution and state law.  Each of these Defendants played a role in a system of health care that's only concern was saving money.

Plaintiffs now bring this motion for summary judgment with the hope that justice can be wrought.  The breadth of discovery completed in this case has clearly and undeniably shown that Defendants' conduct has fallen well below constitutional standards.  The motion for summary judgment must be granted.

## II. STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.  Jackson County Jail.

The new Jackson County jail became operational in July of 2000. (Deposition of Marc Alan Lahrman, p.34) The new Jackson County jail has a holding capacity above that needed to serve Jackson County inmates. (Deposition of Jerry Wayne Hounshel, p.42-43) Jackson County was able to generate approximately $500,000 annually by using the excess holding capacity of the Jackson County jail to house out-of-county and Department of Correction inmates. (Hounshel, p. 42-43) On an average day, the headcount of Jackson County jail was about 170 inmates. (Lahrman, p.35)

Sheriff Hounshel oversaw the adoption of the jail policies and procedures sometime in the year 2000.  (Lahrman, p.34; *and* Hounshel, p.43-44) In 2005-2006, Jail Commander Lahrman supervised the 20 jail officers, the part-time jail officers, the office manager, and Nurse Robinson. (Lahrman, p.36) Officer Lahrman reported directly to Sheriff Hounshel. (Lahrman, p.36) Sheriff Hounshel also assisted in supervising Nurse Robinson. (Lahrman, p.37-38)

Jail nurse Robinson was the first and only jail nurse that Jackson County jail has had. (Lahrman, p.37) Sheriff Hounshel hired by Nurse Robinson shortly after he took office in 1999. (Hounshel, p.65) Nurse Robinson was repeatedly late for work and not in appropriate attire. (Hounshel, p.66; Lahrman, p.52; Plaintiff's Designation of Evidence #29, Nurse Robinson: Filed Complaints/Reprimands) Nurse Robinson never provided a specific reason for her repeated tardiness to Jail Commander Lahrman. (Lahrman, p.52, lines 11-16) Nurse Robinson was never tested for drugs by the county or the department. (Lahrman, p.46) Officer Lahrman stated that one of Nurse Robinson's repeated problems was that she was usually working in the book-in area instead of doing her nursing duties. (Lahrman, p.49, lines 7-11)

Former jail officer, Tina Benton commented that Nurse Robinson was "burnt-out" and had a "who cares attitude." (Deposition of Tina Jean Benton, p.53) After some time at the jail, Nurse Robinson stopped communicating with the inmates about their medical problems and just began to mechanically hand out medications. (Benton, p.56) Officer Benton also observed Nurse Robinson callously skipping dispensing inmates' medications when they did not line up for her promptly. (Benton, p. 54-56)

Both Officer Lahrman and Sheriff Hounshel had threatened Nurse Robinson with termination on at least two (2) separate occasions. (Hounshel, p.66) Nurse Robinson was put on probation on multiple occasions and suspended without pay for the working days of June 4th, 7th, and 8th, 2004. (Lahrman, p.48-52; Reprimands) However, neither Sheriff Hounshel nor Officer Lahrman ever followed through on their threats to terminate Nurse Robinson, despite repeated disciplinary incidents. (Hounshel, p.66-67; Lahrman, p.43-44) Sheriff Hounshel could not recall why he did not fire Nurse Robinson. (Hounshel, p.66) Officer Lahrman stated that it was at the sheriff's discretion to terminate Nurse Robinson. (Lahrman, p.52)

The layout of the jail included several control areas (Deposition of Douglas Richard Howard, p.19), a book-in area (Lahrman, p.81), front holding cells (Benton, p.21-22), and a medical area that was adjacent to the book-in area (Deposition of David D. Ridlen, p.18, lines 2-3). Each inmate has a book-in file and, potentially, a medical file. (Lahrman, p.86-87) Hard copies of the inmates' medical histories, generated during the book-in process, were housed in the medical area. (Lahrman, p. 86-87,) The inmates' medical packets are then supposed to be further supplemented by completed medical protocols, doctor's sheets, or logs generated from additional inmate medical issues that may arise while in the jail. (Lahrman, p.87-88) Jail officers type jail log entries into the computer when there is a medical event with an inmate. (Howard,

5

p.14-15; *see e.g.* Plaintiff's Designation of Evidence #50) Jail officers also create typed jail logs for medical appointments with the doctor. (Lahrman, p.116; *see e.g.* Plaintiff's Designation of Evidence #51). An inmate's medical history and related jail logs could easily be accessed on the computer in the book-in area. (Ridlen, p.40) After ACH was hired, the medical protocol sheets were also kept in the book-in area. (Deposition of Christopher Everhart, p. 15-16; Ridlen, p. 41)

The inmates were housed in "pods" that were "basically big rooms," similar to dorms. (Deposition of Eric Wills, p.21) The pods were capable of holding about 32 people. (Wills, p.21) Within the pods there were cells or cubes that contained eight (8) bunks. (Wills, p.21) From the pods it was a straight shot to the book-in area. (Wills, p.33) The pods were connected to the book-in area through a series of sliding doors. (Everhart, p.42-43) The pods were on two (2) separate sides and lettered A, B, and C for one side and F, E, and D for the other side. (Deposition of Adam William Brooks, p.28, lines 12-14) Inside the pod there is an intercom button next to the door that the inmates can use to contact the control areas if there is a problem. (Benton, p. 24)

**B.  Enacting Jackson County Jail's Cost Cutting Policies.**

Sheriff Hounshel was initially introduced to Advanced Correctional Healthcare (ACH) at a sheriff's seminar sometime in 2005. (Hounshel, p. 34) Prior to hiring ACH, Jackson County Jail received 8-hour daytime medical care from Dr. Raphael Carter, a local physician from Brownstown. (Hounshel, p.31-32; *and* Lahrman, p. 31) In the event of a nighttime emergency, the inmate would be transported to the emergency room at Memorial Hospital in Seymour. (Hounshel, p. 33 & 36) If an inmate had a medical request they would fill out a medical request form and turn it into a jail officer who would in turn forward it to Nurse Robinson. (Lahrman,

p.54-55) Nurse Robinson would then determine if the inmate needed to see the doctor.
(Lahrman, p.55-56)

Prior to hiring ACH, Jackson County Jail often exceeded the $140,000 medical budget
that had been approved by the county council. (Hounshel, p.35-36) Sheriff Hounshel frequently
had to request supplemental appropriations to cover medical costs that were in excess of
$200,000. (Hounshel, p. 35-36)

Advanced Correctional Healthcare's sales pitch was that they would be able to control
costs while providing 24-hour medical service. (Lahrman, p.38-39) ACH promised to make the
medical costs incurred by the jail steady so that they would be more predictable. (Lahrman, p.38)
The 24-hour medical service consisted of a doctor that would visit the jail site once a week and
the ability to reach a doctor by phone 24 hours a day. (Lahrman, p.39)

Sheriff Hounshel sent out about 12 surveys to jails in the surrounding area to determine
what their experience with ACH had been. (Hounshel, p.40-41) Sheriff Hounshel was unable to
recall how many jails had responded to the survey. (Hounshel, p.41) Sheriff Hounshel did not
prepare the survey and he was unsure who had created it. (Hounshel, p.42) The list of jails that
the survey was sent to was provided by ACH. (Hounshel, p.40)

Sheriff Hounshel never consulted with any other medical provider to see if a
comparable on-call service could be provided. (Hounshel, p.33) Sheriff Hounshel also never
talked to any other medical groups. (Hounshel, p.34) Sheriff Hounshel never compared ACH's
offered services or prices with that provided by any other medical provider. (Hounshel, p.35,
lines 5-6) No background check was conducted on ACH, beyond the surveys. (Hounshel, p.54)

Sheriff Hounshel stated that the objective of switching to ACH was to improve inmate
health and to save money. (Hounshel, p.37-38; *and* p.46, lines 5-10) Sheriff Hounshel touted that

the biggest improvement to inmate health would be the addition of 24-hour phone service. (Hounshel, p.38) However, Sheriff Hounshel never looked into where those phone calls went. (Hounshel, p.39) Sheriff Hounshel did not realize that Dr. Faisal Ahmed, the doctor assigned to service Jackson County jail, worked from his car. (Hounshel, p.40) Sheriff Hounshel also did not know how many jails that Dr. Ahmed saw in addition to Jackson County jail. (Hounshel, p.55, lines 2-5)

Sheriff Hounshel negotiated the contract with ACH. (Lahrman, p.39) Sheriff Hounshel, Officer Lahrman, Nurse Robinson, and three (3) county commissioners participated in at least two (2), public meetings on deciding to hire ACH. (Hounshel, p.44-45) Dr. Johnson stated that it was "virtually all financial information" that was given to ACH to determine if they could assist Jackson County Jail. (Johnson, p.125-126) The financial information referred to by Dr. Johnson was a questionnaire that had been filled out by Sheriff Hounshel. (Plaintiff's Designation of Evidence #45, Completed Jackson County Jail Questionnaire)[1] The questionnaire completed under Sheriff Hounshel's direction only included financial information regarding Jackson County Jail's medical budget and current healthcare usage. (Questionnaire) The contract offered by ACH was then priced to be slightly under Jackson County jail's available medical budget. (Plaintiff's Designation of Evidence #41, Agreement for the Provision of Inmate Health Service at the Jackson County Jail, Attached Cost Proposal, (the contracted price was $131,994 with a capped yearly increase of 7% or $9,239.58); *compare* Hounshel, p.35-36 (stating that Jackson County Jail's medical budget was $140,000 annually)) The contract to hire ACH was signed by Sheriff Hounshel and the Jackson County commissioners on December 20, 2005. (Deposition of Norman R. Johnson, M.D., p. 128; Agreement, p.10) The contract was then signed and accepted

---

[1] The Questionnaire was provided in response to a supplemental request given during Johnson's deposition, p.126-128.

by Dr. Norman Johnson, the founder and president of Advanced Correctional Healthcare, on December 28, 2005. (Johnson, p.45-46, 52, 128; Agreement, p.10) Dr. Johnson was deposed on March 20, 2008 and was designated under Federal Rule of Civil Procedure 30(b)(6) by Defendant's Counsel for ACH as the designated corporate representative for ACH.  Also, Dr. Johnson was designated as an expert witness (which status is being challenged, *see* Dockets #87-88).  Dr. Johnson appeared totally unfamiliar with the requirements for expert witness designation.

Once ACH was hired, one of the first decisions made by Dr. Johnson was to reduce or remove a substantial number of the inmates' prescription medications. (Johnson, p.208-209) Dr. Johnson decided to reduce the inmates' "unnecessary narcotics" on December 27, 2005. (Johnson, p.209-210) Dr. Johnson did not consult with the inmates' personal physician or the physician previously used by Jackson County Jail. (Johnson, p.209-210) Dr. Johnson did not talk with each of the inmates before deciding to reduce their medication, and could not recall if he had talked to any of them without reviewing his records. (Johnson, p.211) No records have since been provided.[2]

Additionally, a Strategic Plan[3] was drafted by Dr. Johnson to force Jackson County to reduce medical costs by transferring many expenses directly to the inmate. (Plaintiff's Designation of Evidence #44, Jackson County Indiana Strategic Plan, p.4-5) The Strategic Plan emphasized continuing to follow the inmate co-pay requirement for sick calls made by either the nurse or a jail officer.  (Strategic Plan, p.4-5) The strategic plan also contained a cost containment program that advocated against sending inmates off-site. (Strategic Plan, p.4) The

---

[2] Defendants' counsel has not provided any records of inmate consultations in response to supplemental requests for production.
[3] Defendant ACH's counsel did not initially produce the Strategic Plan. The Strategic Plan was finally discovered after the entire file was requested.

strategic plan also required inmates to buy Tylenol directly from the commissary so as to increase cash flow to the commissary. (Strategic Plan, p.5; *and* Strategic Plan, Attachment #2) Interestingly enough, Tylenol was the most common prescription given by ACH's doctor, Dr. Ahmed. (Benton, p.46-47, 70, lines 8-16) Dr. Ahmed prescribed Tylenol so frequently that he eventually became known by the nickname, "the Tylenol doctor." (Benton, p.70, lines 8-16)

ACH then introduced 84 medical protocols[4] that were to be used by the jail staff before calling the doctor. (Plaintiff's Designation of Evidence #30, 2005 Jackson County Jail Medical Protocols; Johnson, p.156) The protocols were often times no more than a single sheet of questions that the jail officer was supposed to ask an inmate that was suffering from a health problem. (Protocols; Lahrman, p.56-57) The jail officer was then supposed to follow the treatment that was dictated by the protocol sheet. (Lahrman, p.56-57) Jail Commander Lahrman understood that these protocols were to be a replacement for the medical request forms that the jail previously used. (Lahrman, p.55-58) However, at the time of Wallace's death it was not clear to the jail officers whether a medical request form was still to be used or not. (Lahrman, p.57-58 (stating that the protocols were to be used instead of the medical request forms); *compare* Ridlen, p.48; *and* Clark, p.27-28; *and* Benton, p.36-38)

The protocols were authored by what Dr. Johnson called the "Physician Advisory Committee." (Johnson, p.112) The Physician Advisory Committee consisted of Dr. Johnson and other physicians working for ACH. (Johnson, p.112-113) Dr. Johnson never provided a list of the other physicians that assisted him in creating the medical protocols. (Plaintiff's Designation of Evidence #58, Attorney Letter 4/07/08) To familiarize a trained physician with the protocols, Dr. Johnson would spend "a number of hours." (Johnson, p. 113-114) However, ACH's training

---

[4] Hereinafter also referred to as "protocols."

10

presentation to the jail staff took only two hours. (Johnson, p.154) During the presentation, Dr. Johnson, in passing, talked about the protocols, but did not cover them in-depth. (Johnson, p.155-156; Plaintiff's Designation of Evidence #40, Dr. Johnson's Presentation Materials, December 27, 2005)  His lecture materials contained no specific references to the protocols, but instead emphasized reducing the risk of a lawsuit and how to reduce health care costs in the jail. (*See*, *generally* Presentation Materials) Dr. Johnson's presentation brazenly advocated that the best approach for the jail to adopt was to "Take No Medical Responsibility." (*See* Presentation Materials)

Jail officers working the night shift were not present for the ACH presentation and received no training on how to use the medical protocols. (Benton, p.18-19; *and* Teipen, p.14-15) Dr. Johnson testified that he assumed Nurse Robinson would conduct follow-up training with the rest of the jail staff. (Johnson, p.156) Jackson County Jail's contract with ACH did not specifically state or require that the jail nurse provide follow-up training. (Johnson, p.156, lines 11-14; *also, generally* Agreement) According to a letter from ACH's regional manager to Sheriff Hounshel, dated June 9, 2006, Jackson County Jail's policies and procedures had still not been completed to reflect the exact medical operations of the facility. (Plaintiff's Designation of Evidence #42, ACH Correspondence with Sheriff Hounshel, June 9, 2006) There is also no record of any jail officer receiving any training on the protocols beyond what was contained in Dr. Johnson's presentation on December 27, 2005, prior to Wallace's death. (Johnson, p.161-164; Plaintiff's Designation of Evidence #59, Email from Counsel for Sheriff Hounshel, *et. al.*, confirming that no training records existed for January of 2006)[5]

---

[5] Plaintiffs' counsel specifically requested from all Defendants any written documentation that provided evidence that the jail officers received formal training in the protocols from either ACH or Nurse Robinson. Defendants ACH and Dr. Ahmed have not provided any additional information. Counsel for

ACH assigned Dr. Faisal Ahmed to Jackson County jail January 1, 2006. (Plaintiff's Designation of Evidence #55, Advanced Correctional Healthcare Staffing & Salary Schedule, re: Dr. Faisal Ahmed, signed 2/24/06) During 2006, Dr. Ahmed serviced up to 20 different jails, across three (3) states, each week. (Staffing & Salary Schedule; Ahmed, p.79; Johnson, p.81-84) Dr. Ahmed never saw ACH's contract with Jackson County, nor did he examine the specific contracts of the other counties he served. (Ahmed, p.83) Dr. Ahmed was also not familiar with the Indiana Jail Standards, but did look at them "a year and a half ago" in preparation for a jail inspector's visit. (Ahmed, p.100-101)

During his deposition, Dr. Ahmed was still not certain if Jackson County Jail had adopted ACH's protocols. (Ahmed, p.96-97) Dr. Ahmed maintained that the protocols were not "rigid guidelines" and that he "deviate[d] from the protocols all the time." (Ahmed, p.96) When asked when was the last time Dr. Ahmed looked at the Jackson County Jail Protocols he responded: "Okay, last time for Jackson County, well here's the problem with your question. I go there infrequently, off and on as it is. Last time I was there I would have looked at the protocol book." (Ahmed, p.88)

Dr. Ahmed was initially hired by ACH as an independent contractor. (Johnson, p.79-80, Plaintiff's Designation of Evidence #54; Advanced Correctional Healthcare Work for Hire Agreement, signed 10/17/05 re: Dr. Faisal Ahmed) However, according to Dr. Ahmed's complete personnel file, provided by Dr. Johnson at the beginning of his deposition, Dr. Ahmed became a regular employee two (2) weeks later. (*Compare* Designation of Evidence #54, signed 10/17/05 with Plaintiff's Designation of Evidence #60, Advanced Correctional Healthcare Employment Agreement, signed 11/02/05, re: Dr. Faisal Ahmed) During Dr. Johnson's

---

Jackson County Jail, Stacey Harris, confirmed that there was no record of any formal training in January 2006.

deposition, he was unable to give a clear answer as to what Dr. Ahmed's employment status was at the time of Wallace's death. (Johnson, p.55-56 & p.81-83)

Under his contract with ACH, Dr. Ahmed had the authority to increase or decrease the number of jails that he visited. (Ahmed, p.79; Johnson, p.88-91)  Dr. Ahmed was responsible for conducting sick calls at the jails and to be available for questions from nurses or correctional officers. (Ahmed, p.75)  Dr. Ahmed also stated that he provided informal training of the jail staff. (Ahmed, p.80-81)  Dr. Ahmed defined informal training as: "if they have questions, they ask and I tell them what is the best way of resolving the problem." (Ahmed, p.81)

Originally, Defendants Dr. Ahmed and ACH produced a handwritten submission that indicated that Dr. Ahmed visited the jail every week (Plaintiff's Designation of Evidence #56, Hand-written note purporting to demonstrate Dr. Ahmed's schedule of visits to Jackson County Jail produced by ACH's Accounting/Human Resources Department).  However, Dr. Ahmed had the practice of calling Nurse Robinson in advance of a visit and inquiring whether he needed to visit the jail that week or not. (Robinson, p.56) Dr. Ahmed said: "I don't make the sick call list. The nurse determines who gets to be seen.  She maintains the sick call list, she puts the inmate on sick call, she knows when a doctor is going to be there." (Ahmed, p.92) Dr. Ahmed did not visit every week. (Robinson, p.56; *also see* Ahmed, p.88, lines 20-23)

Dr. Ahmed was paid the same whether or not he visited the jails that he serviced. (Johnson, p.83-84) During Dr. Ahmed's deposition, he was unsure if he had visited Jackson County Jail on April 6, 2006 or April 13, 2006. (Ahmed, p.112-115) There is no jail sign-in sheet that corroborates Dr. Ahmed's weekly visits. (Lahrman, p.115-116; Robinson, p.56-57) According to Jackson County Jail inmate medical appointment logs, Dr. Ahmed visited the jail on: March 9, April 13, and April 20. (Plaintiff's Designation of Evidence #51, Jackson County

Jail Inmate Medical Appointment Logs, March–April) According to the Jackson County inmate

medical event logs, Dr. Ahmed also visited on March 23, 2006 and April 6, 2006. (Plaintiff's

Designation of Evidence #52, Jackson County Jail Inmate Medical Event Logs) Defendants

ACH and Dr. Ahmed's original, handwritten submission from ACH's accounting department

(Johnson, p.85-88) placed Dr. Ahmed at the jail on March 2, March 9, March 16, March 23,

March 30, April 6, April 13. (Handwritten Note)

Dr. Ahmed did not have a physical office outside of the jail. (Ahmed, p.75) Dr. Ahmed

answered health questions from the jail via his company assigned cell phone. (Ahmed, p.75-76)

Unlike Jackson County jail's previous medical provider, Dr. Ahmed was unable to receive faxed

inmate medical information. (Ahmed, p.156, lines 19-21) Dr. Ahmed did not keep any record of

the phone calls that he received. (Ahmed, p. 110, 153, lines 10-15)

### C. **William Wallace is Booked into Jackson County Jail**.

William Wallace booked into the newly constructed Jackson County Jail in February of

2006. (Howard, p.9; Plaintiff's Designation of Evidence #23, Jackson County Jail File—William

Wallace) Officer Howard was working the book-in area when Wallace was booked in. (Howard,

p.9) During the book-in process, the officer is prompted by their computer to ask the inmate

specific questions. (Howard, p.9) When prompted by the book-in screen, the jail officer working

the computer would input the inmate's medical history. (Howard, p.9) Wallace informed the

officer that he had first stage diabetes and had undergone back surgery some years ago.

(Lahrman, p.85-86) Wallace was housed in F-pod during his stay at Jackson County Jail.

(Howard, p.11)

During Wallace's tenure at Jackson County Jail he was generally well liked by the jail

officers. (Howard, p.14; *see also* Ridlen, p.13, lines 12-18; *and* Everhart, p.24-25; *and*

Deposition of Joshua E. Clark, p.13-14) Sheriff Hounshel described Wallace as a "model prisoner." (Deposition of Cecelia Wallace, p.49) Wallace did, on occasion, vent to some of the officers about being incarcerated. (Everhart, p.42) Wallace also complained to his nephew, inmate Eric Wills, about Nurse Robinson not doing her job properly. (Wills, p. 30) Wills recalled Wallace complaining that Nurse Robinson was lazy and that it would take forever to get a hold of her. (Wills, p.30)

### D.  March 25, 2006—Wallace's First Coronary Attack.

In the early morning of March 25, 2006, around 3:00 a.m., severe chest pain woke inmate William Wallace. Wallace used the telecom in F-pod to contact the jail officers in the control pod to tell someone that he thought he was having a heart attack. (Benton, p. 23-24) Officer Benton was at control pod 2, getting ready to leave, when she heard over the telecom that Wallace might be having a heart attack. (Benton, p.23-25) Officer Benton left her control pod and escorted Wallace from F-pod to the book-in area (Benton, p.25-26). Wallace told Officer Benton that his chest and the top part of his arm were hurting him (Benton, p.25, lines 17-19). Officer Benton asked if he had done anything to aggravate his chest or arms.  Officer Benton alleged Wallace said he had done 2,250 push-ups. (Benton, p.25, lines 20-23) No jail officer had ever seen Wallace doing any calisthenics or push-ups. (Brooks, p.16; *see also* Howard, p.14; *and* Clark, p.15; *and* Wills, p.64, lines 6-10) Officer Benton also never saw Wallace doing any push-ups during her shift. (Benton, p.33, lines 13-14**)**

Since Officer Benton's shift had been completed, she left Wallace at the book-in area with Sergeant Christopher Everhart and Jail Officer Joshua Lee Teipen so that she could complete her log for the night. (Benton, p.26, lines 3-10) Officer Teipen met Wallace at the door when he entered the book-in area (Deposition of Officer Joshua Lee Teipen, p.20, line 12).

Officer Teipen asked Wallace what was wrong and Wallace informed him that he was having chest pains. (Teipen, p.21)

Officer Teipen then retrieved the "medical standard operating procedure on chest pain." (Teipen, p. 21, lines 11-12)  Officer Teipen reviewed the index for the protocol on Chest Pain— Cardiac and began asking William Wallace the listed questions. (Teipen, p. 21-22) Officer Teipen had never received any training on how to use the protocol sheet. (Teipen, p.22, lines 6-8) According to the answers Officer Teipen wrote down, William Wallace was suffering from pressure in his chest, was short of breath, pale, and had a blood pressure of 177/119 (Plaintiff's Designation of Evidence #31). Despite having CPR and emergency medical dispatching certifications (Teipen, p.10, line 22), Officer Teipen claimed not to have any understanding of what a normal blood pressure range would be (Teipen, p.24, lines 14-19).

In spite of the protocol's bold warning that, "**This may be an Emergency Situation— Call Physician Immediately** (Plaintiff's Designation of Evidence #31)," Officer Teipen did not call a physician (Teipen, p.23, lines 2-3).  Officer Teipen believed that "the sheet advised [him] to not call the doctor." (Teipen, p.22, line 17-18)  Officer Teipen also did not call or talk to Nurse Robinson about the incident. (Teipen, p.23, lines 17-25) When asked during his deposition, Officer Teipen stated that he did not provide Wallace with any ice or Tylenol to address his chest pain. (Teipen, p.28, 32-33)  After writing down the answers to the questions listed on the medical protocol, Officer Teipen states that he "made two copies, one copy went into inmate Wallace's folder and the other into the nurse's box." (Teipen, p. 23, lines 9-13). Officer Teipen then escorted William Wallace back to F-pod. (Teipen, p. 26, lines 11-12) Officer Teipen states that he then returned to the booking area and completed a jail log of the event (Teipen, p.25, lines 9-17).  However, Officer Teipen's jail log failed to mention Wallace's

abnormally high blood pressure or the fact that he was pale and short of breath. (Teipen, p.26-27; Plaintiff's Designation of Evidence #47, Officer Teipen's Inmate Medical Event Jail Log for March 25, 2006)

Nurse Robinson maintains that she never received the completed March 25 protocol (Robinson, p.51, lines 14-21).  Nurse Robinson stated that the jail officers often placed the completed protocol sheets in the wrong folders. (Robinson, p.51-52) Neither Nurse Robinson, nor Officer Teipen, conducted any follow-up care of William Wallace. (Robinson, p. 28-29; Teipen, p.23) Officer Teipen took no additional steps to insure that Nurse Robinson received the completed medical protocol. (Teipen, p.23, lines 14-25)

Plaintiff's expert, Dr. John Christopher Bailey, reviewed the information that had been recorded by Officer Teipen on the morning of March 25, 2006. (Deposition of Doctor John Christopher Bailey, p. 27-28) In his deposition, Dr. Bailey describes Wallace's condition on March 25 as "a textbook quality presentation for acute…coronary syndrome." (Bailey, p.38-39) "Acute coronary syndrome refers to a couple of presentations of acute myocardial infarction and or impending acute myocardial infarction." (Bailey, p.39, lines 10-13) Specifically, Dr. Bailey concluded that the presentation of Wallace to Officer Teipen was entirely consistent with an acute myocardial infarction. (Bailey, p. 41, lines 16-18) An acute myocardial infarction is "an acute event characterized clinically by a syndrome of chest pain and ECG changes and blood work changes, enzyme changes…[and] pathologically characterized by a total occlusion of a culprit blood vessel to the heart." (Bailey, p.40, lines 17-21)  Dr. Bailey notes that the blood pressure recorded by Officer Teipen was severely high. (Bailey, p.118, lines 12-16) Dr. Bailey also noted that it is entirely possible that Wallace suffered a heart attack and was able to survive despite receiving no aid (Bailey, p.122-123). Dr. Bailey noted that the "guy may feel like he had

17

been run over by a mule" after the event. (Bailey, p.122, lines 24-25)  Inmate Eric Wills, William

Wallace's nephew, noticed that after Wallace's first episode of chest pains he appeared "wore-

out" and "went to bed a lot more." (Wills, p.42-43)

The following afternoon, Wallace spoke with Jail Officer Clark about the previous

night's chest pains. (Clark, p.15-17) Wallace told Officer Clark that he wanted to go to the

emergency room. (Clark, p.16, line 20) Officer Clark incorrectly explained to Wallace that he

had to be seen by the jail doctor before he would be allowed to go to the emergency room.

(Clark, p.16, line 23-25) Officer Clark then radioed Jail Commander Marc Lahrman and Nurse

Robinson that William Wallace had asked to see the doctor when he visited the jail. (Clark, p.18,

line 15-18)  When Officer Clark returned to the control area he then spoke with Officer Lahrman

and Nurse Robinson on the radio, discussing his previous conversation with Wallace. (Clark,

p.20, line 11-15) During his second conversation with Officer Lahrman, Officer Clark stated that

Wallace "didn't want to see the doctor that we have here." (Clark, p.20, line 14-15).  Officer

Clark created a log of Wallace's alleged statement, but did not include Wallace's request to

immediately go to the emergency room. (Plaintiff's Designation of Evidence #48, Officer

Clark's Inmate Medical Event Jail Log for March 25, 2006; Clark, p.16, line 20)

Officer Clark took no vital signs or conducted any formal examination of Wallace.

(Clark, p.20, line 19-20) Nurse Robinson contradicted Officer Clark's recollection, stating that

she was unaware of any medical events concerning Wallace prior to the phone call she received

on the night of April 2, 2006. (Robinson, p. 29-30, 51-52) Officer Lahrman does not specifically

recall being contacted by Officer Clark, but concluded that the log was probably accurate and

assumed Nurse Robinson would have known about Wallace's condition on the night before.

(Lahrman, p.102-104)

E. **April 2, 2006—Wallace's Second Coronary Attack**.

At approximately 4:00 am in the morning of April 2, 2006, severe chest pains once again awakened William Wallace. (Plaintiff's Designation of Evidence #49, Officer Ridlen's Inmate Medical Event Jail Log for April 2, 2006; Plaintiff's Designation of Evidence #27, Taped Statement Transcript between Dr. Ahmed & Srgt. Ridlen) Jailer Blake Everhart contacted Sergeant David Ridlen and told him that Wallace was suffering from chest pains. (Ridlen, p.16-17) Sergeant Ridlen was in the book-in area at the time he was contacted. (Ridlen, 16-17) Sergeant Ridlen had the officer in the control room let Wallace into the sliding doors and then Sergeant Ridlen met Wallace in the book-in area. (Ridlen, p.16-17) Sergeant Ridlen then brought Wallace to the medical room that is just off the book-in area, so he could take his vital signs. (Ridlen p.17-18)

Sergeant Ridlen then began asking Wallace the various questions that were in the Advanced Correctional Healthcare protocol. (Ridlen, p.18, lines 18-20) Sergeant Ridlen recalled Wallace being red in the face and holding his hand up to his chest. (Ridlen, p.18, lines 6-9) Sergeant Ridlen wrote down that Wallace was pale, short of breath, and suffering from crushing chest pain that was radiating throughout his chest. (Plaintiff's Designation of Evidence #32, Jackson County Jail Completed Medical Protocol used on April 2, 2006 for William Wallace) Sergeant Ridlen then took Wallace's blood pressure and recorded an astounding 236/165, with a pulse of 100. (4/2/06 Protocol) Going by the Chest Pain—Cardiac protocol provided by Advanced Correctional Healthcare, Sergeant Ridlen then called the jail physician, Dr. Faisal Ahmed. (Ridlen, p.22-23; 4/2/06 Protocol)

Dr. Ahmed received Sergeant Ridlen's phone call at approximately 4:00 am. (4/2/06 Protocol) Sergeant Ridlen began by stating that he had another inmate who had been woken up

by chest pains. (Ridlen–Ahmed Transcript) Sergeant Ridlen then informed Dr. Ahmed of

Wallace's abnormally high blood pressure and pulse. (Ridlen–Ahmed Transcript) Dr. Ahmed

interrupted Sergeant Ridlen before he could finish disclosing Wallace's additional symptoms.

(Ridlen, p.24, lines 7-15) This was not the first time that Sergeant Ridlen had trouble

communicating with Dr. Ahmed. (Ridlen, p.28-29) Other members of the jail staff also had

previous experiences with Dr. Ahmed cutting them off. (Robinson, p.46; Everhart, p.19-20;

Ridlen, p.49, lines 17-19)

Earlier that evening Sergeant Ridlen had been forced to call Dr. Ahmed back to finish

disclosing the symptoms of another inmate, Paul Morgan, who was also suffering from severe

chest pains. (Ridlen, p.32-33) Dr. Ahmed had initially prescribed Tylenol when Sergeant Ridlen

had called earlier that evening for inmate Paul Morgan's severe chest pains. (Ridlen, p.32-33)  It

was only when Sergeant Ridlen called Dr. Ahmed again and informed him that Mr. Morgan also

had a blood pressure of 188/122 that Dr. Ahmed finally sent Mr. Morgan to the hospital. (Ridlen,

p.32-33; *and* Plaintiff's Designation of Evidence #28, Taped Statement Transcript between

Nurse Robinson & Srgt. Ridlen) In spite of his previous difficulties communicating with Dr.

Ahmed, Sergeant Ridlen did not call Dr. Ahmed back to disclose Wallace's additional

symptoms. (Ridlen, p.33)

Dr. Ahmed told Sergeant Ridlen to give Wallace the blood pressure medications of

Lisinopril and HCTZ. (Ridlen-Ahmed Transcript) Sergeant Ridlen recalled having trouble

making out exactly what medication Dr. Ahmed was referring to because he gave him the 4-

letter acronym and not the full name of the prescription. (Ridlen, p.23-24) When later questioned

during his deposition about his prescription, Dr. Ahmed stated that he did not believe that the

blood pressure taken by Sergeant Ridlen was accurate. (Ahmed, p.128) Dr. Ahmed never

instructed Sergeant Ridlen to retake Wallace's blood pressure. (Ridlen-Ahmed Transcript)

When presented with Wallace's full symptoms during his deposition, Dr. Ahmed stated

that, as a trained physician, the "Individual can be having a heart attack." (Ahmed, p.130) Dr.

Ahmed also stated: "Let me make it easy for you. If I was to be contacted by an officer who says

he's got an offender who has got crushing chest pain, who is short of breath with pain radiating,

high blood pressure, high pulse rate, appears pale, short of breath and is diaphoretic, I would

send him to the emergency room.  Is that the answer you are looking for?"

After Sergeant Ridlen got off of the phone with Dr. Ahmed, he called Nurse Robinson to

clarify the prescription that Dr. Ahmed had given him. (Ridlen, p.24) Nurse Robinson spelled out

the name of proper blood pressure medication for Sergeant Ridlen and told him it was ok to take

some of another inmate's pills, if there were not enough in the medical cart, and give Wallace

those. (Robinson, p.31-32; *and* Ridlen-Robinson Transcript)

Sergeant Ridlen then briefly discussed with Nurse Robinson the previous inmate that he

had sent to the emergency room. (Ridlen, p.31-32; *and* Ridlen-Robinson Transcript) Sergeant

Ridlen told Nurse Robinson that the inmate, Paul Morgan, had a blood pressure of 188/122, to

which Nurse Robinson exclaimed, "Wow." (Ridlen-Robinson Transcript)  Despite Nurse

Robinson's surprised reaction to Mr. Morgan's high blood pressure, Sergeant Ridlen did not

inform her of Wallace's significantly higher blood pressure of 236/165. (Ridlen, p.33-34; *and*

Ridlen-Robinson Transcript)

After Wallace took the blood pressure medications prescribed by Dr. Ahmed he returned

to his bunk in F-pod. (Ridlen's Inmate Medical Event Log, 4/2/06)  Sergeant Ridlen conducted

no additional follow-up care of Wallace. (Ridlen, p.36) Sergeant Ridlen did not refer to any of

Wallace's previous medical records either during or after his examination of Wallace. (Ridlen, p.38) The protocols created by ACH do not direct jail staff to review the medical history or any recently logged medical events. (Plaintiff's Designation of Evidence #30, Protocols)

Nurse Robinson recalled reviewing the medical protocol sheet that was filled out by Sergeant Ridlen the next day she came in to work. (Robinson, p.35-36) Yet, Nurse Robinson did not bother to schedule Wallace to be seen by Dr. Ahmed for a follow-up on the two previous cardiac events. (Robinson, p. 46; Ahmed, p.137) Nurse Robinson ran into Wallace, by happenstance, that morning and casually spoke with him about his chest pain. (Robinson, p. 41) Nurse Robinson did not check any of Wallace's vital signs. (Robinson, p.41) Nurse Robinson also did not take Wallace's blood pressure. (Robinson, p.41) Nurse Robinson told Wallace that she would check on his blood pressure in a week, but failed to conduct any additional follow-up care, even after a week had passed. (Robinson, p.46)

Dr. Ahmed did not make any formal record of his discussion with Sergeant Ridlen. (Ahmed, p.110, 153, lines 13-14) Dr. Ahmed also did not conduct any follow-up care with Wallace. (Ahmed, p.136)  According to the inmate medical event logs, Dr. Ahmed was at Jackson County Jail on April 6, 2006 and April 13, 2006. (Plaintiff's Designation of Evidence #52, Jackson County Jail Inmate Medical Event Logs indicating an inmate that has been seen by Dr. Ahmed, as provided by Counsel for Sheriff Hounshel, et.al.) Dr. Ahmed did not examine Wallace on April 6, 2006. (Ahmed, p.136) Dr. Ahmed stated that the protocol completed by Sergeant Ridlen "was not made available to me" until after Wallace's death. (Ahmed, p.112-114) Additionally, Dr. Ahmed did not review Wallace's medical administration sheet after he prescribed the blood pressure medication. (Ahmed, p.145) 1

Despite having given a notice to prepare to Dr. Ahmed's attorney, Dr. Ahmed still was unclear about what occurred during his April 2 phone call with Sergeant Ridlen. (Ahmed, p.111-113)[6] At his deposition, Dr. Ahmed still did not even know the day that Wallace had died. (Ahmed, p. 111-114) Dr. Ahmed never saw any of Wallace's completed protocol sheets until after his death. (Ahmed, p. 112, 145) Although Dr. Ahmed did sign off on Nurse Robinson's medical entry regarding her discussion with Wallace on April 3, the signature is not dated. (Plaintiff's Designation of Evidence #36, Jackson County Jail Medical Log Entry for April 3, 2006 as prepared by Nurse Robinson) The Court is invited to review Dr. Ahmed's entire deposition to gain a sense of Dr. Ahmed's complete indifference to inmate Wallace's life.

**F.  April 11, 2006—Wallace's Final Coronary Event.**

 Shortly after breakfast, on the morning of April 11, 2006 (Brooks, p.28) William Wallace suffered sudden cardiac death (Bailey, p.108, lines 6-15). At approximately 9:15 a.m. (Plaintiff's Designation of Evidence #50, Officer Howard's Inmate Medical Event Jail Log for April 11, 2006), an inmate in F-pod used the intercom system to contact Jail Officer Douglas Howard in Control 2 to inform Officer Howard that Wallace was having a seizure (Howard, p.15-16). Officer Howard proceeded to contact the book-in area where he told Sergeant Wanda Frady and, over the speakerphone, Jail Commander Marc Lahrman and Jail Officer Adam Brooks, that the inmates of F-pod had reported that William Wallace was having a seizure. (Howard, p.18; Brooks, p. 24-25) Jail Nurse Robinson was talking with Matron Linda Hounshel outside the book-in area when she received a page from Officer Lahrman (Brooks, p. 25) that Wallace was having a seizure. (Robinson, p.48)

---

[6] *See* Ahmed, p.10, line17-p.11, line 24 (Discussion between counsel for Plaintiffs and Defendants, and apology from attorney Steven Groth, Dr. Ahmed's counsel).

Nurse Robinson met with Officer Brooks in the slider and the two of them proceeded to F-pod.  (Brooks, p.25) Officer Lahrman left the book-in area to retrieve an automatic defibrillator at the request of either Nurse Robinson or one of the jail officers. (Lahrman, p. 137) Officer Howard, after he had contacted Sergeant Frady, contacted Central Control to let them know he was disabling his pod so he could go back to F-pod to help. (Howard, p.19) Officer Howard then grabbed a pair of latex gloves and went to F-pod. (Howard, p.19) Officer Brooks and Nurse Robinson were the first of the jail staff to arrive at F-pod. (Brooks, p. 27, lines 2-4)

When he first arrived in F-pod, Officer Brooks observed a blue tint to Wallace's skin. (Brooks, p.27, line 6) Officer Howard entered behind Officer Brooks and immediately instructed the other inmates in F-pod to sit down in their bunk areas. (Howard, p.19-20) Nurse Robinson checked Wallace for a pulse and then radioed to Jail Commander Lahrman to call an ambulance. (Brooks, p.27, lines 9-12) Officer Brooks and Officer Howard then assisted Nurse Robinson in moving Wallace from his bunk to the floor, so Nurse Robinson could begin performing CPR. (Howard, p.20, lines 6-11)  Nurse Robinson then ordered Officer Brooks to retrieve an airbag to assist in resuscitating Wallace. (Brooks, p.27) Officer Brooks left F-pod to retrieve the air bag from Control 2 and, on his way back, he saw Officer Lahrman coming down the hallway with the defibrillator.  (Brooks, p.27)

When Officer Lahrman arrived with the automatic defibrillator Nurse Robinson had still not succeeded in restoring a pulse to Wallace. (Lahrman, p.138) Officer Lahrman and Nurse Robinson then attached the automatic defibrillator to Wallace and followed the computerized instructions. (Howard, p.20-21) They were not successful in restoring a pulse. (Howard, p.21) Officer Lahrman eventually left Nurse Robinson to assist the medic unit with their equipment. (Lahrman, p.138, lines 21-22) Officer Lahrman and Nurse Robinson stayed with Wallace as he

was taken to Schneck Medical Center. (Lahrman, p.138; Cecelia Wallace, p.47) Wallace was pronounced dead either on arrival or shortly thereafter. (Hounshel, p. 84)

The jail staff did not contact Cecelia Wallace, William Wallace's mother and emergency contact, when Wallace suffered any of his cardiac events. (Cecelia Wallace, p.72)  Calling Wallace's emergency contact was the responsibility of the jail commander, Officer Lahrman, or the sergeant on duty, Wanda Frady. (Brooks, p.34) Instead, Cecelia Wallace discovered what happened to her son from a phone call from inmate Eric Wills, her grandson. (Cecelia Wallace, p.46; Deposition of Eric Wills, p.40)  When Cecelia contacted the hospital concerning her son, she was immediately questioned about how she had discovered the incident. (Cecelia Wallace, p. 47)  Cecelia was eventually told over the phone that her son had died.  (Cecelia Wallace, p.47) Later that morning, Sheriff Hounshel and the County Coroner, Andrew Rumph, visited Cecelia Wallace to officially inform her of William Wallace's death.  (Cecelia Wallace, p.48)

Sheriff Hounshel first learned that an inmate had been rushed to the hospital from a telephone call he received from his sheriff's office-manager, Linda Brown. (Hounshel, p. 85) Sheriff Hounshel immediately left for the hospital. (Hounshel, p.85-86) Sheriff Hounshel met with Jail Commander Marc Lahrman and Jail Nurse Robinson outside of the emergency room and briefly discussed what had happened. (Hounshel, p.85-86) Sheriff Hounshel was informed at that time that Wallace had died.  Shortly thereafter, Sheriff Hounshel met with the County Coroner, Andy Rumph, to drive out to Cecelia Wallace's house and inform her that her son had passed away. (Hounshel, p.86-87) On the ride over to Cecelia Wallace's house, Sheriff Hounshel expressed that he was concerned about the fact that Wallace had complained of chest pains twice and that they had done nothing for him. (Deposition of Richard Andrew Rumph, p.21-22)

## III.  ARGUMENT

### A.  Summary Judgment Standard.

The purpose of summary judgment is to "assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment "is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions to file, and affidavits, and where the moving party is entitled to judgment as a matter of law."  *Spring v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008) (citing Fed. R. Civ. P. 56(c)).

The inquiry on summary judgment boils down to whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue raised.  *See Vitug v. Multistate Tax Comm'n.*, 88 F.3d 506, 512 (7th Cir. 1996).  In making its determination of a summary judgment motion, the court will not weigh the credibility of witnesses or evidence because evaluating credibility, weighing evidence, and reaching factual inferences are only within the province of the jury.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Rather, the court's role is limited to assessing whether a genuine issue of material fact exists, thereby creating the need for trial.  *Anderson*, 477 U.S. at 255.

On a summary judgment motion, the moving party bears the burden of persuading the court that there is no issue of material fact.  *Janowiak v. City of South Bend*, 836 F.2d 1034, 1036 (7th Cir. 1987).  The moving party must illustrate for the court that there is an absence of evidence in support of the nonmoving parties claims and defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden of advancing the case then shifts to the nonmoving party to show that there is a genuine issue of material fact only a trier of fact can resolve. *Id.* at 330-31.

In making its determination as to whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the nonmoving party. *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999). The court must likewise draw all reasonable inferences and resolve all disputed facts in favor of the non-moving party. *Solon v. Kaplan*, 398 F.3d 629, 631 (7th Cir. 2005). However, a "genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).

**B.   Standard of Review for Eighth Amendment Claims.**

A successful § 1983 claim based on a violation of the Eighth Amendment requires proof of two elements: (1) that the harm to the prisoner was objectively, sufficiently serious and a substantial risk to his health or safety, and (2) that the individual defendants were deliberately indifferent to the inmates health and safety. *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 556-57 (7th Cir. 2003) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103-06 (1976); *Estate of Novack v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)).

In order to show deliberate indifference, a plaintiff is not required to show "purposeful infliction of harm." *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 926 (7th Cir. 2004). Rather, a detainee can show deliberate indifference by "demonstrating that the defendants were aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger." *Id.* at 926-27 (quoting *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998)). Thus, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an

inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *see also Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) ("[A] prisoner claiming deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired.") (quoting *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996)).  Furthermore, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Hull v. Fletcher*, 2006 WL 4013799, *6 (W.D. Mich. 2006) ("'[E]vidence that [a] defendant disregarded the classic symptoms of a heart attack' as well as the prisoner's requests for medical treatment is 'sufficient to support an inference that satisfie[s] the subjective component' of the Eighth Amendment analysis.") (quoting *Forton v. County of Ogemaw*, 435 F. Supp. 2d 640, 651 (E.D. Mich. 2006)).

As for the first prong of analysis, there can be no question that Mr. Wallace's heart attacks constituted an objectively serious medical condition.  The fact that Mr. Wallace suffered not one (1), but three (3) separate cardiac arrests clearly indicates the imperative for necessary medical attention.  *See, e.g., Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (inmate whose heart was "fluttering" and risked "heavy chest pains" due to lapse in medication objectively serious medical need); *Donald v. Cook County Sheriff's Dept.*, 95 F.3d 548, 555 (7th Cir. 1996) (reversing dismissal of Eighth Amendment claim where prisoner alleged two-day deprivation of heart medication resulted in heart attack and hospitalization); *Plemmons v. Roberts*, 439 F.3d 818, 823-24 (8th Cir. 2006) (inmate experiencing "classic heart attack symptoms, including arm and chest pain, profuse sweating, and nausea-symptom" constituted objectively serious medical need); *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005) (Inmate's "severe chest pain and her heart attack each are sufficiently serious to satisfy the objective

prong."); *Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) ("[E]ven laypersons can be expected to know that a person showing the warning signs of a heart attack needs treatment immediately in order to avoid death."); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (evidence of heart attack "sufficiently establishes the objective element of the deliberate indifference test.").

Plaintiffs' expert witness, Dr. John Christopher Bailey, testified as to the information recorded for Mr. Wallace's first heart attack and concluded that Wallace's condition was "a textbook quality presentation for acute…coronary syndrome." Dr. Bailey stated that acute coronary syndrome refers to a couple of presentations of acute myocardial infarction and or impending acute myocardial infarction." Consequently, Dr. Bailey concluded that the presentation of Wallace to Officer Teipen was entirely consistent with an acute myocardial infarction. Accordingly, there can be no question that Wallace's heart attacks were objectively serious under the Eighth Amendment.

C. **Federal Claims Against Advanced Correctional Health and the Jackson County Sheriff In His Official Capacity.**

Having determined that Mr. Wallace's medical condition was objectively serious, it is necessary to determine whether a particular defendant's conduct constituted "deliberate indifference" under the Eighth Amendment. *See Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 556-57 (7th Cir. 2003). Plaintiffs will address each Defendant in turn.

Plaintiffs bring claims against Advanced Correctional Health (ACH) and the Jackson County Sheriff, in his official capacity pursuant to 42 U.S.C. § 1983 for violations of their constitutional rights. Specifically, Plaintiffs allege that ACH and the Jackson County Sheriff in his official capacity adopted policies and practices that constituted deliberate indifference to the

serious medical needs of prisoners, including the Decedent, and as a result of this indifference caused the death of Decedent.  Furthermore, Plaintiffs contend that ACH and the Jackson County Sheriff in his official capacity failed to properly train its employees to deal with inmates' serious medical needs, and such failure constituted deliberate indifference to the constitutional rights of inmates, including those of the Decedent.

In *Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658 (1978), the Supreme Court held that "municipalities and other local government units [were] included among those persons to whom § 1983 applies." *Id.* at 690.  Specifically, municipal liability exists "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. Unconstitutional practices and policies can be shown in three ways:  (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice, that, although unauthorized, is so permanent and well-settled that it constitutes a "custom or usage" with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury. *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004) (citing *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003)).

In the case at bar, Defendant Sheriff Hounshel is sued in his official capacity, and thus Plaintiffs' claims in this regard are against Jackson County.  *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)); *Franklin v. Zaruba*, 150 F.3d 682, 684 n.2 (7th Cir. 1998) ("A suit against a governmental officer in his official capacity is really a suit against the entity of which the officer is an agent.") (citations omitted).  Furthermore, because Advanced Correctional Health (ACH) was acting under color of state law as a corporate entity performing a part of the public function of running

a jail, it is treated the same as a municipality for purposes of § 1983.  *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002) ("For purposes of § 1983, we have treated a private corporation acting under color of state law as though it were a municipal entity."). Accordingly, ACH, as a corporate entity, also "violates an inmate's constitutional rights 'if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners.'"  *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (quoting *Estate of Novack v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)).

Plaintiffs maintain that ACH and Jackson County adopted policies regarding the medical care and treatment of inmates that caused the deprivation of Plaintiffs' constitutional rights. Furthermore, Plaintiffs contend that ACH and Jackson County failed to properly train its employees to deal with inmates' serious medical needs, and such failure caused the deprivation of Plaintiffs' constitutional rights.

It is clear that ACH and Jackson County relegated inmates' medical care to tertiary importance behind profit and cost-cutting.  Jackson County's relationship with ACH was clearly a marriage of monetary interests.  ACH's sales pitch was that they would be able to control costs while providing 24-hour medical service.  ACH promised to make the medical costs incurred by the jail steady so that they would be more predictable.  The 24-hour medical service consisted of a doctor that would visit the jail site once a week and the ability to reach a doctor by phone 24 hours a day.

As the chief policymaker for the Jackson County jail, Sheriff Hounshel never consulted with any other medical provider to see if a comparable on-call service could be provided.  Sheriff Hounshel also never talked to any other medical groups.  Sheriff Hounshel never compared

ACH's offered services or prices with that provided by any other medical provider.  Indeed, no background check was conducted on ACH.

Sheriff Hounshel stated that the objective of switching to ACH was to save money. Sheriff Hounshel touted that the biggest improvement to inmate health would be the addition of 24-hour phone service.  However, Sheriff Hounshel never looked into where that phone call went.  Sheriff Hounshel did not realize that Dr. Faisal Ahmed, the doctor assigned to service Jackson County jail, worked from his car.  Sheriff Hounshel also did not know how many jails that Dr. Ahmed saw in addition to Jackson County jail.

The policies adopted by Jackson County and ACH focused on reducing costs at the expense of inmates' constitutional rights.  One of the first decisions made by ACH CEO, Dr. Norman Johnson, was to reduce or remove a substantial number of the inmates' prescription medications.  Dr. Johnson decided to reduce the inmates' "unnecessary narcotics" on December 27, 2005.  Dr. Johnson did not consult with the inmates' prior physicians.  Dr. Johnson did not talk with each of the inmates before deciding to reduce their medication, and could not recall if he had talked to any of them without reviewing his records.  No records have since been provided.

Furthermore, Jackson County and ACH engaged in a strategic plan aimed at reducing medical costs by transferring many expenses directly to the inmate.  The strategic plan added a co-pay requirement for an inmate to see the doctor or the nurse.  The strategic plan contained a cost containment program that advocated against sending inmates off-site, and required inmates to buy medications directly from the commissary so as to increase cash flow to the commissary. The strategic plan was clearly a concerted policy by Jackson County and ACH to subjugate inmates' medical concerns to profiteering.

In addition to the strategic vision embraced by ACH and Jackson County, the specific medical policies adopted by these defendants were aimed at undercutting inmates' constitutional rights. The medical policies embraced by ACH and Jackson County were contained within specific medical protocols which were to be used by the jail staff before calling the doctor. The protocols were often times no more than a single sheet of questions that the jail officer was supposed to ask an inmate that was suffering from a health problem. The jail officer was then supposed to follow the treatment that was dictated by the medical protocol sheet.

Dr. Johnson presented the protocols to an audience during a presentation to the jail staff that took only two (2) hours. During the presentation, Dr. Johnson merely referenced in passing the protocols, but did not cover them in-depth. Specifically, his lecture materials contained no references to the medical protocols. Jail officers working the night shift were not present for the ACH presentation and received no training on how to use the medical protocols.

Dr. Johnson's presentation materials detail an egregious mindset adopted by Jackson County and ACH toward inmates. The first slide of Dr. Johnson's presentation specifically identifies that two (2) of the three (3) topics to be discussed are, "How do you reduce risks from healthcare related to law suits," and "How do you lower the healthcare cost." The presentation materials then indicate that Jackson County's "responsibility for the standard of healthcare in the correctional setting" requires that "the inmate must be able to **function** within the environment." Furthermore, the presentation materials also indicate that one way "to reduce lawsuit risk in the correctional setting" includes a concerted decision by ACH and Jackson County to, "Take No Medical responsibility."

There is no question that Jackson County and ACH had express policies, in addition to widespread practices, that caused a constitutional deprivation. *See Chortek v. City of Milwaukee*,

33

356 F.3d 740, 748 (7th Cir. 2004) (citing *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003)).  Keeping inmates at the level of merely being able to "function," and specifically adopting as a practice and policy the goal of taking "no medical responsibility" is clearly below the standard of care required under the Eighth Amendment, and evidences the deliberate indifference of ACH and Jackson County to inmates' constitutional rights.

The policies and practices discussed *supra* caused Mr. Wallace's injuries.  The general policy of reducing costs by not sending inmates off-site to the hospital emergency room clearly factored into Mr. Wallace's death.  Wallace presented symptoms of multiple heart attacks on different occasions but was never permitted to obtain emergency health care, despite the tell-tale signs of cardiac emergency, one of the major causes of inmate deaths specifically identified in Dr. Johnson's presentation.  Accordingly, the practices and policies of Jackson County and ACH were constructed and utilized with full knowledge of their inadequacies.  And yet, even when armed with an understanding of their inadequacies, as well as the knowledge that Mr. Wallace had suffered several heart attacks, no action was taken to reduce the potential harm to Wallace.  Thus, Jackson County and ACH engaged in nothing short of deliberate indifference to Mr. Wallace's serious medical needs.  *See, e.g., Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *see also Hull v. Fletcher*, 2006 WL 4013799, *6 (W.D. Mich. 2006) ("'[E]vidence that [a] defendant disregarded the classic symptoms of a heart attack' as well as the prisoner's requests for medical treatment is 'sufficient to support an inference that satisfie[s] the subjective component' of the Eighth Amendment analysis.") (quoting *Forton v. County of Ogemaw*, 435 F. Supp. 2d 640, 651 (E.D. Mich. 2006)).

Plaintiffs also contend that ACH and Jackson County failed to properly train its employees to deal with inmates' serious medical needs, and such failure caused the deprivation of Plaintiffs' constitutional rights.  The inadequacy of an actor's training may serve as the basis for liability under 42 U.S.C. § 1983 where "the failure to train amounts to deliberate indifference to the rights of persons with whom the [defendants] come into contact."  *Canton v. Harris*, 489 U.S. 378, 388 (1989).  Deliberate indifference may be shown in one of two ways.  First, a municipality shows deliberate indifference when it fails to train or supervise its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation.  *Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003) (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997).  Second, a municipality can exhibit deliberate indifference if it fails to provide further training or supervision after learning of a pattern of constitutional violations.  *Dunn* at 646 (citing *Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997)); *see also Dunn* at 646 ("Plaintiffs had to show that the City was aware that unless further training was given the officers would undermine the constitutional rights of others.") (citing *Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000)).

Thus, "the finding of 'deliberate indifference' is derived from the [municipality's] failure to act in the face of 'actual or constructive notice' that such a failure is likely to result in constitutional deprivations."  *Robles*, 113 F.3d at 735 (citing *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993)); *see also Cox v. District of Columbia*, 821 F. Supp. 1, 18 (D.D.C. 1993) ("Constructive knowledge 'may be inferred from the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these.'")

(quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987), *cert. denied*, 484 U.S. 1027

(1988)).  As the Supreme Court has articulated:

> The likelihood that the situation will recur and the predictability that an officer
> lacking specific tools to handle that situation will violate citizens' rights could
> justify a finding that policymakers' decision not to train the officer reflected
> "deliberate indifference" to the obvious consequence of the policymakers' choice-
> namely, a violation of a specific constitutional or statutory right.

*Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997).  In the case at

bar, it is clear that ACH and Jackson County were aware that they would need to have adequate

training as to inmates' constitutional rights to appropriate medical care, and the obvious failure

to properly train constitutes deliberate indifference.

As is clear from the discussion *supra*, not only did Jackson County and ACH adopt

policies and practices that were deliberately indifferent to Mr. Wallace's rights, but they also

failed even to train their employees to properly handle situations where inmates' constitutional

right to medical care would be at issue.

The medical protocols to be used by the jail staff were not included in the initial

presentation by Dr. Johnson and were merely referenced in passing without proper introduction.

Furthermore, because the medical protocols were never specifically discussed, no jailer at the

Jackson County jail or employee of ACH was ever trained regarding the use of such protocols.

Indeed, jail officers working the night shift were not even present for the ACH presentation.

Additionally, at the time of Wallace's death it was not clear to the jail officers whether a medical

request form was still to be used or not.  Finally, the protocols were not even completely

composed as of June 2006 according to a letter from ACH to the Jackson County Sheriff.  Thus,

at the time of Wallace's death, the protocols were incomplete and inadequate by Defendants'

own admission.

In addition to the failure to initially train regarding the jail's medical policies, it was also revealed in Dr. Johnson's deposition that he merely assumed Nurse Robinson would conduct follow-up training with the rest of the jail staff.  Jackson County Jail's contract with ACH did not specifically state or require that the jail nurse provide follow-up training.  Indeed, no follow-up training sessions were conducted prior to Wallace's death.

The obvious failures by the jail staff clearly indicates deliberate indifference by way of a failure to train.  During Wallace's first heart attack, jail officer Teipen reviewed the medical protocol for "chest pain" and took Mr. Wallace's blood pressure, which was elevated to a level of 177/119.  Officer Teipen claimed not to have any understanding of what a normal blood pressure would be.  Furthermore, the medical protocol specifically stated on it in bold warning that, **"This may be an Emergency Situation—Call Physician Immediately."**  Yet, despite this fact, Officer Teipen understood the protocol "advised [him] to not call the doctor.  Indeed, Officer Clark incorrectly explained to Wallace that he had to be seen by the jail doctor before he would be allowed to go to the emergency room.  Moreover, Nurse Robinson, who was to receive the completed medical protocol, never did so.  Incredibly, Nurse Robinson stated that the jail officers often placed the completed protocol sheets in the wrong folders.  However, despite such knowledge, no effort was made to correct such obvious deficiencies in inmate medical processing.

During Wallace's second heart attack, jail officer Ridlen recorded Mr. Wallace's blood pressure at 236/165 with a pulse of 100.  Ridlen contacted jail physician Dr. Ahmed, but Dr. Ahmed cut off Ridlen before he could finish detailing Wallace's symptoms.  Ridlen indicated in his deposition that he had previously had difficulty communicating with Dr. Ahmed, and other staff members indicated similar communication difficulties.  Yet, once again, despite an

awareness of such communication problems, no effort was made to properly train and correct the deficiencies in communicating with the jail physician.  Indeed, Ridlen did not even call Dr. Ahmed back to disclose Wallace's complete symptoms and thus was aware the treatment recommended by Dr. Ahmed was based on less than the full picture of Wallace's symptoms. Thus, armed with the knowledge of an incomplete review by the jail physician, Ridlen gave Wallace medication with which he was unfamiliar and never sent Wallace for emergency care.

It is evident that Jackson County and ACH failed to properly train its employees and agents such that "the failure to train amounts to deliberate indifference to the rights of persons with whom the [defendants] come into contact."  *Canton v. Harris*, 489 U.S. 378, 388 (1989). The absolute failure to train regarding the use of medical protocols clearly indicates deliberate indifference on Jackson County and ACH's part to train or supervise its employees to handle a recurring situation that presents an obvious potential for a constitutional violation.  *See Dunn v. City of Elgin, Illinois*, 347 F.3d 641, 646 (7th Cir. 2003) (citing *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997).  Furthermore, the failure to remedy the continual failures regarding the processing of completed medical forms and communication deficiencies with the jail physician exhibits deliberate indifference.  *Dunn* at 646 (citing *Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997)); *see also Dunn* at 646 (deliberate indifference can be shown where municipality "was aware that unless further training was given the officers would undermine the constitutional rights of others.") (citing *Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000)).

In the case at bar, it is clear that ACH and Jackson County were aware that they would need to have adequate training as to inmates' constitutional rights to appropriate medical care, and the obvious failure to properly train constitutes deliberate indifference.

**D.  Federal Claims Against Individual Defendants.**

Plaintiffs have also sued Defendants Hounshel, Ahmed, Lahrman, Nurse Robinson, Jail

Officer Teipen, and Jail Officer Ridlen in their individual capacities.  Individual liability under

42 U.S.C. § 1983 is "based on a finding that the defendant caused the deprivation at issue."

*Kelly v. Mun. Courts of Marion County*, 97 F.3d 902, 909 (7th Cir. 1996).  Lawsuits against

individual defendants require personal involvement in the alleged constitutional deprivation.

*Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) (citing *Zentmyer v. Kendall County,*

*Ill.*, 220 F.3d 805, 811 (7th Cir. 2000); *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000);

*Davis v. Zirkelbach*, 149 F.3d 614, 619 (7th Cir. 1998)).  However, as the Seventh Circuit has

explained:

> [A] defendant's direct participation in the deprivation is not required.  An official
> satisfies the personal responsibility requirement of section 1983 if she acts or fails
> to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or
> if the conduct causing the constitutional deprivation occurs at her direction or
> with her knowledge and consent.

*Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986) (quoting *Smith v. Rowe*, 761 F.2d 360,

369 (7th Cir. 1985)); *see also Palmer*, 327 F.3d at 594 ("direct participation is not necessary" for

establishing personal liability).

Furthermore, an individual defendant can be held liable for a failure to appropriately

supervise when that failure causes a constitutional deprivation.  For supervisors:

> [a]n official satisfies the personal responsibility requirement of section 1983…if
> the conduct causing the constitutional deprivation occurs at [his] direction or with
> [his] knowledge and consent.  That is, he must know about the conduct and
> facilitate it, approve it, condone it, or turn a blind eye.  In short, some causal
> connection or affirmative link between the action complained about and the
> official sued is necessary for § 1983 recovery.

*Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003) (internal

quotation marks and citations omitted).  Thus, supervisor liability can be established "if the

39

supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis

for it." *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) (citing *Lanigan v. Village of*

*East Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997)); *see also Iqbal v. Hasty*, 490 F.3d 143,

152 (2d Cir. 2007) (supervisor liability can be established by, *inter alia*, "fail[ing] to remedy the

[constitutional] violation after being informed of it by report or appeal."); *Sutton v. Utah State*

*School for Deaf and Blind*, 173 F.3d 1226, 1240 (10th Cir. 1999) ("Where a superior's failure to

train amounts to deliberate indifference…the inadequacy of training may serve as the basis for §

1983 liability."); *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985) (failure to conduct a

reasonable inquiry after the fact can constitute supervisor liability under § 1983), *cert. denied*,

480 U.S. 916 (1987); *Walker v. Norris*, 917 F.2d 1449, 1457 (6th Cir. 1990) (same).

### 1.  <u>Sheriff Hounshel</u>.

Sheriff Hounshel oversaw the adoption of the jail policies and procedures sometime in

the year 2000.  In 2005-2006, Jail Commander Lahrman supervised the 20 jail officers, the part-

time jail officers, the office manager, and Nurse Robinson.  Officer Lahrman reported directly to

Sheriff Hounshel.  Sheriff Hounshel also assisted in supervising Nurse Robinson.  The medical

policies and procedures were adopted under the authority of Sheriff Hounshel's supervisory

authority.  Sheriff Hounshel never consulted with any other medical provider to see if a

comparable on-call medical service, other than ACH, could be provided.  Sheriff Hounshel also

never talked to any other medical groups.  Sheriff Hounshel never compared ACH's offered

services or prices with that provided by any other medical provider.  Indeed, no background

check was conducted on ACH.

Sheriff Hounshel stated that the objective of switching to ACH was to save money.

Sheriff Hounshel touted that the biggest improvement to inmate health would be the addition of

24-hour phone service.  However, Sheriff Hounshel never looked into where that phone call

went.  Sheriff Hounshel did not know that Dr. Faisal Ahmed, the doctor assigned to service

Jackson County jail, worked from his car.  Sheriff Hounshel also did not know how many jails

that Dr. Ahmed saw in addition to Jackson County jail.

As detailed *supra*, the policies adopted by Jackson County and ACH focused on reducing

costs at the expense of inmates' constitutional rights.  Sheriff Hounshel approved of the strategic

plan aimed at reducing medical costs by transferring many expenses directly to the inmate.  The

strategic plan added a co-pay requirement for an inmate to see the doctor or the nurse.  The

strategic plan contained a cost containment program that advocated against sending inmates off-

site, particularly for emergency treatment, and required inmates to buy medications directly from

the commissary so as to increase cash flow to the commissary.  The strategic plan was clearly a

concerted policy by Jackson County and ACH to subjugate inmates' medical concerns to

profiteering.

Sheriff Hounshel also supervised Nurse Robinson and was aware of her deficient

execution of medical duties, yet did nothing to remedy such deficiencies.  Specifically, Nurse

Robinson was repeatedly late for work and not in the appropriate attire.  Nurse Robinson was

never tested for drugs by the county or the department.  Officer Lahrman, whom Sheriff

Hounshel supervised, stated that one of Nurse Robinson's repeated problems was that she was

usually working in the book-in area instead of doing her nursing duties.  Sheriff Hounshel had

threatened Nurse Robinson with termination on at least two (2) separate occasions.  Nurse

Robinson was put on probation on multiple occasions and suspended without pay for the

working days of June 4th, 7th, and 8th, 2004.  However, Sheriff Hounshel never followed

through on his threats to terminate Nurse Robinson, despite repeated disciplinary incidents.

41

Furthermore, Sheriff Hounshel expressed to the County Coroner, Richard Andrew Rumph, that

he was aware that Mr. Wallace had complained of chest pains twice before his third and final

heart attack and was aware that nothing had been done to help Wallace.  Accordingly, Sheriff

Hounshel was aware of his subordinates deficient conduct and "approve[d]" of it and "turn[ed] a

blind eye" to it.  *See Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1039 (7th

Cir. 2003) (internal quotation marks and citations omitted); *see also Gossmeyer v. McDonald*,

128 F.3d 481, 495 (7th Cir. 1997) (supervisor liability can be established "if the supervisor, with

knowledge of the subordinate's conduct, approves of the conduct and the basis for it.") (citing

*Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997)); *Iqbal v. Hasty*,

490 F.3d 143, 152 (2d Cir. 2007) (supervisor liability can be established by, *inter alia*, "fail[ing]

to remedy the [constitutional] violation after being informed of it by report or appeal."); *Sutton v.

Utah State School for Deaf and Blind*, 173 F.3d 1226, 1240 (10th Cir. 1999) ("Where a superior's

failure to train amounts to deliberate indifference…the inadequacy of training may serve as the

basis for § 1983 liability."); *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985) (failure to

conduct a reasonable inquiry after the fact can constitute supervisor liability under § 1983), *cert.

denied*, 480 U.S. 916 (1987); *Walker v. Norris*, 917 F.2d 1449, 1457 (6th Cir. 1990) (same).

## 2.  **Jail Commander Lahrman.**

In 2005-2006, Jail Commander Lahrman supervised the 20 jail officers, the part-time jail

officers, the office manager, and Nurse Robinson.  Officer Lahrman reported directly to Sheriff

Hounshel.  As with Sheriff Hounshel, Officer Lahrman failed to appropriately supervise Nurse

Robinson, and such conduct constitutes deliberate indifference to Wallace's constitutional rights.

*See* Argument § III(D)(1), *supra*.

Additionally, Lahrman directly participated in, and supervised, the inadequate handling of Wallace's medical needs following Wallace's first heart attack. The afternoon following Wallace's first cardiac arrest, Wallace informed jail officer Clark that he wanted to go to the emergency room. Officer Clark then contacted Lahrman and Nurse Robinson and informed them that Wallace requested to see a doctor. Clark then had a second conversation with Lahrman regarding Wallace's complaints. At no time did Lahrman instruct Clark to take vital signs or conduct a formal examination of Mr. Wallace. At no time did Lahrman probe the issue any further in an effort to determine the best manner to handle Wallace's medical complaints. Furthermore, Lahrman assumed that Nurse Robinson knew of Mr. Wallace's condition, despite her previous job-related deficiencies in handling inmate medical needs. In short, Lahrman was put on actual notice that Wallace was complaining of chest pains and did nothing. Indeed, after Wallace's second heart attack, Lahrman, as supervisor for the jail staff, took no action whatsoever to address Wallace's medical needs, including instructing staff and/or personally addressing Mr. Wallace's situation. Consequently, Officer Lahrman's conduct constitutes deliberate indifference to Wallace's constitutional rights.

**3.  Nurse Robinson.**

Nurse Robinson maintained a consistent pattern of disregard for the medical needs of Jackson County Jail's inmates. Nurse Robinson consistently showed up late to work, regularly ignored her medical duties, preferring to work in the book-in area instead, and repeatedly displayed a complete lack of interest in addressing the medical needs of the inmates. Nurse Robinson even knew that the jail officers often placed the completed medical protocols in the wrong file, but she did nothing to correct the problem.

43

Nurse Robinson was subjectively aware of Wallace's serious medical needs and completely disregarded the excessive risk that a lack of treatment posed to the prisoner's health. On March 25, later the same day after Wallace presented to Officer Teipen with the classic symptoms of a heart attack, Officer Clark informed Nurse Robinson that Wallace had asked to go to the emergency room.  Nurse Robinson knew that Wallace had a potentially serious problem, but completely ignored the request.  Nurse Robinson conducted no follow-up care, took no vital signs, and completely disregarded the incident.

Nurse Robinson's approach to inmate medical care is unfalteringly indifferent to the medical needs entrusted to her.  From March 25 to April 11, Nurse Robinson had seventeen (17) days to read Officer's Teipen's completed medical protocol and address Wallace's unmistakable heart condition. Yet, she never saw the protocol prior to Wallace's death.

Former jail officer, Tina Benton commented that Nurse Robinson was "burnt-out" and had adopted a "who cares attitude." After some time at the jail, Nurse Robinson stopped communicating with the inmates about their medical problems and just began to mechanically hand out medications. Officer Benton even observed Nurse Robinson callously skipping dispensing inmates' medications when they did not line up for her promptly. A snapshot of Nurse Robinson's complete indifference to the inmates' medication needs was neatly captured in her phone call with Sergeant Ridlen, when she let Ridlen take another inmate's pills to give to Wallace.

Nurse Robinson's "who cares attitude" again manifested on April 3, the morning after she had received a late night phone call that notified her of a potentially serious problem with Wallace. Rather than conducting even a scintilla of actual medical care, Nurse Robinson merely ran into Wallace by happenstance and casually asked him about the prior evening.  Nurse

44

Robinson promised to follow-up with Wallace in a week and check to see if he was doing better. Eight (8) days later, Wallace died. Nurse Robinson never performed the follow-up she had promised. Finally, Nurse Robinson was responsible for scheduling inmates to see Dr. Ahmed, yet Dr. Ahmed never once saw Wallace. Undoubtedly, by April 3, Nurse Robinson was aware that Wallace had a serious medical problem, yet she never took any steps to make sure that he was either seen by Dr. Ahmed or taken to an emergency room. There is no question Nurse Robinson's conduct toward Wallace constitutes deliberate indifference, and summary judgment is appropriate.

**4. <u>Jail Officer Teipen</u>.**

Officer Teipen's involvement with Mr. Wallace's first heart attack reflects deliberate indifference to Wallace's constitutional rights. Upon receiving Wallace, Officer Teipen asked Wallace what was wrong and Wallace informed him that he was having chest pains. Officer Teipen then retrieved the medical protocol on chest pain. Officer Teipen reviewed the index for the protocol on chest pain and asked Wallace the listed questions. Officer Teipen had never received any training on how to use the protocol sheet. Based on the answers Officer Teipen wrote down, it is clear that Wallace was suffering from pressure in his chest, was short of breath, pale, and had a blood pressure of 177/119. However, despite claiming to have CPR and emergency medical dispatching certifications, Officer Teipen stated he did not to have any understanding of what a normal blood pressure range would be. Furthermore, the medical protocol specifically stated in bold print that, "**This may be an Emergency Situation—Call Physician Immediately.**" However, Officer Teipen did not call a physician, and stated in his deposition that he felt the protocol specifically "advised [him] to not call the doctor."

In addition to the aforementioned failures, Officer Teipen also did not call or talk to Nurse Robinson about Wallace's condition. Indeed, Officer Teipen did not provide Wallace with any ice or Tylenol to address his chest pain. Officer Teipen merely escorted William Wallace back to his cell, and did not call for emergency medical attention. Officer Teipen states that he completed a jail log of the event, however, Officer Teipen's jail log failed to mention Wallace's abnormally high blood pressure or the fact that he was pale and short of breath. Finally, Nurse Robinson maintained that she never received the completed medical protocol prepared by Teipen. Officer Teipen did not conduct any follow-up care of William Wallace, and took no additional steps to insure that Nurse Robinson received the completed medical protocol.

There is no question that Officer Teipen was deliberately indifferent to Wallace's serious medical situation. Plaintiffs have conclusively demonstrated that Teipen was "aware of a substantial risk of serious injury to [Wallace] but nevertheless failed to take appropriate steps to protect him from a known danger." *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 926-27 (7th Cir. 2004) (quoting *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1041 (7th Cir. 1998)). Thus, Teipen "failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *see also Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) ("[A] prisoner claiming deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired.") (quoting *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996)). It is without question that the risk to Wallace was obvious, and Teipen failed to act appropriately when confronted with such knowledge. *See Hull v. Fletcher*, 2006 WL 4013799, *6 (W.D. Mich. 2006) ("'[E]vidence that [a] defendant disregarded the classic symptoms of a heart attack' as well as the prisoner's requests for medical treatment is 'sufficient to support an inference that satisfie[s] the subjective component' of the

Eighth Amendment analysis.") (quoting *Forton v. County of Ogemaw*, 435 F. Supp. 2d 640, 651 (E.D. Mich. 2006)); *see also Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) ("[E]ven laypersons can be expected to know that a person showing the warning signs of a heart attack needs treatment immediately in order to avoid death."). The fact that Teipen did not even follow the medical protocol recommendation to contact the jail physician, despite an awareness that the protocol so instructed, is the epitome of deliberate indifference to an inmate's rights, and consequently summary judgment is appropriate for Plaintiffs on this claim.

### 5. **Jail Officer Ridlen.**

Office Ridlen's conduct was also deliberately indifferent to Mr. Wallace's constitutional rights. At approximately 4:00 a.m. in the morning of April 2, 2006, Wallace complained against of severe chest pains. Ridlen began to ask Wallace the various questions in the medical protocol. Ridlen observed Wallace being red in the face and holding his hand up to his chest. Ridlen noted that Wallace was pale, short of breath, and suffering from crushing chest pain that was radiating throughout his chest. Sergeant Ridlen then took Wallace's blood pressure and recorded an astounding 236/165, with a pulse of 100. Going by the Chest Pain—Cardiac protocol provided by Advanced Correctional Healthcare, Sergeant Ridlen then called the jail physician, Dr. Faisal Ahmed.

Ridlen stated to Ahmed that he had an inmate who had been awakened by chest pains. Ridlen informed Dr. Ahmed of Wallace's abnormally high blood pressure and pulse. However, Dr. Ahmed cut Sergeant Ridlen off before he could finish disclosing Wallace's additional symptoms. This was not the first time that Sergeant Ridlen had trouble communicating with Dr. Ahmed. Several other members of the jail staff also had previous experiences with Dr. Ahmed cutting them off. Indeed, earlier that evening Sergeant Ridlen had been forced to call Dr. Ahmed

back to finish disclosing the symptoms of another inmate who was also suffering from severe chest pains.  In Wallace's case, however, Ridlen did not even call Dr. Ahmed back to disclose Wallace's complete symptoms and thus was aware the treatment recommended by Dr. Ahmed was based on less than the full picture of Wallace's symptoms.  Armed with the knowledge of an incomplete review by the jail physician, Ridlen gave Wallace medication with which he was unfamiliar and never sent Wallace for emergency care.  Furthermore, Ridlen was aware that the previous inmate's blood pressure, which was less than Wallace's, required emergency treatment, but in Wallace's case he simply sent Wallace back to his cell.  As with Officer Teipen, Ridlen's conduct constitutes deliberate indifference to Wallace's constitutional rights.  The fact that Ridlen was aware that Wallace was suffering from an acute medical emergency, but failed to provide emergency treatment, and provided treatment based on an incomplete picture of Wallace's symptoms evidences deliberate indifference. Thus, summary judgment is appropriate for Plaintiffs on this claim.

### 6.  **Jail Physician Dr. Faisal Ahmed.**

Dr. Faisal Ahmed's conduct constituted deliberate indifference to Wallace's constitutional rights.  Dr. Ahmed's disregard and lack of care in the face of obvious medical needs constitutes a violation of Wallace's rights.

Dr. Ahmed serviced up to 20 different jails, across three (3) states, each week.  Dr. Ahmed was responsible for conducting sick calls at the jails and to be available for questions from nurses or correctional officers.  Originally, Defendants Dr. Ahmed and ACH produced a handwritten submission that indicated that Dr. Ahmed visited the jail every week.  However, Dr. Ahmed had the practice of calling Nurse Robinson in advance of a visit and inquiring whether he needed to visit the jail that week or not.  Dr. Ahmed did not, in fact, visit the jail every week.

During Dr. Ahmed's deposition, Dr. Ahmed was unsure if he had visited Jackson County Jail on April 6, 2006 or April 13, 2006.  Dr. Ahmed did not have a physical office outside of the jail. Dr. Ahmed answered health questions from the jail via his company assigned cell phone.  Unlike Jackson County jail's previous medical provider, Dr. Ahmed was unable to receive faxed inmate medical information.  Dr. Ahmed did not keep any record of the phone calls that he received.

Dr. Ahmed was contacted regarding Wallace's second heart attack by Officer Ridlen. Ridlen informed Dr. Ahmed of Wallace's abnormally high blood pressure and pulse.  Despite being confronted with the information indicating a serious medical condition, Dr. Ahmed cut Ridlen off before he could finish disclosing Wallace's additional symptoms.  Dr. Ahmed told Ridlen to give Wallace blood pressure medications, despite the fact that Dr. Ahmed had cut Ridlen off and had not discussed all of Wallace's symptoms.  During his deposition, Dr. Ahmed stated that he did not believe that the blood pressure taken by Ridlen was accurate.  However, he never instructed Ridlen to retake Wallace's blood pressure or conduct any other type of evaluation.

Dr. Ahmed's conduct was deliberately indifferent to Wallace's serious medical needs.  In fact, earlier in the evening of Wallace's second heart attack, Dr. Ahmed sent an inmate to the hospital for emergency medical care when the inmate presented a blood pressure of 188/122. However, in Wallace's situation, Dr. Ahmed was specifically informed of his elevated blood pressure of 236/165, which was worse than the earlier inmate's.  Armed with such knowledge, Dr. Ahmed did not instruct for Wallace to be sent to the emergency room.  Additionally, Dr. Ahmed did not conduct any follow-up care with Wallace and never examined Wallace a single time.  Indeed, Dr. Ahmed never saw any of Wallace's completed protocol sheets until after his death.  In short, Dr. Ahmed was presented with information detailing an obvious medical need

49

and chose not to address it, going so far as to cut off his discussion with Ridlen in an effort to "Take No Medical responsibility," as recommended in Dr. Johnson and ACH's presentation materials.  Summary judgment is, therefore, appropriate on these claims.

## E.  State Wrongful Death Claims.

Plaintiffs also move for summary judgment as to Plaintiffs' state wrongful death claims pursuant to Ind. Code § 34-23-1 *et seq*.  The basis for Plaintiffs' claims involves the same facts and circumstances surrounding Wallace's death as detailed *supra*.  However, the Indiana wrongful death provisions permit recover for a "wrongful act omission," which is in essence a negligence standard.  *See, e.g, Cahoon v. Cummings*, 734 N.E.2d 535, 539-40 (Ind. 2000) (discussing wrongful death actions and applying traditional tort theories of causation and proximate causation).  Accordingly, rather than having to show deliberate indifference or reckless disregard for Wallace's constitutional rights, Plaintiffs need only show Defendants negligently caused Wallace's death.  As is detailed *supra*, there is a great body of evidence already discussed which proves as a matter of law that Jackson County Jail and ACH, along with their agents and/or employees, proximately caused the wrongful death of William Wallace through negligent and wrongful acts and omissions.  Accordingly, summary judgment as to liability on this issue is appropriate.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant Plaintiffs'

motions for summary judgment and provide all relief just and proper in the premises.


Respectfully Submitted,

s/[Michael K. Sutherlin]
Michael K. Sutherlin
Attorney for Plaintiff
Atty. No. 508-49

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2008, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties by operation of the Court's electronic

filing system or by certified U.S. Mail.  Parties may access this filing through the Court's

system:

> Stacy K. Harris
> Max Fiester
> RUDOLPH, FINE, PORTER & JOHNSON, LLP
> 221 N. W. 5th Street
> P.O. Box 1507
> Evansville, IN 47706-1507
>
> *Attorneys for Jerry Hounshel,*
> *Marc Lahrman, Sheriff*
> *Missy Robinson, Nurse,*
> *Joshua Teipen, Jail Officer AND*
> *David D. Ridlen, Jail Officer*
>
>
> Robert B. Clemens
> Steven D. Groth
> Michael D. Rogers
> BOSE MCKINNEY & EVANS LLP
> 2700 First Indiana Plaza
> 135 N. Pennsylvania Street
> Indianapolis, IN 46204
>
> *Attorneys for Dr. Faisal Ahmed and*
> *Advanced Correctional Healthcare, Inc.*

s/[Michael K. Sutherlin]
Michael K. Sutherlin
Attorney for Plaintiff
Atty. No. 508-49

MICHAEL K. SUTHERLIN & ASSOCIATES, PC
P.O. Box 441095
Indianapolis, IN 46244-1095
Phone:  (317) 634-6313
Fax:  (317) 631-8818
Email:  msutherlin@michaelsutherlin.com