1

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF INDIANA

3              INDIANAPOLIS DIVISION

4

5         CASE NUMBER 1:06-CV-1560-RLY-TAB

6

7    CECELIA WALLACE, individually  )
       and as the executor of the    )
       Estate of WILLIAM M. WALLACE   )
8    Deceased                   )
                               )
9             Plaintiff,     )
                               )
10      vs.                   )
       JERRY HOUNSHEL, SHERIFF OF     )
11   JACKSON COUNTY, et al.,      )
                               )
12            Defendants.    )

13      THE DEPOSITION of NORMAN R. JOHNSON, M.D.,

14    an expert witness called by the plaintiff in

15    the above entitled cause, taken before me,

16    Grace Cafaro, CSR-RPR-CP, License #084-000702,

17    a Notary Public in and for the County of Peoria

18    and State of Illinois, at 415 Hamilton

19    Boulevard, 415 Hamilton Boulevard, in the City

20    of Peoria, County of Peoria and State of

21    Illinois, on the 20th day of March, A.D. 2008,

22          commencing at 10:00 a.m.

23

2

```
 1          APPEARANCES:

 2              Michael K. Sutherlin & Associates, P.C.
                333 Senate Avenue
 3              Indianapolis, IN 46204
                By:  Michael K. Sutherlin, Esq.
 4                  For plaintiff

 5              Bose, McKinney & Evans, LLP
                2700 First Indiana Plaza
 6              135 North Pennsylvania Street
                Indianapolis, IN  46204
 7              By:  Steven D. Groth, Esq.
                    For defendants
 8                  Advanced Correctional Healthcare, Inc.
                     and Faisal Ahmed, M.D.

 9

10              Rudolph, Fine, Porter & Johnson
                221 N. W. Fifth Street
11              P. O. Box 1507
                 Evansville, Indiana 47706-1507
12              By: Stacy K. Harris, Esq.
                     For defendants
13                  Jerry Hounshel, Marc Lahrman,
                    Melissa Robins, Josh Teipen and
14                  David Ridlin

15
                        ********
16

17

18

19

20

21
```

22

23

3

```
 1
 2                         I N D E X
 3
 4          Examination by:
 5              Mr. Sutherlin           Page  5
 6              Ms. Harris                    238
 7              Mr. Sutherlin                 239
 8
 9          EXHIBIT NUMBER              PAGE IDENTIFIED
10          Exhibit #1                  14
11          Exhibit #2                  16
12          Exhibit #3                  30
13          Exhibit #4                  47
14          Exhibit #5                  47
15          Exhibit #6                  48
16          Exhibit #7                  49
17          Exhibit #8                  49
18          Exhibit #9                  57
19          Exhibit #10                 85
20          Exhibit #11                 223
21          Exhibit #12                 218
```

22

23

4

1           IT IS HEREBY STIPULATED by and between the

2      parties hereto and their respective attorneys

3      that this is a deposition taken pursuant to

4      notice to the attorneys of record and pursuant

5      to the provisions of the Code of Civil

6      Procedure and the Rules of the United States

7      District Court.

8           That the deposition may be taken before

9      Grace Cafaro, CSR-RPR-CP, License #084-000702,

10     a Notary Public of Peoria County, Illinois, on

11     the 20th day of March A.D. 2005, at 415

12     Hamilton Boulevard, Peoria, Illinois, and

13     reduced to printed manuscript.

14           IT IS FURTHER STIPULATED that the reading

15     and signing of the deposition by the witness is

16     hereby reserved.

17                        (Witness Sworn)

18

19

20

21

22

23

5

```
 1              NORMAN R. JOHNSON, M.D.,

 2         being first duly sworn, deposes and says as
           follows, in answer to
 3
           EXAMINATION BY MR. SUTHERLIN:
 4    Q.   Dr. Johnson, my name is Michael Sutherlin, we

 5         introduced ourselves to each other.  This is

 6         the first time we've met, as I recall.

 7    A.   Yes.

 8    Q.   Can I have your full name, your given name?

 9    A.   Norman R. Johnson.

10    Q.   And your age?

11    A.   I'm 66.

12    Q.   And could I have your present employment and

13         position?

14    A.   I'm CEO of the Advanced Correctional

15         Healthcare, Inc.

16    Q.   Are you a stockholder as well?

17    A.   Yes.

18    Q.   And are there any other stockholders?

19    A.   My wife.

20    Q.   And what's the stock split?

21    A.   50/50.
```

22    Q.    And your wife's name?

23    A.    Brenda Johnson.

6

1    Q.   And just a little background.  I see you're

2         married.  How long have you been married?

3    A.   Well, day by day, you know.

4    Q.   I didn't ask for the date.

5    A.   Forty-seven years.

6    Q.   And do you have any children?

7    A.   We have one daughter.

8    Q.   And can I have her age?

9    A.   She is forty-seven.

10   Q.   Okay.  Have you ever given a deposition before?

11   A.   Yes.

12   Q.   Can you tell me how many times and what the

13        circumstances were?

14   A.   Usually they're for evidence.  I have done it

15        for, I think as an expert witness, maybe once

16        or twice, and I've done it as defense in

17        lawsuits on two occasions.

18   Q.   And you've been an expert as -- I didn't

19        understand what you --

20   A.   It might have been once or twice.  It would

21        have been many years ago.

22    Q.    As an expert?

23    A.    Yeah.  Literally decades ago.  It was back when

7

```
 1        I was in practice in internal medicine.
 2   Q.   Okay, but more recently you say you've done it.
 3        Under what circumstances?
 4   A.   Usually it's relating to a suit of some type
 5        relating to the company.
 6   Q.   Okay, you say usually.  Let's cover those
 7        first.  How many times have you been deposed,
 8        say since 2002 --
 9   A.   Oh, I'm --
10   Q.   -- in cases related to -- One of the things we
11        have to do is when I ask a question --
12   A.   Sure.
13   Q.   -- let me finish the question and then you give
14        the answer, because she'll yell at both of us
15        for talking over each other.  And so sometimes
16        my questions are a little fact specific, so let
17        me finish.  The question I was about to ask you
18        was, attempted to ask you was:
19            Since 2002, can you identify how many
20        times you've been deposed in connection with
21        litigation involving Advanced Correctional
```

22        Health Services?

23    A.   This would be an approximate number because I

8

1          did not research this before I came down.  I'm

2          going to say maybe four times.

3     Q.   Four?

4     A.   Yes.

5     Q.   Okay.  Let me tell you a little bit about how I

6          conduct depositions, Dr. Johnson.  Ms. Harris

7          and Mr. Groth have been involved probably in,

8          by now, eight or nine depositions and I've been

9          doing them the same for about thirty years.

10              I'm going to ask you a number of questions

11          about your background, education, employment

12          training and, more specifically, about your

13          company, Advanced Correctional Health Services.

14          If I ask you a question that you need to

15          reflect on before giving a complete answer, go

16          ahead and take as much time as you need.

17              If during the course of the deposition you

18          recall more information or even a different

19          answer, please interrupt me and we'll let you

20          correct your previous statement or supplement

21          your previous answer.

22              None of my questions are intended to trap

23         you or trick you or get you to state something

9

1       that's an incorrect recollection.  So if you

2       think that I'm asking a question that's

3       ambiguous or you're not clear about it, I'll be

4       glad to repeat it or rephrase it.

5            Your attorney may have some objections to

6       any of my questions, so if he interrupts or if

7       he doesn't interrupt but wait till I finish my

8       question, he may have an objection.  Let him

9       make the objection and then we'll decide

10      whether you need to answer that question or

11      not.

12           If I ask you a question and you don't

13      recall without referring to a document, it may

14      be that I'm just trying to test your

15      recollection or it may be that I have no

16      problems with you refreshing your recollection

17      by looking at a document before you give your

18      answer.  But let me make that call because

19      sometimes the attorney is really trying to get

20      a comprehensive picture of your understanding

21      as opposed to the documentation that you may

22          have brought with you.

23               Do you understand that distinction?

10

```
 1    A.    I do.  I'm not sure I understand the reason for

 2          that.  I would assume that you would want the

 3          truth to the best of my ability and it may be

 4          lying in the document as opposed to my memory.

 5    Q.    Well, sometimes a person's familiarity with the

 6          document reveals a lack of concern or

 7          consideration.

 8               For example, if I asked you your wife's

 9          anniversary or birth date, she might be

10          offended that she didn't know, even though she

11          refers to being married, specifically that you

12          would give a very accurate answer.  You

13          understand the distinction?

14    A.    Yes.

15    Q.    Okay.  So, with some effort, could you identify

16          the specific cases that you've given

17          depositions for with regard to any litigation

18          involving Advanced Correctional Health

19          Services?

20               In other words, you'd be able to identify

21          that with some effort, I take it?
```

22    A.    I gave a deposition in a case in Peoria, I

23          cannot quote the citation of the case, but it's

11

1        an ongoing case.

2    Q.   But you can't identify that --

3    A.   Yes.

4    Q.   -- I take it?

5    A.   Right.

6    Q.   Are you aware that your attorney has identified

7         you as an expert?

8    A.   Yes, I believe that was --

9    Q.   Do you know what the requirements are for being

10        an expert?

11   A.   Not exactly.

12   Q.   Okay.  Well, one of the things that I expect to

13        see from your attorneys is the requirements

14        under the Federal Rules of Procedure for you to

15        be certified or qualified as an expert, and

16        that includes any times you've testified in

17        depositions in the last four years or so.

18             Can you recall any other cases?  You can't

19        give me the name of this one, but can you

20        recall any others?

21   A.   I really cannot.  We can recoup that but I

```
22        really cannot recall that off the top of my

23        head.
```

12

1   Q.   Prior to today's deposition, did you review any

2        documents, any materials, to refresh your

3        memory or just acquaint yourself with the

4        issues you anticipate being asked about?

5   A.   Yes, I reviewed the letter of November, I think

6        it was November 5th or November 9th, from you

7        in which you had requested specific things.

8        And I reviewed my CV just to make sure it was

9        up to date and it was accurate.  I reviewed the

10       training manual that I used when I gave the

11       initial two-hour lecture in Jackson County.

12       And I looked over the contract file.  I also

13       reviewed the schedule for Dr. Ahmed because you

14       asked about that.

15  Q.   Anything else?

16  A.   I read Dr. Bailey's report.

17  Q.   Okay.  Anything else?

18  A.   No, I believe that was probably it.

19  Q.   Okay.  So to clarify then, you have not

20       reviewed other materials.

21            Well, let me ask this question.  Have you

22          reviewed any other materials in connection with

23          doctors with Mr. Wallace's death?

13

1    A.   I saw the transcript.   There was a transcript

2         that was taken of the telephone call.   I saw

3         that.

4    Q.   Of which telephone call?

5    A.   Of the telephone call with Dr. Ahmed.

6    Q.   Okay.   From the jail staff?

7    A.   Yes.

8    Q.   Okay.   Anything else?

9    A.   In the distant past, not -- not in preparation

10        for this, but in the distant past I had a

11        chance to look at the records, but I did not

12        pull them out and did not review them for this

13        deposition.   That was not part of your request.

14   Q.   I understand.   This is a different question.

15        Maybe I wasn't clear.

16             With regard to Mr. Wallace's death, can

17        you identify the documents or materials that

18        you did review?

19   A.   I think those that I've listed, I think that's

20        what I did review.

21   Q.   Were you aware that a state police officer by

22          the name of Detective Sergeant Baize(ph)

23          conducted an investigation?

14

1    A.   I'm not sure of the name but I know that the

2         state police did investigate that, yes.

3    Q.   It was a rather comprehensive investigation.

4         Did you look at his materials?

5    A.   No.

6    Q.   There were many depositions taken in this case,

7         including that of Dr. Faisal Ahmed.  Dr. Faisal

8         Ahmed gave a deposition.  Did you review that?

9    A.   No.

10   Q.   Did you review any depositions?

11   A.   Just the one from the -- if that was a

12        deposition -- I guess it was an opinion from

13        Dr. Bailey.

14   Q.   Okay.

15             MR. SUTHERLIN:  Grace, could you mark this

16        Exhibit 1, please.

17                         (Whereupon Deposition Exhibit #1

18                         was marked and identified for

19                         the record.)

20   BY MR. SUTHERLIN:

21   Q.   Dr. Johnson, you have a copy in front of you.

22    A.    Yes.

23    Q.    Is this a document that you've seen before?

15

```
 1    A.   I believe so.  I believe I've seen this, yes.

 2    Q.   And is this the document that notified you of

 3         your deposition?

 4    A.   Yes.

 5    Q.   And did it also require you, on page 3, to

 6         bring certain -- page 4, I guess with the

 7         subpoena, with the subpoena to bring certain

 8         materials with you?

 9    A.   Yes.

10    Q.   Okay.  And then I think I did attach the letter

11         that you earlier referred to as last two pages?

12    A.   Yes.

13    Q.   So did you get this document?

14    A.   Yes.

15    Q.   All right.  Did you bring the materials

16         identified --

17    A.   Yes.

18    Q.   -- Identified in the document itself?

19    A.   I believe so.

20    Q.   Can you go through those?

21    A.   Yes.
```

22   Q.   Can I see your personnel file, Doctor?

23   A.   Yes.

16

1    Q.   Okay.  Now this looks to be a copy?

2    A.   Yes, this is the copy of the -- I think it's

3         everything that you have already.

4    Q.   Okay.

5    A.   I'm pretty sure that you have all of this.

6    Q.   Okay.  Well, if it's a copy, then can we mark

7         this as an exhibit?

8    A.   I presume, yes.

9    Q.   I mean it's not something you need back?

10   A.   No, I don't need that book.

11             MR. SUTHERLIN:  Okay, would you mark this

12        outside envelope then.

13                           (Whereupon Deposition Exhibit #2

14                            was marked and identified for

15                            the record.)

16   BY MR. SUTHERLIN:

17   Q.   And is this a personnel file that you keep in

18        the ordinary course of business on Dr. Ahmed as

19        one of your contract employees?

20   A.   Yes.

21   Q.   And does it contain all of the materials and

22          items and documents and records which you would

23          ordinarily include in a contract employee?

17

```
 1    A.    Yes.

 2    Q.    Okay, and what is Dr. Ahmed's official position

 3          now?

 4    A.    He is medical director of Advanced Correctional

 5          Healthcare.

 6    Q.    In 2005 when he was hired, what was his

 7          position?

 8    A.    He was a duty physician at that time, he was

 9          hired in to go to various jails and perform the

10          medical services.

11    Q.    All right, and the second would be the contract

12          and negotiation file?

13    A.    I think you probably have a copy of that.  This

14          is the contract.  Now, did you receive a copy

15          of the contract from the sheriff?

16    Q.    Now, we -- if I may speak sort for everybody,

17          we had requested a number of documents through

18          your attorney and they responded and we have

19          that contract.  I just wanted to --

20    A.    Okay.

21    Q.    -- see if the originals -- I won't mark that, I
```

22          would like to look at it.

23     A.   This is an original.

18

 1   Q.   Okay, I won't mark that.

 2             I'm just looking here, but the signature

 3        page appears to be a photocopy.

 4   A.   Let me take a look.  This does look like a

 5        photocopy, so this may be a copy of the

 6        original, but I thought it was the original.

 7             Okay, this was back in '05.  Since then

 8        we've hired a president and he may have moved

 9        the originals into his and placed copies in

10        mine, since I don't use mine for anything other

11        day-to-day work.

12   Q.   Okay.

13   A.   So that is possible.

14   Q.   Okay.  But to your -- to the best of your

15        knowledge this is an accurate --

16   A.   Yes.

17   Q.   -- copy then --

18   A.   Yes.

19   Q.   -- of the original contract?

20   A.   Yes.

21   Q.   Any other documents associated with the

22          negotiation and the contract?

23    A.   Not with the negotiation of the contract, no.

19

1    Q.   Okay, number 3:  All records of presenting the

2         protocol or instructions on the use of the

3         medical protocol to the Jackson County

4         Sheriff's Department Personnel.

5    A.   No --

6    Q.   Now let me sort of interrupt you there.  I

7         notice that you have a file.  Is there -- were

8         there any communications back and forth

9         between --

10   A.   Yes.

11   Q.   Okay.

12   A.   Yes, but they were not --

13             MR. GROTH:  Let him finish the question.

14             THE WITNESS:  Oh, I'm sorry.

15             MR. GROTH:  He was going to specify which

16        one.

17        BY MR. SUTHERLIN:

18   Q.   -- with regard to the negotiations of that

19        contract?

20   A.   No.

21   Q.   So there's -- you just show up with no other

22          discussions in writing to the sheriff and the

23          county commissioners, there's no back and forth

20

1         communications?

2    A.   There is discussion.  Those are -- You know,

3         there's handwritten notes, there's various work

4         sheets.  Those are all financial details.

5              You haven't asked for any financial

6         details, I didn't bring any of that with me.

7    Q.   Well, I don't know that I need the financial

8         details but I was interested in knowing how you

9         arrived at the contract.  In other words, I

10        would assume that you sit down with the county

11        commissioners, maybe the president of the

12        county commissioners and the sheriffs and

13        there's some discussions, he asks some

14        questions, you respond.  You might respond in

15        writing, you might respond verbally, you might

16        make notes, that kind of thing.  Do you have

17        any such things?

18   A.   Well, the way it works is this.  A sheriff has

19        a problem of some kind, it could be financial,

20        it could be organizational, it could be risk

21        management; it could be a number of different

```
22        things.  So they call us because of that

23        problem.
```

21

1          When that happens, once we get the initial

2          call, then we ask them to fill out a financial

3          sheet because we can tell from a financial

4          sheet where management problems exist as a

5          general rule of thumb.

6          And so from the financial sheet, then we

7          begin to look to see how the thing could be

8          structured and then we set down our ideas about

9          that and that's where the final number comes

10         in.  And then we present that to the

11         committees.

12    Q.   Okay.  Ho did you present that to the

13         committee?

14    A.   Well, this was done by the marketing team.  It

15         wasn't me.  So generally what they do is they

16         go in and explain what services we believe we

17         can supply that would improve the services that

18         the sheriff wishes to have improved.

19    Q.   Is that presentation in writing?

20    A.   There usually is a written presentation that is

21         presented at that time --

22    Q.   Okay.

23    A.   -- to the county.

22

1   Q.   Wouldn't that be involved in any sort of

2        presentation?  Wouldn't that be, that

3        presentation of information to the county

4        commissioners and the sheriff, part of the

5        negotiations?

6   A.   Yes, it would.

7   Q.   Did you bring that with you?

8   A.   Well, let me just check.  It's frequently put

9        on as an attachment to the contract.  Well, let

10       me see if it was.

11  Q.   Well, there are some numbers to that contract.

12  A.   Yeah.

13  Q.   But I didn't know if those were initially

14       presented or those were the end result of

15       negotiations.

16  A.   No, this is the presentation.  This is the

17       record, this is what we planned to do.  This

18       talks about the program, this is what was

19       presented to them.

20  Q.   All right, so let me back up there then, Dr.

21       Johnson.  You were contacted.  Were you

22      contacted by phone or in writing?

23   A.   I do not remember because it would have been

23

1        the marketing team, it would not have been me

2        personally.

3   Q.   All right, and does the marketing team then

4        keep a separate file?

5   A.   Well, they keep their own internal records.   I

6        don't review those but I presume that they have

7        an ongoing file of their marketing activity,

8        yes.

9   Q.   So if a sheriff has a problem, as you described

10       it, most of the problems that they talk about

11       are financial, they want to save money and as

12       you say --

13  A.   Not always.

14  Q.   -- and as you say, they may have a management

15       control problem or a protocol problem and you

16       may want to respond to that, but I'm assuming

17       there's something in writing so you know how to

18       address their concerns when you go down there

19       to make this presentation.

20  A.   That would be attached to the contract.   Yes,

21       that's what you have.

22    Q.    So that's it, there's no intermediate documents

23          or exchanges?

24

1    A.   No, there has to be one final thing that we

2         present and this is what our understanding was

3         of what they wanted and, therefore, we put this

4         together and presented this to him.

5    Q.   I understand that.  There's no other

6         communications between you and the sheriff or

7         the county commissioners?

8    A.   I have no other communications.

9    Q.   So you make one presentation, they look at it

10        and they sign it.  Is that what you're telling

11        me?

12   A.   They usually look at it and they debate it, and

13        that goes on for a period of time.  And then

14        they get their lawyers involved and then they

15        start to read things.

16            And then if there's any changes in the

17        wording of the contract, they may have various

18        nuance changes.  We generally don't keep all of

19        those, we just get it down to the final

20        contract that they want and then that's the way

21        it goes.  But the original presentation is put

22          on as -- as an attachment to the contract.

23     Q.   Okay.  You know, you have in this folder here

25

1         another side to your folder here.  Are those

2         letters or documents that pertain to the

3         contract?

4   A.   Yes.

5   Q.   Okay.  And may I look at those?

6   A.   Yes.

7   Q.   I don't need you to take them out of the

8         envelope.

9   A.   Yes.

10   Q.   This refers to minutes of a meeting held.  Do

11         you have those?

12   A.   Yes.

13   Q.   Okay, and this is from a regional nurse, not a

14         marketing person?

15   A.   That's correct.

16   Q.   All right.  There was another meeting earlier

17         in July and there were minutes of that meeting

18         with Shannon McCord and she sent those to

19         Sheriff Lahrman.  Do you have those?

20   A.   Yes.

21   Q.   May I look at those other sections?

22    A.    Yes.

23              MR. SUTHERLIN:  I would like to have

26

1          copies of this.

2                    MR. GROTH:  Okay.

3                    MR. SUTHERLIN:  All right.

4          BY MR. SUTHERLIN:

5      Q.  The next one, I think I asked about all records

6          of presenting the protocol or instruction.  Do

7          you have that?

8      A.  Yes.

9      Q.  May I see that, please?

10     A.  Yes.

11     Q.  Okay.  Is this a copy?

12     A.  Yes.

13     Q.  May I have this?

14     A.  I can make a copy of it for you.  Or how do you

15         want to do this?

16     Q.  Well, I think our court reporter, when we take

17         a break she can make some copies.

18     A.  Okay.  This is something I -- it is -- these

19         are internal documents, so I wouldn't want them

20         to be spread all over.  We can certainly give

21         you a copy, I just want to make sure we secure

22          them.

23    Q.    Mr. Groth and I had an understanding if there's

27

1       something you think is proprietary for you, let

2       me know and I will agree to that.

3           MS. HARRIS:  We will not be sharing that

4       information with anyone.

5           MR. GROTH:  The manual entitled

6       INTRODUCTION TO CORRECTIONAL HEALTHCARE we

7       would consider that proprietary and

8       confidential and we will give you a copy.

9           MR. SUTHERLIN:  We'll be using that during

10      the deposition, so when we take a break we'll

11      make a copy of it.

12          MR. GROTH:  Sure.

13          MR. SUTHERLIN:  Okay.

14      BY MR. SUTHERLIN:

15  Q.  Number 4.  All policies and procedures

16      pertaining to the performance of the contract

17      provisions for providing services to Jackson

18      County Sheriff's Department.

19  A.  Okay.  Now I don't have those, the sheriff has

20      those, he has the policies and procedures,

21      those are internal to them.  They're specific

22          to his site.

23     Q.    I understand that.  So you don't have a copy?

28

1   A.   I do not have a copy.  We do not keep copies of

2        the sheriff's internal policies and procedures.

3   Q.   Okay.  You are aware that the first copy they

4        had had your signature line on literally every

5        protocol?

6   A.   Yes, and that would be because I had signed off

7        as -- as a health authority in that position.

8        But we wouldn't keep those copies ourselves,

9        those would be -- those belong to the sheriff.

10  Q.   The copy that I received was a photocopy.

11  A.   Okay.

12  Q.   So I was assuming that somebody had the

13       original signed copy and I assume, maybe

14       incorrectly, that that would have been your

15       office.

16  A.   No.

17  Q.   Is that not correct?

18  A.   No, that would be the sheriff.

19  Q.   Because one of the copies does not have his

20       name on it, it's just a general form.

21  A.   Okay.  That would be the sheriff, it's the

22          sheriff's document.  We do not keep these

23          copies.  We have 96 contracts, we don't keep

29

1       all of those individual policies.  The sheriffs

2       own them all.

3   Q.   I'd like to go into your background, if I

4       could.

5   A.   Uh-huh.

6   Q.   Beginning with your undergraduate degree, can

7       you tell me where you -- I don't have a vitae

8       unless you brought it with you.

9   A.   I did.

10   Q.   May I see it, please?

11   A.   Sure.

12   Q.   That would solve some of that.

13         All right.  Dr. Johnson, you've handed me

14       what looks to be an original.  Is this your

15       vitae resume?

16   A.   It is.

17   Q.   And it's dated at the end on page 5 February

18       2008.  Do you believe this to be an accurate

19       and up to date --

20   A.   Yes, it is.

21   Q.   -- resume?

22                    Your attorneys had listed you as an expert

23           in a letter dated February the 7th, 2008,

30

1        indicating they would forward to us your

2        resume.  This is the first time I've seen it.

3        Mail's slow.

4                Can we use this one?

5    A.  Yes, you can.

6                MR. SUTHERLIN:  Would you mark this as

7        Exhibit 3.

8                        (Whereupon Deposition Exhibit #3

9                        was marked and identified for

10                       the record.)

11   BY MR. SUTHERLIN:

12   Q.  Dr. Johnson, I'd like to ask you some questions

13       about -- I guess I understand your education,

14       I'm going to talk more about your practice and

15       the category you referred to as experience.

16               Following completing your residency, it

17       looks like in 1981 at Saint Francis Medical

18       Center, you indicate that that residency is in

19       straight medicine.  What does that mean?

20   A.  Well, straight medicine means that it is not

21       family practice.  So I was not trained in

22        obstetrics, I did not spend an inordinate

23        amount of time in pediatrics; that sort of

```
1          thing.  It was more internal medicine which is

2          the --

3    Q.    Okay, and that was --

4    A.    -- medical treatment of internal disease.

5    Q.    -- in 1985 you were board certified in internal

6          medicine?

7    A.    Yes.

8    Q.    And then in 1988 you received extra

9          credentialing in geriatric medicine?

10   A.    Yes.

11   Q.    What's involved in that?

12   A.    Well, at the time I was doing a lot of nursing

13         home work and nursing home work is very

14         structured work and so it is a true specialty

15         and so I went on for extra training and then

16         was certified in that.

17   Q.    You also indicate in 2004 you were certified in

18         addiction medicine?

19   A.    Yes.

20   Q.    Tell me what that means.

21   A.    Well, we were running into more and more
```

22        problems in the correctional field with the

23        addicted patient and so I felt that to give the

32

```
 1          best care I needed to be certified in addiction

 2          medicine so that we would have a better

 3          understanding and be able to handle the

 4          problems of the addicted patient.

 5     Q.   Okay.  You indicate on your resume that from

 6          1982 until 1999 you had a clinical instructor

 7          position at the Peoria School of Medicine.

 8     A.   Yes.

 9     Q.   And tell me about that position; what was

10          involved in that?

11     A.   Well, basically, if we admitted patients to one

12          of the Peoria hospitals, it was possible that

13          at any one time that we may have medical

14          students or residents on the case that were

15          assigned with us and we were certified as

16          instructors so that we could teach those

17          residents and teach the students.

18     Q.   Did you present classical, you know, classroom

19          setting?

20     A.   I did from time to time, but that was rare.

21     Q.   So most of the time it was sort of over site
```

22        supervision?

23    A.    Yes, going on rounds, seeing patients on rounds

33

1          and discussing patients in the nursing

2          stations, comparing examinations at the

3          bedside, doing things like that.

4     Q.   And why did that end in 1999?

5     A.   I stopped admitting to the hospital at that

6          time.

7     Q.   Can you tell me which hospitals you have

8          privileges at?

9     A.   At the present time, I don't believe I have

10         privileges at any hospitals.  Now, I had

11         privileges at Saint Francis in Peoria,

12         Methodist Hospital in Peoria and Pekin Hospital

13         in Pekin, Illinois.

14    Q.   Can you tell me when each of those ended?

15    A.   I cannot.  I would have to refer to the

16         records.

17    Q.   Would they have ended in the 1980's?

18    A.   I would have to refer to the record.

19    Q.   What record would that be?

20    A.   That would be what you're holding.

21    Q.   Okay, let me hand it back to you.  Unless you

22        have a copy.

23   A.   I don't.  Okay --

34

1    Q.   Refer to which page and section you're reading

2         from.

3    A.   On page 2, it would be in this area right here.

4         I don't know what section it is.  I guess it

5         would be section EXPERIENCE.  The listing reads

6         as follows:

7              Courtesy staff Saint Francis 1985 to 2002,

8         courtesy staff Methodist 1985 to 1999, and

9         Pekin Hospital 1981 to 2003.

10   Q.   All right, thank you.  Can I have that document

11        back, please?

12             Thank you.  It says that you're involved

13        in the Indiana State Medical Society Political

14        Action Committee.  What does that mean?

15   A.   I believe it's the Illinois.

16   Q.   I'm sorry, I meant to say Illinois.

17   A.   Yeah, it's the Illinois.

18             The Illinois Medical Society, as all

19        medical societies, has a political action

20        commission in which they collect PAC funds from

21        their members.  This committee then debates the

22          merits of various politicians and we support

23          them financially based upon committee vote.  I

35

1          was one of the committee members.

2     Q.   Okay, thank you.  It indicates that you were

3          also on the Board of Directors for the Pekin

4          Area Physicians Association.  What is that?

5     A.   That has since disbanded.  The Pekin Area

6          Physicians Association was an HMO from a number

7          of years ago.  It has since disbanded.  I was

8          on the board of directors of that for a short

9          period of time.

10    Q.   Okay.  It indicates you're on the Board of

11         Directors and Treasurer of the Central Indiana

12         Medical Association.  Are you still in that

13         position?

14    A.   May I see that exactly?

15    Q.   Under PROFESSIONAL AFFILIATIONS.

16    A.   Let's see here.  No, that's Central Illinois.

17         You said Indiana.

18    Q.   I'm misspeaking.  I keep thinking I said

19         Illinois but I misspoke.  I'm sorry.

20    A.   All right.  I'm sorry, could you point to the

21         one that you referred to?  I'll try to address

22        it for you.

23    Q.    Board of Directors and Treasurer Central

1          Indiana -- Illinois Medical Association.  It's

2          about in the middle.  You were treasurer.

3     A.   What was the other one that you asked me about?

4          What was the last one?

5     Q.   Pekin.

6     A.   Okay, let me be sure I get these straight here.

7               THE WITNESS:  I'm sorry, could you read

8          back to me his last question on -- not on this

9          one, but what was the last one that he asked me

10         about.

11    A.   I apologize, I'm just --

12    Q.   No problem.

13    A.   I've got it.

14    Q.   Okay.

15    A.   Both of these are the same organization, that's

16         why I was confused.  Both of them are the same

17         organization.  One of them I was on the Board

18         of Directors and Chairman and Treasurer and

19         another time I was Chairman of Finance but it's

20         the same organization.  It was an HMO.

21    Q.   Pekin?

22    A.   This doesn't say Pekin, it's Central Illinois

23         Medical Association.

37

1    Q.   But the first one I asked you about was Pekin

2         Medical.

3    A.   Okay.  I didn't recall you asking me about

4         Pekin.

5    Q.   Want me to find that one for you?

6    A.   Yes.  If you can, that would be fine.

7    Q.   In any event, it says --

8    A.   Oh, this is on committees.  Okay.

9    Q.   And you told me it had since disbanded?

10   A.   Okay, I apologize.  I believe the question that

11        you asked me was on the Central Illinois

12        Medical Association.  That one has been

13        disbanded.

14             This one is Board of Directors Pekin Area

15        Physicians Association, and I apologize if I

16        misheard that.  This I believe -- I believe

17        this is probably the Pekin Medical Association,

18        which is the -- it's a doctors' group.  It's

19        not Peoria Medical Association and Pekin

20        Medical Association.

21             I was on the Pekin Medical Association at

22          that time and I was on the Board of Directors

23          and I think I was even Chairman for one.

38

1    Q.   You understand this is the first time I've

2         seen --

3    A.   Sure, sure.

4    Q.   -- this resume, so I'm not familiar with your

5         credentials and so I'm not as organized as I

6         might be had I had this in advance.

7                      (Cell phone ringing}

8    A.   I apologize for this, I'll shut it off.

9    Q.   I didn't mention this earlier, but if you have

10        a need to take any emergency call, please let

11        us know.

12   A.   I'll try not to do that.

13   Q.   Well, I don't know how it's up to you.  It's up

14        to whoever calls, I think.  But that's

15        certainly something that we'll make allowances

16        for.

17             Okay, Past Secretary and Board Of

18        Directors for the Johnson Fine Jewelry & Bridal

19        Gifts.

20   A.   Yes, my wife owned the store and I was the

21        secretary on the Board of Directors for that.

22    Q.    Past President of the Opera of Illinois,

23          Peoria, Illinois.

39

1    A.   Yes I had an interest in opera and I was the

2         chairman of the opera in town here.

3    Q.   When was that?

4    A.   I'd have to refer to the dates.  It's been a

5         few years ago.

6    Q.   Okay, all right.  Well, here's what I'm going

7         to do, I think.  I'm going to hand this back to

8         you, it's a little hard to interpret Doctor.

9         Since there's not a date for a lot of those

10        credentials or activities you may refer to

11        that, and I'd like you to sort of walk through,

12        if you would, your medical practice, different

13        groups you were associated with, different

14        hospitals that you had privileges at and

15        different organizations that you may have

16        provided medical services for up to the present

17        time.

18   A.   Okay.  Well, I graduated from medical school in

19        '78, went through my residency training up

20        until 1981.  In 1981, I started a private

21        practice in Pekin, Illinois and I was in

22          private practice and on the staff of Pekin

23          Memorial Hospital.

40

1    Q.    Were you associated with anybody then?

2    A.    No.

3    Q.    You just had your own office?

4    A.    I had my own office.  However, within the next

5          few years I began to recruit physicians and

6          built a multi-specialty group so that by the

7          end of my practice, which was middle to latter

8          part of the '90's, we had a number of primary

9          care physicians and we had many specialists

10         that were in the group in one large building.

11   Q.    What was the name of the group?

12   A.    Pekin Internal Medicine Associates.

13   Q.    Is that identified on your resume?

14   A.    I do not see it listed.

15   Q.    So from 1981, you began to build a practice

16         with various specialties and you say that

17         continued to 1995 or late '90's?

18   A.    Yes.

19   Q.    And it's not on your resume?

20   A.    It's not.  Looks like it was an oversight.

21   Q.    What happened to it?

22    A.   The --

23    Q.   The group.

41

1    A.    -- group was eventually bought out by Pekin

2          Memorial Hospital and then they disbanded it,

3          took various physicians into their own practice

4          and remodeled the business and used it as an

5          outpatient setting and things like that.

6    Q.    Okay.  With that explanation and clarification,

7          please continue --

8    A.    Okay.

9    Q.    -- with your history of your practice.

10   A.    Okay, in -- it looks like in about 1985 we

11         began to expand out then and to open other

12         offices.  We opened an office in --

13   Q.    When you say "we" --

14   A.    We, now we have partners by 1985.

15   Q.    This is your group?

16   A.    This is the group, yeah.  So the group began to

17         expand out and we had offices in Delavan

18         Illinois, I think we had an office for a short

19         period of time in Bartonville, and then

20         eventually I opened an office in East Peoria

21         with a couple of other doctors and we continued

22          to build those practices.

23              Also at that time, there was a new drug

42

```
 1          addiction center opened that was called White

 2          Oaks and I was the original physician, along

 3          with another physician, that started that

 4          project.

 5               We worked on the original protocols and

 6          saw patients in that drug addiction center.

 7     Q.   Is that identified in your resume?

 8     A.   Yes, that is the White Oaks Center Co-Director

 9          1958.

10     Q.   That's under which section?

11     A.   That's under EXPERIENCE.

12     Q.   Okay.  This group, did it have -- continue to

13          have the same name that you earlier referred

14          to?

15     A.   Pekin Internal Medicine, yes.

16     Q.   And it was a corporation?

17     A.   Yes, it was corporation.

18     Q.   Incorporated in the State of Illinois?

19     A.   Yes.

20     Q.   And these different offices that you opened up,

21          how would you describe their area of practice
```

22          or the medical services that they offered?

23    A.    Primary care.

43

1    Q.   Okay, please continue.

2    A.   In 1995, I began to get involved with

3         correctional healthcare, this was through a

4         friend of mine that worked in the Illinois

5         prison system.

6              And as I began to learn about it, I began

7         to put the elements together of the company and

8         so this friend and I began a company called

9         Health Professionals, Ltd., and we ran that

10        company from 1995 until 2002.

11   Q.   And who was that other partner?

12   A.   Dr. Stephen Cullinan.   And his wife was also an

13        owner of that, Dr. Theresa Falcon.

14   Q.   And was that a corporation?

15   A.   Yes.

16   Q.   Was that incorporated in the State of Illinois?

17   A.   Yes.

18   Q.   Okay.

19   A.   In 2002 we split that company apart and they

20        took virtually all the prison work, I took a

21        number of jails and I continued to grow my

22          business and they continued to grow their

23          business.  And so from 2002 until the present

44

1       then, I've continued to grow Advanced

2       Professional Healthcare.

3  Q.  Okay.  And in looking at your resume, it would

4       appear that you've also had some experiences in

5       nursing homes and other facilities?

6  A.  Yes.

7  Q.  I don't know if there were any dates on that.

8       You have it in front of you.

9  A.  No, there aren't any dates on it but I can give

10      you approximate dates.

11        What we did was to go to nursing homes

12      and --

13  Q.  Again "we" is the --

14  A.  Well --

15  Q.  Is that --

16  A.  -- let me rephrase that.  I went to nursing

17      homes because this really was my thing.  It

18      was -- the money all came into the corporation

19      though, it was just that I did a practice that

20      was different from other people.  But the money

21      was shared among all of the partners.

22                 So that's the way it worked, it all came

23            in.  But what I did specifically was I went to

45

```
1              the nursing homes and became the medical

2              director of these homes and then I provided

3              many of the policies, procedures and protocols

4              and developed the systems of healthcare for the

5              elderly.  And that was the period that I went

6              on to become certified in geriatric medicine.

7    Q.   And that was the Pekin Medical Group?

8    A.   Yes, I was in the Pekin Medical Group at the

9              time that I did that.

10   Q.   And the income generated from the medical

11             services provided to these nursing homes and

12             geriatric centers were included in the income

13             for the corporation?

14   A.   Yes --

15   Q.   Okay.

16   A.   -- they were.

17   Q.   Then if I understand, in 19 -- 2002 you and

18             your partner agreed to, I guess, split the

19             practice?

20   A.   Yes.

21   Q.   He kept the old name?
```

22    A.    Yes.

23    Q.    And then you created the new company?

46

1    A.   Yes.

2    Q.   And that was called --

3    A.   Advanced Correctional Healthcare.

4              MR. SUTHERLIN:  Why don't we take a break

5         right now, if we could, and then we can copy

6         these things because I'll be asking you

7         questions about the documents.

8              MR. GROTH:  That's fine.

9

10                        (Whereupon a short recess was

11                        taken and proceedings resumed as

12                        follows.)

13             BY SUTHERLIN:  We'll go back on the record

14        and mark these individually.

15                        (Whereupon Deposition Exhibits

16                        #4, #5 and #6 were marked for

17                        identification)

18        BY MR. SUTHERLIN:

19   Q.   Just to clear up a couple of things, Dr.

20        Johnson.  Earlier when I was asking you about

21        documents that you brought with you, you

22          indicated that you brought a number of

23          documents and they were originals, so we've now

47

```
 1        copied them.

 2                     (Whereupon Deposition Exhibit #4

 3                     was identified for the record.)

 4        BY MR. SUTHERLIN:

 5    Q.  I'd like you to look at Plaintiff's deposition

 6        Exhibit #4 and tell me what that is.

 7    A.  This is an outline of the lecture that I gave

 8        to the correctional officers at Jackson County.

 9    Q.  Okay.  And is this a similar outline or

10        identical outline to the correctional officers

11        that you would give in the various jails that

12        you have contract with?

13    A.  The outline is similar to what I would give in

14        various jails.  This is not given to the

15        officers.  I use it as my notes as I speak to

16        them.

17    Q.  Okay, so it's your outline prompting you --

18    A.  Yes.

19    Q.  -- as you give it?

20    A.  Yes.

21    Q.  Okay.
```

22                    (Whereupon Deposition Exhibit #5

23                    was identified for the record.)

48

1         BY MR. SUTHERLIN:

2    Q.   And Exhibit #5, would you identify what that

3         is.

4    A.   This is the contract between Jackson County and

5         Advanced Correctional Healthcare.

6    Q.   And as we already talked about, this is maybe a

7         copy, but as far as you know, it's identical to

8         the original?

9    A.   As far as I know.

10                        (Whereupon Deposition Exhibit #6

11                         was identified for the record.)

12        BY MR. SUTHERLIN:

13   Q.   And (sic) Exhibit #7 is actually a number of

14        letters.  Would you identify what Exhibit #7

15        is.

16             MR. GROTH:  You said #7 but it says #6.

17             MR. SUTHERLIN:  I'm sorry, #6 then.  I

18        misspoke.

19   A.   Exhibit #6 is a series of letters between

20        Jackson County and Advanced Correctional

21        Healthcare.

22    Q.    Okay, there's one item missing.  In your book,

23          if you'd open it up.  Open to this section over

49

1       here.

2               MR. SUTHERLIN:  I'd like that copied as

3       well.

4                       (Whereupon a short recess was

5                       taken and proceedings resumed as

6                       follows.)

7               MR. SUTHERLIN:  Would you mark these.

8                       (Whereupon Deposition Exhibits

9                       #7 and #8 were marked and then

10                      identified for the record)

11      BY MR. SUTHERLIN:

12  Q.  I'm going to ask you then to identify

13      Plaintiff's Deposition Exhibits #7 and #8 and

14      tell me what each of those are, please.

15  A.  Exhibit #7 is a copy of the CQI minutes of the

16      meetings.  Exhibit #8 is a copy of the initial

17      Jackson County Strategic Plan.

18  Q.  Could you tell me what CQI minutes are?

19  A.  Continuing Quality Improvement.

20  Q.  And these have dates on them.  Are these the

21      dates then that these quality improvement

22          assessments were determined?

23     A.   They're the dates that the meetings were held.

50

1    Q.   Okay.  All right, we'll come back to that.

2         And then the Jackson County Indiana

3         Strategic Plan, Exhibit #8, what did that -- It

4         has your name at the very end.

5    A.   Yes.

6    Q.   Is that something that you prepared?

7    A.   Yes, this is a document that I prepared after

8         my initial assessment on the startup day, the

9         day that I gave the initial two-hour

10        presentation.

11        At that time I went through the facility

12        and analyzed it from the standpoint of where

13        could we help, what things could we make

14        improvements in and that sort of thing.  And

15        this document then explains that.

16   Q.   Okay, and this -- this was prepared before the

17        contract was executed or afterwards?

18   A.   Afterwards.

19   Q.   All right.  And so how did this then aid you or

20        facilitate the implementation of the contract

21        that had already been signed between your

22          organization and Jackson County officials?

23     A.   This allowed us to look for areas that we felt

51

```
 1        we could make improvements in line with the

 2        sheriff's wishes.  Not all of it is pursuant to

 3        the contract per se, but it's all in the vein

 4        of wanting to make continuing improvements in

 5        healthy delivery at the Jackson County Jail.

 6             So the action items were then written at

 7        the tail end of that.

 8   Q.   May I have that back?

 9   A.   Sure.

10   Q.   Now, was the sheriff given a copy of this?

11   A.   Yes.

12             MR. SUTHERLIN:  Tracy, have you ever seen

13        this?

14             MS. HARRIS:  I haven't seen this.  It

15        doesn't mean I don't have it.

16             MR. SUTHERLIN:  Off the record.

17                       (Whereupon a discussion was held

18                        off the record.)

19   BY MR. SUTHERLIN:

20   Q.   Let's talk about then your organization,

21        Advanced Correctional Health Services, Inc.
```

22            Do you recall who the officers are of that

23        corporation?

52

```
 1    A.    I'm the president and my wife is the
 2          vice-president.
 3    Q.    Okay, and do you and your wife own the shares
 4          50/50?
 5    A.    Yes.
 6    Q.    And it was formed in 2002?
 7    A.    Yes.
 8    Q.    And have you kept your corporation in good
 9          standing with the State of Illinois?
10    A.    Yes.
11    Q.    I'd like you to identify each and every
12          employee that was on your payroll as an
13          employee of the corporation, not an independent
14          contractor, and their positions in, let's say,
15          2005 when you began to negotiate with the
16          Jackson County Sheriff's Department.
17    A.    I would have to ask for employment records.
18          The reason for that is that we probably
19          employed in the neighborhood of a hundred
20          people or more spread out over many states and
21          I could not recall that by memory.
```

22    Q.    Well, I'm not talking about contract employees.

23          I'm talking about your corporation.

53

 1   A.   Okay.  All right, I can probably do most of

 2        that --

 3   Q.   Okay.

 4   A.   -- in 2005.  Diane Anderson would have been

 5        head of marketing.

 6   Q.   Okay.

 7   A.   Karen Stocke would have been head of medical

 8        operations.

 9   Q.   Was she a nurse?

10   A.   Yes.

11   Q.   Okay.

12   A.   I believe Les Singleton was a sales person with

13        our team at that time.

14   Q.   What did that mean?

15   A.   Well, he would go out, give presentations to

16        counties, communicate with them.  He would go

17        to, oh, state meetings and maybe set up a

18        booth, a show booth, and he would man the

19        booth, write down contacts, field phone calls

20        coming in.

21   Q.   Okay.

```
22      A.    In 2005, Bev Wilson was head of accounting.

23            Uh, I -- That may have been it.  We've grown a
```

54

```
 1        lot since then but I believe at that time

 2        that's where we were.

 3   Q.   Dr. Johnson, when I went on your web site --

 4        You have a web site, do you not?

 5   A.   Uh-huh.

 6   Q.   And you listed your staff at that time --

 7   A.   Uh-huh.

 8   Q.   2005 --

 9   A.   Okay.

10   Q.   -- and 2006.

11            Is it fair to say that you were the only

12        medical doctor on the employment of the

13        Advanced Correctional Health Services company?

14   A.   I don't think that's correct.

15   Q.   Who was the other doctor?

16   A.   Well, I would have to refer to records on that.

17        At the present time, we employ about 20-some

18        physicians, I believe, and in 2005 --

19   Q.   I'm not talking about contract employees, I'm

20        talking about on staff that are actually part

21        of your corporation's employment.
```

22   A.   Oh, that work in the corporate office?

23   Q.   Yes, uh-huh.

55

```
 1   A.   There were no other doctors in the corporate

 2        office.

 3   Q.   And your nurse, Ms. Stocke --

 4   A.   Yes.

 5   Q.   -- was the only other medical person on staff?

 6   A.   In the corporate office.

 7   Q.   In the corporate office.  All the other

 8        physicians you referred to were independent

 9        contractors; is that correct?

10   A.   No, some were employees and some were

11        independent contractors.

12   Q.   Can you identify -- First of all, was Dr.

13        Faisal Ahmed an independent contractor when you

14        hired him in 2005 or an employee?

15   A.   I think he was an employee.

16   Q.   Okay.  And would you be able to refer to his

17        employment file to determine that?

18   A.   I probably could.

19   Q.   I'm going to have to ask for opinions here.

20        I've got a W-9 for Faisal Ahmed and it says

21        check appropriate box and it says individual.
```

22                    Would that indicate that he was an

23            individual employee as opposed to corporation

56

1        or opposed to a contracted individual.  Does

2        that tell us that?

3   A.   Well, I don't know.

4              MR. GROTH:  I think just the fact he's got

5        a W-9 it's a contractor.  Because if he was a

6        regular employee, he would have a W-2.

7              THE WITNESS:  Is that the way it is?

8   A.   Okay.  Well, then maybe he was a contractor at

9        that time.  He's an employee at this time.

10  Q.   I'm sure he was independent contractor at that

11       time.

12  A.   Okay, then that could be.

13  Q.   That's what the contract says he was.  If you

14       read through the contract, that's what he

15       appears to be.

16  A.   I did not read through this contract.  So that

17       could be.

18  Q.   Now you just referred to Plaintiff's Deposition

19       Exhibit #2 to assist in recalling whether or

20       not Dr. Faisal Ahmed was an employee of the

21       corporation or an independent contractor.  I

```
22          think we've agreed, in looking at that

23          document, that he is an independent contractor.
```

57

1          Is that correct?

2     A.   Okay.

3     Q.   All right, I'm going --

4               MR. SUTHERLIN:  Would you mark this

5          Plaintiff's Exhibit 9.

6                         (Whereupon Deposition Exhibit #9

7                         was marked and identified for

8                         the record.)

9     BY MR. SUTHERLIN:

10    Q.   I'm going to hand you what is marked as

11         Plaintiff's Deposition Exhibit #9 and ask you

12         to take a look at that.

13    A.   Okay.

14    Q.   Did the plaintiffs request the personnel file

15         of Dr. Ahmed?

16    A.   Yes.

17              MR. GROTH:  I think they did.  What number

18         is it?

19    A.   Here it is, right here.  Request number 1, yes.

20    Q.   Can you explain why that response is so much

21         less than the one you brought with you today?

```
22   A.   No.

23   Q.   Did you assist in any way in preparing that
```

58

1        response in gathering the documents --

2   A.   No.

3   Q.   -- that would be -- Let me finish the

4        question -- that would be responsive to the

5        request for Dr. Faisal Ahmed's complete

6        personnel file?

7   A.   No.  This -- Okay.

8   Q.   Do you want to add something?

9   A.   Yes, I would.  My guess is that this -- it's a

10       pure guess, that this may not have been as

11       complete as it is today because his file

12       continues to that.

13  Q.   Let me show you something to help you out a

14       little bit.

15  A.   Okay.

16  Q.   It was returned to us on October 26 of '07.

17       Now, it isn't --

18  A.   It isn't that far back.

19  Q.   Clearly, there could be some additional things.

20       But as I look through this, the vast majority

21       of that -- vast majority of that predates this

22      request.

23    A.    I have no explanation for that.

1    Q.    Have you ever been sued for medical malpractice

2          in any states?

3    A.    Yes.

4    Q.    Which states?

5    A.    Illinois.

6    Q.    And when did that happen?

7    A.    It would have been back in maybe '91.

8    Q.    Okay.

9    A.    And then again probably in maybe '99.

10   Q.    Okay.  What were the allegations in each of

11         those complaints?

12   A.    On the first one, the allegation was that I did

13         not hospitalize a patient that was in

14         congestive heart failure.

15   Q.    And what was the outcome of that?

16   A.    We paid either fifty or a hundred thousand

17         dollars on that.

18   Q.    Who's the "we"?

19   A.    The corporation.

20   Q.    Okay.

21   A.    I should say the insurance company.

22    Q.   Okay.  And I'm unfamiliar with the process in

23         Illinois.  Were you actually identified as a

60

1          defendant and the corporation identified as a

2          defendant in this lawsuit?

3     A.   I don't remember if the corporation was.  I

4          was.

5     Q.   Okay.  And was this in connection with any

6          specific services, medical services, you were

7          providing to a healthcare or geriatric or

8          nursing facility?

9     A.   No.

10    Q.   What was it -- what services were you

11         providing?

12    A.   This was in line with our internal medicine

13         practice.

14    Q.   Okay.  And a second lawsuit you said was 1999?

15    A.   Yes.  That was in line with our nursing home

16         work.  It did not -- Well, let me state that

17         again.

18              It had to do with a patient who was

19         admitted under my name but actually belonged to

20         another doctor.

21    Q.   And how was that?

22     A.    Well, sometimes --

23     Q.    How did that happen?

61

1    A.    -- when they're sent in, and I was the medical

2          director, they automatically put my name on the

3          chart is what happened.  And I went down to see

4          the patient and he said, You're not my doctor,

5          I see doctor so-and-so.  I said okay and that

6          was the end of the case.

7    Q.    And were other doctors named as defendants, as

8          well, in that case?

9    A.    No, I was the only one identified.

10   Q.    Okay, and what was the outcome of that?

11   A.    There was a judgment.  It was a group judgment

12         of about 900,000.  And I don't know what

13         portion we paid, I can't tell you, but I think

14         it was probably half of that would be my guess.

15   Q.    Who were the other defendants in that suit?

16   A.    The other defendant was Health Professionals

17         and they had employed a nurse practitioner that

18         had worked in this -- in this nursing home.

19   Q.    And she was in --

20   A.    She is --

21   Q.    -- the group you were associated with?

22    A.    Yes.

23    Q.    So the group that you were associated with then

62

1         was sued as one of the defendants?

2    A.   Yes.

3    Q.   Okay.  Any others?

4    A.   No.

5    Q.   Have you ever had your license suspended or

6         have you ever been placed on probation?

7    A.   No.

8    Q.   Has any hospital ever revoked privileges?

9    A.   No.

10   Q.   I'd like you to talk a little bit about the

11        hiring process of Dr. Ahmed.  I know he was

12        hired as an independent contractor for Advanced

13        Correctional Health Services.  Did you have a

14        prior relationship with him before 2005?

15   A.   Yes.

16   Q.   Can you tell me what that was?

17   A.   I believe he worked for us around the tail end

18        of our association through HPL and I think that

19        he worked in Menard Prison at that time as an

20        HPL employee.  I was the CEO of the company at

21        that time.

22    Q.    Where is the Menard Prison located?

23    A.    Chester, Illinois.

63

1   Q.   Okay.

2   A.   And so I knew of him.  At that time, I knew of

3        his skills, I did not know him very well

4        personally at that time.

5   Q.   And so was he an employee of that organization?

6   A.   Well, once again, I was not involved with those

7        details.  I thought he was but maybe he was an

8        independent contractor.  But I thought he was

9        an employee.

10  Q.   Did you examine his personnel file and his

11       application for employment before today's

12       deposition?

13  A.   No, I did not.

14  Q.   So you weren't familiar with the details of his

15       hiring?

16  A.   No, I remember exactly because I was the one

17       that made phone calls myself about him.

18  Q.   About him and the hiring decision made --

19  A.   Yes.

20  Q.   -- in 2005.

21  A.   Yes, I was the one who made the decision to

22        hire him.

23    Q.   Okay, let's talk about that.   You made the

64

1        calls and I assume based upon his application

2        for employment?

3    A.   Yes.

4    Q.   Do you have that with you in your personnel

5        file?

6    A.   I believe we have a copy of it.

7            MR. GROTH:  I have it.

8            THE WITNESS:  Okay.

9    BY MR. SUTHERLIN:

10   Q.   You're now looking at Plaintiffs Deposition

11       Exhibit #2.  Would you look through that and

12       find his application for employment in 2005?

13               (Long pause in proceedings)

14   A.   I'm sorry, it's going to take me a while to dig

15       through this.

16   Q.   That's fine.

17           MR. SUTHERLIN:  Let's go off the record.

18

19               (Whereupon a short recess was

20               taken and proceedings resumed as

21               follows.)

22      BY MR. SUTHERLIN:

23   Q.   Dr. Johnson, originally I had asked you to look

65

1      at Deposition Exhibit #2 which was the

2      personnel file of Dr. Ahmed that you brought

3      with you, and it seems to be a more complete

4      file.

5           Since then I've handed you while we were

6      on break the response given by the defendants

7      to the request for Dr. Faisal Ahmed's personnel

8      file which does have, at least on top, what I

9      believe to be his application for employment.

10     Is that correct?

11  A.  That appears to be correct.

12  Q.  Okay.  Looking through that, I'm going to ask

13     you some questions about his employment hiring.

14          You said you had some knowledge of him

15     from a previous relationship.  Was that at

16     Menard?

17  A.  Yes.

18  Q.  Was that named after the --

19  A.  There's a Menard County.  And I think there was

20     a Senator Menard at one time.  I think that's

21     how it was named.

22    Q.    Did you personally interview Dr. Faisal Ahmed?

23    A.    Yes.

66

1    Q.    Okay.  And did you review his application?

2    A.    No.

3    Q.    Why not?

4    A.    Well, because that's the paperwork issue.  What

5          I wanted to do was to talk to him personally.

6          I knew of his skill set.  That I knew.  What I

7          wasn't sure was his personality and I wanted to

8          get familiar with his personality.  And the

9          only way I felt I could do that was to talk to

10         people that I knew personally and intimately

11         that knew him personally and intimately and

12         that turned out to be his program director at

13         his residency.

14   Q.    Which was where?

15   A.    In Saint Francis in Peoria, Illinois.

16   Q.    And so you spoke to that individual?

17   A.    I talked to Dr. Sarah Rusch who was his program

18         director at that time.

19   Q.    Rusch?

20   A.    Sarah Rusch, yes.

21   Q.    Anyone else?  Did you speak with anyone else?

22   A.   I spoke to Dr. Adrian Finnerman.

23   Q.   Who is he?

67

```
 1    A.   Dr. Adrian Finnerman was the medical director

 2         at Health Professionals and worked very closely

 3         with Dr. Ahmed down at Menard Prison, so he had

 4         intimate knowledge of his skills and that sort

 5         of thing.

 6    Q.   Referring to each of those by name, what did

 7         much of them say about Dr. Faisal Ahmed?

 8    A.   They said this was an excellent physician, that

 9         the only time that he could be difficult is if

10         he felt an inmate's health was in jeopardy or

11         there was some structural problem in policy and

12         procedure that was getting in the way of good

13         health care, then he would stand his ground and

14         see to it that things were done correctly,

15         which is exactly what we needed in our system.

16    Q.   So you never did review his personnel

17         application?

18    A.   I didn't look at his licenses, I didn't look at

19         those things, no.

20    Q.   Did you look at his employment history?

21    A.   Not any further back than HPL since we'd had --
```

22          I was aware of that.

23     Q.   Did he share with you any other history,

68

```
 1        employment history incidents or of any events

 2        that were of significance?

 3   A.   He shared with me an incident that occurred, I

 4        believe it was in the state of Nebraska, in

 5        which there was an issue going on about the

 6        level of health care that the state of Nebraska

 7        was providing for the inmates.

 8            He, as I understand it, I did not review

 9        any documents concerning this, but what he told

10        me was that this went so far as senate

11        investigations into the practice of the

12        Department of Corrections, he was testifying I

13        believe for the plaintiffs at that time, and I

14        believe that's what I understand.

15   Q.   Did you look into any of that?

16   A.   I did not.

17   Q.   Do you know whether or not he was disciplined

18        or recovered any adverse employment actions?

19   A.   Certainly, when you go up against the state,

20        you would expect there to be, but I don't know

21        of any myself but you would certainly expect
```

```
22          that you were going against the state to try to

23          get them to change things if something adverse
```

69

1       happened to you, yes.  But I'm not aware

2       personally.

3   Q.  You didn't personally verify any of that?

4   A.  No.

5   Q.  Did anybody in your corporation in into his

6       background?

7   A.  Well, we looked into his background.  We did,

8       for example, fill any background checks.  We

9       looked at data bank entries, we looked at that

10      sort of thing.

11  Q.  Uh-huh.

12  A.  But that's all done by the various HR clerks,

13      Human Resources clerks.

14  Q.  Who would have been the HR person designated at

15      that time?

16  A.  It probably was Shelly Neilson.

17  Q.  Okay.  Do you know whether or not she verified

18      any of the employment history of Dr. Ahmed?

19  A.  I believe she probably would have.

20  Q.  And would you be able to tell from the record

21      that she did that?  In other words, a lot of

22        times there is sort of a verification form or

23        initial next to employment history that

70

1           indicate checks out okay.

2    A.    I, after reviewing this briefly, do not

3           identify a specific area.  The decision was

4           made by committee and then -- including the HR

5           representative, as well as Karen Stocke and

6           myself.  That's how that decision was made.

7    Q.    Tell me how it is made by committee then.

8    A.    We all get together and I ask questions.  I

9           have the final responsibility in this case.

10   Q.    Uh-huh.

11   A.    So I said, Well, does his background check out?

12          Yes, everything was fine, we have no problems

13          at all.

14              What do we know about his personality?  I

15          got a report on that.  Do we know about his

16          skill set?  I reported on what Adrian Finnerman

17          had told me about that and what I knew on that.

18              And so that's how it was done.

19   Q.    Okay.  Do you know where he lived at the time

20          he applied?

21   A.    I believe he lived in Missouri.

22    Q.   Do you know where in Missouri?

23    A.   I think it would have been in St. Charles or

71

1        Charleston.

2   Q.   St. Louis?

3   A.   Someplace -- someplace over on the western side

4        of St. Louis.

5   Q.   Okay.  Near St. Louis though?

6   A.   Yes.

7   Q.   Did that cause you any concern that he was that

8        far away?

9   A.   No, because we have contracts in multiple

10       states all over, including Missouri.

11  Q.   Looking at that contract that you have before

12       you, the initial contract, is that a standard

13       contract that you utilized when hiring

14       independent contractor physicians?

15  A.   Yes, this was the contract that we used at this

16       time.

17  Q.   All right, and how did you determine --

18            MR. SUTHERLIN:  Steve, can I have that

19       back?

20            MR. GROTH:  Sure.

21            MR. SUTHERLIN:  Thank you.

22      BY MR. SUTHERLIN:

23   Q.   How did you determine the compensation for Dr.

72

1      Ahmed?

2   A.   We do it based upon the contract requirements

3        and we placed the value of $150 an hour per

4        contract hour that is required, and the

5        contract hour is based upon the needs of the

6        facility, the size of the facility, so on and

7        so forth.

8             And then, in addition, he also took call

9        on a number -- in a number of states and then

10       we compensated him extra for that.

11  Q.   And how much did you compensate him for that?

12  A.   $4,000 per state.

13  Q.   Okay, and is he -- is he required to keep time

14       records?

15  A.   He turns in a document to payroll on a regular

16       basis that kind of tells us where he has been

17       and where he goes and that sort of thing.

18  Q.   But that's not the same thing as a time record?

19  A.   Well, it is.  Uh, well, let me restate that.

20       It may not have the exact times.  I'm not sure

21       if it has the times.  It would probably have

22          the days that he was in the jail.  It would

23          have that but not the specific times.

73

```
 1    Q.   How many hours is he required to work under the
 2         terms of your contract?
 3    A.   As much as is necessary.
 4    Q.   Can you find specific requirement in your
 5         contract language?
 6    A.   No, it's as much as is necessary.
 7    Q.   Well, can you find that language then in the
 8         contract?
 9    A.   Well, I -- Let me see.
10    Q.   It's your contract.
11    A.   Yes.  Just a minute here.
12              Okay, if I may read this description of
13         services that he is to provide.
14    Q.   Okay.
15    A.   "Beginning --"
16    Q.   Refer to the section.
17    A.   This is page one.
18    Q.   Okay.
19    A.   Number 1.  DESCRIPTION OF SERVICES.
20    Q.   Okay.
21    A.   "Beginning on October 17th, 2005, contractor
```

22          will provide the following services:   Staff

23          physician at the county jail facilities listed

74

1          in the attached staffing schedule.  Those

2          duties include on-site inmate medical care and

3          treatment, case management and documentation,

4          24/7 physician call and supervision of on-site

5          medical staff.  Details are listed in the

6          physician privilege sheet and approved by the

7          ACH medical director."

8               So it's open ended because one time he

9          might need to be there thirty minutes, another

10         time he might need to be there two hours,

11         another time he might need -- there might be no

12         need for him to go.  And so the services are to

13         be provided whatever it takes and that's why

14         you can't be specific about that.

15    Q.   All right, and so is it your testimony then

16         that in some instances he doesn't even have to

17         go to the county that he's scheduled to go to?

18    A.   If there is no work for him.

19    Q.   How would he determine that?

20    A.   He would receive a call from the medical nurse

21         or the medical officer stating there was no

22          patients for him to see that day.

23     Q.   And you would leave that up to her judgment?

75

```
 1         Is that the way it works in your protocol?
 2    A.   If there is no sick calls, there is no sick
 3         calls.
 4    Q.   That's not the question I asked you.
 5    A.   I'm sorry.
 6    Q.   The question is, would you leave it up to the
 7         nurse to make that judgment call whether or not
 8         Dr. Ahmed was needed?
 9    A.   Yes.
10    Q.   And is that typical of the way you would do
11         this?
12    A.   Yes.
13    Q.   So even if a person had a -- say, an incident
14         in the jail prior to his visit, the doctor
15         would not necessarily be required to see that
16         patient face-to-face?
17    A.   It would depend on what the incident was, it
18         would depend on if the patient would give
19         permission to be seen.  It would depend on a
20         lot of different things.
21    Q.   My question to you is if, in fact, there's an
```

22        incident, who is the gatekeeper for that?

23            MR. GROTH:  I object to the form of the

76

1          question because the incident is not defined.

2                  But if you have an answer, you can give

3          it.

4                  THE WITNESS:  I don't know that I do.

5     A.   There is no gatekeeper system.  The point is

6          that a sick call slip is entered by the

7          inmates, these are then reviewed by the nurse,

8          the nurse then calls the doctor on virtually

9          every sick call, the doctor makes decisions

10         over the phone based upon that.  And that's the

11         way it works.

12                 Now if you have an incident, then maybe

13         there wasn't a sick call slip, but then what

14         you would do is you would advise the patient

15         that they need to be seen but then it would be

16         up to the patient to determine whether they

17         will allow the doctor to see them.

18    Q.   And you're sure about that?  You think that's

19         the medical appropriate requirement?

20    A.   I'm sure that that's the way that all jails

21         run.

22    Q.    Really?

23    A.    You can't force a patient to be seen.

77

```
 1    Q.   But how is -- My question is, since the doctor
 2         isn't asking the patient himself, aren't you
 3         relying upon the nurse in this particular case
 4         or any other designated person to inform the
 5         doctor?
 6    A.   Yes.
 7    Q.   And he has to rely upon that nurse?
 8    A.   Yes.
 9    Q.   Okay.  So if there's an event and the nurse
10         fails to inform the doctor of that event, he
11         wouldn't know necessarily whether or not that
12         patient should be seen or not; correct?
13    A.   I guess he wouldn't know if he wasn't told.
14    Q.   When you hired Dr. Ahmed, did you give him a
15         number of jails or detention facilities that he
16         was assigned to?
17    A.   Yes.
18    Q.   And is that found in his contract?
19    A.   Yes.
20    Q.   And what were they?
21    A.   The Saline County Jail in Harrisburg, Illinois,
```

22          the Randolph County Jail in Moberly, Missouri,

23          the Buchanan County Jail in St. Joseph,

78

```
 1           Missouri, the Pettis County Jail in Sedalia,

 2           Missouri.

 3      Q.   And that was it?

 4      A.   I believe so.

 5      Q.   And that assignment was given to him when?

 6      A.   This was initial 10/17/05.

 7      Q.   And for those services, how much were you then

 8           going to pay him?

 9      A.   I would need a calculator.  It's going to pay

10           him $150.00 per hour, there was a total of five

11           hours of work.  And then, in addition,

12           $4,000.00 a year for taking call for each state

13           where he takes call.  And I don't have the

14           states that he's taking call listing at this

15           point.

16      Q.   Is that identified in your contract?

17      A.   I don't see that it is.  I don't see that it

18           is.

19      Q.   May I see it?

20      A.   Yes.

21      Q.   All right.  I'm going to call your attention to
```

22          a couple of things.  Would you agree that your

23          form dated -- on Plaintiff's Exhibit #9 your

79

| | | |
|---|---|---|
| 1 | | form dated -- Advanced Correctional Healthcare |
| 2 | | Independent Contractor Data Sheet dated 10/9/05 |
| 3 | | is pretty clear that he's an independent |
| 4 | | contractor? |
| 5 | | See at the top where it's designated what |
| 6 | | it is. |
| 7 | A. | Thank you.  Yes, I do see that. |
| 8 | Q. | That's your form, is it not, Doctor? |
| 9 | A. | Yes, but I don't work with this form.  Yes, I |
| 10 | | can see that. |
| 11 | Q. | There's another page, it's called ADVANCED |
| 12 | | CORRECTIONAL HEALTHCARE WORK FOR HIRE |
| 13 | | AGREEMENT, which specifically says RELATIONSHIP |
| 14 | | OF PARTIES, paragraph 4:  It is understood by |
| 15 | | the parties that the Contractor is an |
| 16 | | INDEPENDENT CONTRACTOR. |
| 17 | A. | Okay. |
| 18 | Q. | And it has a place here -- I guess somewhere -- |
| 19 | | you signed off on that on page 3? |
| 20 | A. | Okay. |
| 21 | Q. | If you'll look at that. |

22    A.    Okay, yes.

23    Q.    So do you agree that there's no question he was

80

1          an independent contractor and you approached

2          him for hire on that status?

3   A.   Yes.

4   Q.   And that was dated 10/17/05, was it not, the

5          date of your signature and the date of Dr.

6          Ahmed's signature?

7   A.   Yes.

8   Q.   All right.  You then referred to a page 4,

9          which listed a number of jails for all

10         occasions.  Following that, there is an

11         Advanced Correctional Healthcare, Inc.

12         Acknowledgment of Vehicle Use Policy, and

13         another document called Acknowledgement of

14         Anti-Harassment Policy, Acknowledgment of

15         Corporate Credit Card Policy, and then the

16         Independent Contractor Data Sheet is again

17         repeated.  But behind that is a sheet Staffing

18         and Salary Schedule.

19             Does that refresh your memory?

20   A.   This would have been a revised schedule.  These

21         schedules change fairly rapidly and so this

22          would be an undated one.

23     Q.   And when was it updated?

81

1   A.   Well, it's dated February 24th of '06.

2   Q.   Okay.  So in February 24th of '06, these would

3        have been the jails that Dr. Faisal Ahmed was

4        to visit?

5   A.   Yes, I believe that is correct.

6   Q.   And are there twenty of them?

7   A.   Yes.

8   Q.   And does it set out in there the compensation

9        for Dr. Ahmed?

10  A.   Yes.

11  Q.   And what is that compensation?

12  A.   The entire compensation is $214,800.00 per

13       year.

14  Q.   And that includes the $4,000.00 for visiting

15       each of several states?

16  A.   Yes.

17  Q.   All right.  Does that refresh your memory now

18       about his compensation?

19  A.   I'm sure this is correct.

20  Q.   Okay.  It's from your own records, is it not?

21  A.   Yes, it's from the office records.

22    Q.    This page is not numbered, but I would like you

23          to look at this page.  It says Advanced

82

```
 1          Correctional Healthcare, Inc. Vacation/Sick Pay
 2          Worksheet.
 3               Would you look at that?  I'd like to ask
 4          you some questions about that.
 5     A.   Okay.
 6     Q.   He's an independent contractor.  How is it that
 7          you provide some computation for sick days and
 8          vacation?
 9     A.   I think he's always salaried, so -- and I don't
10          know if I have an answer for you.
11     Q.   Well, do you know the difference between an
12          independent contractor and a salaried employee?
13     A.   Well, a salaried employee would be someone that
14          would, I presume, have insurance, would have
15          401(k), would have all the benefits that we
16          have.
17     Q.   And an independent contractor would be somebody
18          who would have to look after those things
19          himself?
20     A.   Yes, I believe that is correct.
21     Q.   So how is it then that he's entitled to
```

22        vacation and sick days under your arrangement?

23    A.   I think it's part of the agreement that he

83

```
 1            needed to have days off.  And that was part of

 2            our original agreement off.

 3     Q.     And how is that computed?

 4     A.     This is done internally in the Accounting

 5            Department and I don't know that I can explain

 6            the formulas, if that's what you're asking me.

 7     Q.     Well --

 8     A.     Because I'm not sure --

 9     Q.     Well --

10     A.     -- that I understand.

11     Q.     -- I'm asking something close to that.  I'm

12            looking through his contract and I did not find

13            any provision for those sorts of allowances and

14            yet they show up in the document that was

15            provided to us back in October of '07.

16                I'm just asking if you can reconcile that

17            sheet in any way with his contract?

18     A.     This is not a sheet that I use.  I cannot

19            explain the computations.  I suspect that we

20            did pay him for vacation because he just had a

21            salaried amount to take care of these, and so
```

22          the salary just went on.

23    Q.    Okay.  I'd like to hand you back the staffing

84

```
 1        and salary schedule and ask you, if you would,

 2        to explain how the total salary was computed

 3        based upon that information provided?

 4   A.   Well, as I said previously, what we do is to

 5        look at the contract, physician hours in each

 6        site and then we simply salary the physicians

 7        at that rate for the sites that they run.

 8             The hours that they work are not related,

 9        they're independent of that.  In this case, we

10        looked at the total number of hours that were

11        contracted during this period and the number

12        was 26.

13             Those 26 hours were then compensated at

14        the rate of $150.00 per hour.  And then, in

15        addition, he had the three states in which he

16        was compensated at $4,000.00 per year.

17   Q.   So is it fair to say then that you make this

18        salary calculation of $214,000.00 based upon

19        the individual contracts you have with those 20

20        different facilities and Dr. Ahmed gets paid

21        for those hours whether he visits the facility
```

22        or not?

23    A.   That is correct.

85

1    Q.    Is there any independent document that you

2          require of Dr. Ahmed at this time which would

3          demonstrate compliance with the obligations

4          under each of those contracts?

5    A.    I believe accounting has documents that he

6          turns in about every two weeks that shows which

7          sites he has visited and that sort of thing.

8              MR. SUTHERLIN:   Okay.   Would you mark

9          that.

10                          (Whereupon Deposition Exhibit

11                           #10 was marked and identified

12                           for the record.)

13   BY MR. SUTHERLIN:

14   Q.    Let me hand you what has been marked as

15         Plaintiff's Deposition Exhibit #10 and would

16         report to you that that was provided by your

17         attorney under Tab B.   And it's my

18         understanding that this was prepared by

19         somebody in your office or Dr. Faisal Ahmed.

20         It was unclear.

21             Do you recognize that?

22    A.    No.

23    Q.    That is in response to this question for this

86

1   request for production.   Proof that Dr. Faisal

2   Ahmed is -- well, let's see -- that would have

3   been Tab 9, I'm sorry.

4        Any and all logs kept by Dr. Faisal Ahmed

5   of his travels and his visits to all of the

6   jails or detention facilities from February

7   1st, 2006, up to and including April 15th,

8   2006.

9   A.   I'm sorry, your question is...?

10  Q.   The request -- that is the response to question

11  number 9 which is Tab number 8, I'm sorry.

12       Do you understand -- and that might be a

13  typo -- do you understand that that was a

14  response that you gave in response to this

15  request:   Any and all logs kept by Dr. Faisal

16  Ahmed of his travels and visits to all the

17  jails or detention facilities from February

18  1st, 2006, up to and including April 15th,

19  2006.

20       Do you see the question?

21  A.   Okay.

22    Q.   All right, and this response was sent -- this

23         request was sent to your attorneys, defendants

87

1       Dr. Faisal Ahmed and Advanced Correctional

2       Healthcare, and it's titled Responses to

3       Plaintiff's Request For Production and it's

4       signed by your attorney here, Mr. Steven Groth.

5  A.  Okay.

6  Q.  Does that appear to be a response to that

7       request?

8  A.  Well, to tell you the truth, I'm not sure what

9       the internal discussions were.  I don't know if

10      the request was overly broad, I don't know

11      exactly what was involved.

12        This looks like this came from HR and HR

13      then listed the visits that were made to the

14      Jackson County Jail, which I think they

15      probably thought was the one in question.

16  Q.  Now, how would they know that?

17  A.  How would they know Jackson County --

18  Q.  He made the visits.

19  A.  That would have come off of some documents.

20  Q.  That you're unfamiliar with?

21  A.  If you remember, as I mentioned before, I

22          believe that he turns in internal documents to

23          Accounting.  I don't work with those documents,

88

1          I don't see those documents.

2     Q.   Can we have those documents?

3     A.   I presume you can.

4     Q.   Okay.

5               MR. SUTHERLIN:   Mr. Groth, I consider the

6          response you gave me incomplete and inadequate.

7          BY MR. SUTHERLIN:

8     Q.   I further indicate to you that in reviewing the

9          records of the Jackson County Sheriff's

10         Department as best we could, those dates could

11         not be verified by independent records kept by

12         the Jackson County Jail that he visited on

13         those dates.  So I really would like you to

14         make the effort.

15    A.   Okay.

16    Q.   How did you make the decision to add to Dr.

17         Ahmed's schedule from time to time the

18         different jails or detention facilities that he

19         was to review or visit?

20    A.   It would have had to do with when various sites

21         came online.  If other physicians would have

22          needed to change their schedule and he was

23          available to take care of it, those would be

89

```
 1          the kind of decisions that would come into

 2          line.

 3    Q.    And who would make those decisions?

 4    A.    Generally it's done by Medical Operations.

 5    Q.    That's a department.  Who is who?  I'm asking

 6          for -- can you give me a name?

 7    A.    It would be done between Karen Stocke, Director

 8          of Medical Operations, and Dr. Faisal Ahmed and

 9          any other involved physicians.

10    Q.    And who would that be, the other involved

11          physicians?

12    A.    Well, I can't supply an answer for that because

13          it would depend on, for example, if the doctor

14          needed time off for a few months and I don't

15          know exactly throughout the time.

16              This is an ongoing process all the time.

17          Right now we have I think three doctors on

18          vacation, schedules are all over the place

19          right now.  So it would depend on what was

20          going on at that time.

21    Q.    This salary that you computed for Dr. Faisal
```

22          Ahmed and it would be indicated that if the

23          schedule has been accepted initialed and dated

90

```
1         and it would appear as if you initialed it and

2         Dr. Faisal Ahmed initialed it?

3    A.   Yes.

4    Q.   So he would be paid that salary until there had

5         been -- as of that date $214,800.00 per year?

6    A.   Yes.

7    Q.   Until there was a change?

8    A.   Yes.

9    Q.   And he'd be paid that whether he's on vacation

10        or off sick?

11   A.   Yes.

12   Q.   Okay.  I'm going to hand you what was part of a

13        response to request for production and you've

14        identified the four jails that he was to visit

15        as of 10/17/05 and I'm going to show you

16        another list of jails and that's dated 11/7 of

17        '05.

18            Were these jails then added to Dr. Ahmed's

19        schedule?

20   A.   Certainly, they could have been.  I don't have

21        the signature page, but I presume that that's
```

22          what you're giving me.  And his name is at the

23          top of this, so I presume they were added to

91

1        his schedule.

2    Q.    Okay.  Well, I don't have a signature page.  I

3          would report to you that this again was in

4          response to request for production and I

5          have -- I have that sheet.

6    A.    Uh-huh.

7    Q.    I have a payroll change sheet but I do not have

8          any --

9    A.    Okay.

10   Q.    -- signature sheet.

11             MR. GROTH:  Did you say that's our

12         response to production that you're holding?

13             MR. SUTHERLIN:  Yes.

14             MR. GROTH:  Which tab is that?  Are you

15         sure that's not the personnel file we brought

16         today?

17             The reason I say that, I just got --

18             MR. SUTHERLIN:  I think you're correct.

19         I'm sorry.

20             MR. GROTH:  I have that application for

21         you like you requested, and it's got the green

22          sticker note on it.

23                  MR. SUTHERLIN:  I stand corrected, you're

92

1      right.  This is the -- this is part of the

2      personnel file which was presented today.

3      BY MR. SUTHERLIN:

4    Q.   Do you have any way of referring to any

5      documents, Dr. Johnson, to identify other

6      doctors that were working for you as

7      independent contractors between, say, January

8      of '06 and April of '06?

9    A.   I would have to go into the internal health --

10      or HR documents to do that.  I don't have any

11      with me.

12   Q.   I hand you what is marked as the first sheet of

13      the production you've presented today,

14      Plaintiff's Exhibit #2, and you've highlighted,

15      Dr. Faisal Ahmed.  It appears to list a number

16      of other doctors and it's dated December of

17      '07.

18          Looking at that document, is there any way

19      that that refreshes your memory as to how many

20      doctors you had employed during that period of

21      time I just asked you about?

```
22     A.    No, because doctors come and go.  We might have

23           had different doctors on at that time that are
```

93

```
 1          no longer with us and many of these doctors

 2          would have come on after that period.

 3    Q.    Okay, thank you.

 4                Looking at the production which was

 5          delivered to us today, Plaintiff's Exhibit #2,

 6          can you tell me if Dr. Faisal Ahmed's status

 7          has changed in any way and when it changed?

 8    A.    From when?

 9    Q.    From the date of his employment.

10    A.    Date of employment?

11    Q.    Until today.

12    A.    He has been promoted to Medical Director of

13          Advanced Correctional Healthcare.

14                You want the exact date of that?

15    Q.    If you could.

16    A.    Okay.  Oh, it would have been February 1st of

17          2007.  It is not listed as such, but I know it

18          was that date because he received a raise in

19          pay on that date.

20    Q.    So you find nothing in your official corporate

21          personnel files which would indicate his change
```

22        in status?

23    A.   I did not find anything in there.

94

1    Q.   Is it possible that that's not a complete

2         personnel file?

3    A.   Well, I asked for the complete file, I asked

4         for everything to be copied.  I didn't even

5         look at it.  I assumed -- I told them

6         everything, I'm taking everything out of that

7         file with me today, so I assume this is

8         everything in the file.

9    Q.   Well, I assume you think it was.  But since you

10        understand that he changed his title, would

11        that also change his status or is he still an

12        independent contractor?

13   A.   I don't really -- I think he was a salaried

14        employee.  That's what I thought.

15   Q.   As of when?

16   A.   Well, certainly, I would have thought when we

17        raised his pay he would have gone to salaried

18        employee at that time.

19   Q.   Raised his pay when?

20   A.   On April 1st.

21   Q.   I'm sorry?

22   A.   April 1st, 2007.

23   Q.   But you raised his pay from time to time when

95

1      you've added additional states or jails?

2   A.  Right, but that was based upon work load.  This

3       was just a pure raise and I think this was

4       done, as I recall, because we then began to

5       give him managerial responsibility.

6   Q.  So as of April 2007, does he still ride the

7       circuit?

8   A.  A smaller circuit.

9   Q.  A smaller circuit?

10  A.  Yeah.

11  Q.  Okay.  Would you look through your personnel

12      file and see if you see a payroll change dated

13      6/29/06.

14  A.  I think these pages have been mixed up a bit.

15  Q.  I'm sorry?

16  A.  I believe these pages have been mixed up.

17  Q.  I could have done that.  I'm sorry.

18  A.  I'm going to have to look through this whole

19      thing.  Do you happen to have a copy of it?

20  Q.  I have this.  Again, this was provided to us in

21      October of '07 and it looks as if there's a

22          payroll change.

23               Would that indicate that he's being sent

96

1          to another state?

2     A.   It would indicate that he's taken call in

3          another state.

4     Q.   All right.  Well, his circuit includes another

5          state?

6     A.   Not necessarily.  He may just take a call from

7          that state, he may not be operating that

8          particular site.

9     Q.   When you say "call," what do you mean?

10    A.   Well, need to have more than one doctor on-call

11         for each facility.  If you have one doctor in

12         one facility in one state, we need to have more

13         than one doctor take call.

14              So we had him licensed in a number of

15         states so that he could take a backup telephone

16         call if the first doctor could not be located.

17         And we compensated him for that at that time.

18    Q.   So does that mean then he's just given an

19         additional $4,000.00 because he's supposed to

20         take calls from another state where he's never

21         even visited the jail?

22    A.    Well, if it's an emergency or something and the

23          jailers need to get in touch with an M.D., he

97

```
 1            would -- he's licensed in the state and he

 2            could make an over-the-phone decision to help

 3            them.

 4    Q.      And you approve of that practice that a

 5            physician can actually diagnose over the phone

 6            based upon a call from a jail officer at these

 7            facilities and appropriately give medical

 8            instructions?

 9    A.      It's done all the time.

10    Q.      I know it's done.

11    A.      Yes.

12    Q.      And you approve of that?

13    A.      It's the standard of care across the United

14            States, it's done all the time.

15    Q.      Is it also the standard of care that after that

16            call is received and that individual doctor

17            gives orders or instructions that a physician

18            should follow up to see firsthand that the

19            diagnosis or the symptoms as reported were

20            correct and that his diagnosis was correct?

21    A.      The medical team follows up.
```

22    Q.    Which medical team are we referring to now?

23    A.    At whatever site you're referring to, the

98

1      medical team would follow up.  If you're

2      referring to Jackson, it would be medical team,

3      it could possibly be a nurse, it could be a

4      doctor.

5  Q.  That's what I'm asking you.

6  A.  Yes.

7  Q.  Under your contract arrangement, does a nurse

8      get to sort of verify these things or does

9      the doctor have to verify these things?

10  A.  It's a standard nursing responsibilities.

11  Q.  I understand what the standard nursing

12      responsibilities are.  The doctor prescribes

13      medication, provides treatment and care and

14      responds to specific request for advice and

15      orders.

16          Does that doctor not have a duty to follow

17      up to see whether or not that information he

18      received and acted upon was correct?

19  A.  They do that when they come in to visit them,

20      they review the records when they come in.

21  Q.  So your answer is yes?

22    A.   Yes.

23              MR. SUTHERLIN:  Steve, did you find that

99

1        in there?

2              MR. GROTH:  Yeah.  Is this what you're --

3        the payroll change --

4              MR. SUTHERLIN:  Yeah.

5              MR. GROTH:  -- that you were talking

6        about?

7              MR. SUTHERLIN:  Yeah.

8              MR. GROTH:  I'll put a sticker on there if

9        you want to refer to it.

10       BY MR. SUTHERLIN:

11  Q.   I'm going to hand you back Plaintiff's Exhibit

12       #9 and ask you if you would look at this

13       document that's contained in that called

14       GENERAL STAR INDEMNITY COMPANY and, if you

15       would, we'll go through that.

16             I'm sorry, I didn't hand you the front

17       page of that.  Would you start with the front

18       page.

19             Is that a document that you completed?

20  A.   No.

21  Q.   Do you know who completed that?

22    A.    No.

23    Q.    You don't recognize the handwriting of anybody

100

1        on your staff?

2    A.   It's printing and I do not.

3    Q.   All right, printing.  You don't recognize the

4        printing?

5    A.   No.

6    Q.   Would this have been information that would

7        have been provided by you or somebody on your

8        staff to this insurance carrier?

9    A.   This document is signed by Dr. Ahmed.  So I

10       presume that he was the one that filled this

11       out.

12   Q.   Can I have that back?

13   A.   Yes.

14   Q.   Did you review this document before it was sent

15       to the General Star Indemnity Company?

16   A.   No.

17   Q.   Is it typical then that if the doctor you hire

18       on a contract basis would send this in

19       independent of your reviewing his application

20       for professional liability insurance?

21   A.   I think they are sent this application and then

22          they fill it out and then send it in because at

23          that time they all had to be approved prior to

101

1          employment, as I recall.

2     Q.   Is each of the independent contractor

3          physicians then required to complete this form

4          as part of the application process?

5     A.   I think it was at that time.

6     Q.   Okay.  And yet you didn't review this yourself?

7     A.   No, I did not.

8     Q.   Nor did anybody on your staff review this?

9     A.   I'm not aware.  I don't know.

10          THE REPORTER:  I need a moment, please, to

11          load new paper.

12          MR. SUTHERLIN:  Why don't we just take a

13          quick lunch break.

14

15                    ********

16

17

18

19

20

21

22

23

102

```
 1          EXAMINATION RESUMED BY MR. SUTHERLIN:

 2     Q.   Other than this lawsuit which was brought by

 3          the estate of Mr. William Wallace, has there

 4          been any other lawsuits against Advanced

 5          Correctional Healthcare?

 6     A.   Yes.

 7     Q.   Can you identify them, please.

 8     A.   I did not bring the list.  I don't -- I didn't

 9          realize that you wanted that.  I didn't see

10          that on the list.  There have been lawsuits,

11          but I didn't bring the list with me.

12     Q.   Tell me which ones you remember.

13     A.   There was the one in Peoria that we talked

14          about before.  There was a case in

15          Huntington --

16     Q.   Let me back up.  I thought you said the lawsuit

17          was in 1999.  This wasn't incorporated until

18          2002.  Could you be mistaken about that?

19     A.   No.  I do -- The lawsuit in 1999 was a nursing

20          home case, it was not relative to this.

21     Q.   All right, fine.
```

22    A.    And that's what I stated at that time.

23    Q.    Okay.  So there's been a lawsuit in Peoria that

103

1       you haven't mentioned then?

2  A.  Oh, yes, I did.  I talked about this before and

3       you talked -- you asked me when I'd been

4       deposed and I said, yes, it was over a lawsuit

5       in Peoria.

6  Q.  But you didn't say it was in connection with

7       Advanced Correctional Health Services?

8  A.  That's right.  You didn't ask the question, I

9       didn't say that.

10  Q.  All right, keep going.

11  A.  All right, there was one in Huntington,

12       Indiana, there was one or two in Bates County,

13       Missouri.

14  Q.  One or two lawsuits?

15  A.  One or two, yeah.  There was a broken hand

16       where the guy hit the wall and broke his hand

17       and I think there may have been a second one

18       out there.  I'm not sure exactly, but there may

19       be a second one.

20         There is a lawsuit or was a lawsuit out of

21       Cape Girardeau, Missouri.  There is -- there

22          was a suit that we had to address although we

23          weren't involved out of Lake County, Illinois.

104

1           There was a series of suits written by the same

2           inmate with different names out of Bloomington,

3           Indiana.

4                  I know there were others and I can get a

5           complete list for you.

6    Q.    All right.  You've been identified by your

7           counsel in a letter dated -- I think it's

8           February the 7th of '08, that you will act as

9           an expert.

10                 Have you formed any opinions or are you

11          prepared to give any expert opinions based upon

12          your being designated as an expert?

13                 MR. GROTH:  I'll state an objection to the

14          question and form of the question, it's outside

15          the scope of your notice, but I'll let him

16          answer.

17   A.    Yeah, I think it is important to note that I

18          tried to comply with your notice, so I didn't

19          really review the recent records.  As I

20          mentioned before, I did look at them before

21          sometime in the distant past.

22          I have formed a general opinion but I

23      haven't spent a great deal of time on looking

105

1          at it in great detail, but I have a general

2          opinion.

3     Q.   What is your general opinion that you intend to

4          offer?

5     A.   I believe that a review of the case would

6          indicate that this -- there was a patient that

7          presented with a set of symptoms to the

8          correctional officer.  The officer made a

9          decision that this was serious enough that it

10         had to be addressed and he then gathered

11         information, filled out a report and then

12         contacted Dr. Ahmed.

13              I believe he was fairly comfortable with

14         that because he knew that Dr. Ahmed was

15         correctionally trained, he's an internal

16         medicine specialist, he certainly would --

17    Q.   How would you know he was comfortable with that

18         if you've never spoken to him?

19    A.   As I said, I believe that.

20    Q.   Why would you believe that if you've never

21         spoken to him?

22    A.    Because he made the call.

23    Q.    That's all it takes, just to make a call?

106

1          You're required to do that under the contract.

2     A.   If you wish to object to my answer, that's

3          okay.

4     Q.   I wish to question you on your basis for

5          forming an opinion about somebody else's

6          mental state of mind.  Just stick to the

7          opinion, please.  Go ahead.

8     A.   Well, let me just take a second then.

9               Following that, I believe he called Dr.

10         Ahmed, I believe that he gave him the

11         information that he felt was important, Dr.

12         Ahmed received the information, made a clinical

13         judgment based upon what he understood, decided

14         that there was something that needed to be

15         treated, moved forward with treatment for that,

16         the officer took the information.

17              It appears that later he was not certain

18         about exactly what the orders -- some of the

19         words or some other things and so it looks like

20         he might have called to clarify some things.

21    Q.   Called who?

22     A.    I believe he called the nurse, I think is what

23           it was.  He got that clarified and I believe

107

1          the orders were followed.  And then that was,

2          as I understand it, the end of that particular

3          episode.

4               My understanding is that the next morning

5          the patient had no complaints, felt fine,

6          everything was going well.  And the nurse had

7          made contact with him.  There was some point in

8          time in which he refused then to see Dr. Ahmed

9          in follow-up visits, he made various racial

10         slurs at the time.

11              And from that point on, the nurse followed

12         up according to what she felt was appropriate

13         and that's the way the case went.  That's my

14         understanding of it.

15  Q.    You're basing that on what documents and what

16         review of materials?

17  A.    Well, the chart that I read some time ago.

18  Q.    The chart, what are you referring to when you

19         say chart?

20  A.    The medical record chart.

21  Q.    What medical record chart?

22    A.   Of the patient in Jackson County.

23    Q.   I use the term chart actually to be a folder.

1          Are you referring to the whole medical folder

2          or are you referring to one document?

3    A.   I'm referring to the documents that I reviewed

4          and I can't tell you which ones because it was

5          some time ago.  I don't know that I looked at

6          his arrest record and all of that.  I wasn't

7          privy to all of that.

8    Q.   And your opinion?

9    A.   My opinion is that -- that he received the best

10         care that they could under the circumstances

11         but it became very complicated when he refused

12         to follow up.

13   Q.   What is the amount of insurance coverage that

14         you have for Dr. Ahmed and for your

15         corporation?

16   A.   I think it's standard one and three million.

17   Q.   Are you sure?

18   A.   I believe that is correct.

19              MR. GROTH:  Objection.

20              MR. SUTHERLIN:  You can make objections.

21         BY MR. SUTHERLIN:

22     Q.    If you don't even know, then why are you

23           guessing?  Dr. Johnson --

109

```
 1    A.   I'm going to have to take a break.

 2    Q.   Let me finish my --

 3    A.   I need to take a break.

 4    Q.   On the record, if you're going to make guesses

 5         as a medical doctor, do you understand what

 6         sort of reputation that creates?

 7              Let's me just show you the document.  I

 8         said earlier if you're not sure, you can look

 9         at the document.  I have a box that says

10         500,000 and up million.  Is that the coverage?

11    A.   No.  It's one and three.  I'm pretty sure.

12         Furthermore, you didn't say look at the

13         document, you said you were going to ask me

14         first to test me.  That's what you said.

15    Q.   I hand you the document.  Go ahead and look at

16         it.

17    A.   You should have handed me the document before.

18    Q.   Well, I'm asking you if you know.  I asked this

19         person here to provide the medical insurance

20         coverage for your operation, so I'm only

21         relying upon what I've been given.
```

22      A.    Where are you seeing 500,000?

23      Q.    There's a box down there.  Do you see it?

110

1    A.   Yes, I do.

2    Q.   That's what I was relying upon.

3    A.   Okay.

4    Q.   So I don't know, I don't know what the answer

5         is.

6    A.   I think this is the application.  I think he

7         was given one and three.

8    Q.   Okay.

9    A.   All right, I think that's what happened here.

10        I'm going to take a break.

11             MR. SUTHERLIN:  It's unbelievable.

12                     (Whereupon the witness left the

13                      conference room; short recess

14                      was taken and proceedings then

15                      resumed as follows.)

16        BY MR. SUTHERLIN:

17   Q.   Can you refer to any documents, Dr. Johnson,

18        that would verify how many sites Dr. Ahmed was

19        visiting in March and April of 2006?

20   A.   None other than the ones that you have.

21        However, we are able to recoup further

22          documents for you.

23    Q.    All right.  I'll hand you back Plaintiff's

111

```
 1              Exhibit #9 and refer to the staffing and salary
 2              schedule dated February 24th, '06.  You have 20
 3              jail sites.  Do you believe there to be more or
 4              less during the period I just asked you about?
 5   A.    I would think on this particular date, this
 6         would be correct.  However, this may not be
 7         correct for the whole six-month period.
 8   Q.    Okay, all right.  Before you sent Dr. Ahmed out
 9         to visit any of these jail sites, tell me what,
10         if anything, orientation or training you gave
11         him.
12   A.    I met with him privately and we went over
13         policy, procedure, protocols, how we approached
14         various illnesses, how we handled various
15         healthcare problems.
16              It was important that we make sure he
17         understands that the company does not have the
18         ability to deny care in any way, that the
19         doctors at the bedside always determine these
20         sorts of things.
21              And that's unusual because most companies
```

22          have utilization policy that requires the

23          physician to get approval.  Ours does not.  So

112

```
 1          this -- these were differences in nuances

 2          between our company and companies that he may

 3          or may not have been related with before.

 4    Q.    Did --

 5    A.    And based upon that --

 6    Q.    I'm sorry, go ahead.

 7    A.    Based on that, I wanted to be sure that he

 8          understood the philosophy of our company and

 9          that we were about quality as opposed to

10          worrying about anything else.

11    Q.    Which documents then did you make him familiar

12          with before he visited his first site?

13    A.    He would have reviewed a -- kind of a generic

14          set of protocols that we used at that

15          particular time.  That would have probably been

16          the key.

17               Now, those protocols are written by

18          committee, so they would have changed over the

19          years.  But at that time we would have reviewed

20          the protocols that we were using at that time.

21    Q.    And what committee wrote the protocols?
```

```
22    A.    It's the Physician Advisory Committee.

23    Q.    Would you identify the members of that advisory
```

113

1            committee.

2    A.     What we do is we invite all of our physicians,

3            the entire company in to meetings every four

4            months and we discuss the various health issues

5            that we want to address and during those

6            meetings we discuss our protocols and any

7            updates or any important changes that we feel

8            might be necessary for the care of the inmates.

9    Q.     So in October of 2005, what was your advisory?

10           Who could -- who were the members of your

11           advisory committees?

12   A.     They would have been whoever was employed at

13           that particular time.

14   Q.     Can you give me a list?

15   A.     I can recreate a list for you after research.

16   Q.     All right.  So these private meetings that you

17           had, when and where did they take place?

18   A.     I believe they took place in Peoria.

19   Q.     And when?

20   A.     It would have been prior to his employment.

21   Q.     How long did it take to familiarize him with

22          your philosophy and the policies and protocols?

23     A.   Well, this was a trained physician.  I

114

```
 1        believe -- I think we spent a number of hours

 2        on it.

 3   Q.   When you hired Dr. Ahmed, and I think

 4        originally there were four jails, did you give

 5        him a schedule?

 6   A.   What we do is we give him the sites.  He then

 7        calls the jails and sets up a schedule that

 8        works for both of them.  We don't set the

 9        schedule.

10   Q.   And do you know that he did that?

11   A.   Yes.

12   Q.   How do you know that?

13   A.   Because we had no complaints about his not

14        showing up or anything like that.

15   Q.   Are you familiar with the Indiana jail rules?

16   A.   I'm generally familiar with them, yes.

17   Q.   How are you generally familiar with them?

18   A.   I have reviewed them in the past, I've looked

19        at them, I've looked -- I haven't looked at

20        them for a long time, but I have looked at them

21        in the past.
```

22    Q.    Do they in any way relate to your position

23          responsibilities in providing health care?

115

1    A.    Well, you want to be sure that the jail's

2          policies and procedures at least cover those

3          minimum standards.  Most jail standards by

4          states are fairly minimal.

5    Q.    You realize those are minimum standards?

6    A.    Yes.

7    Q.    Not optimum standards?

8    A.    Yes, that's why the present policies and

9          procedures greatly exceed those standards.

10   Q.    Do you have any documentation to demonstrate

11         that Dr. Ahmed became familiar with your

12         philosophy and your protocols and your general

13         standard of care?

14   A.    You're asking for paper documentation?  Is that

15         the question?

16   Q.    Yes.

17   A.    The paper documentation would be through peer

18         review.

19   Q.    Pardon?

20   A.    It would be through peer review.

21   Q.    Do you have any peer review documentation?

22    A.    I don't have any peer review documentation at

23          this time, no, but we do peer review on a

116

1        regular basis.

2    Q.   Okay, let me help you out there.  Typically

3        when a jail officer comes in and he's newly

4        hired, he will be asked to sign a document that

5        he has reviewed that you have rules and

6        regulations or he has to sign a receipt for

7        having a copy of those rules and regulations,

8        and they do all of this so that the

9        administrator can be assured that everybody in

10       fact is trained.

11            Do you have any such document, any such --

12   A.   No.

13   Q.   -- method for --

14            MR. GROTH:  Wait.

15   BY MR. SUTHERLIN:

16   Q.   -- insuring Dr. Ahmed became familiar with your

17       protocols and your strategy and your standards?

18   A.   No.

19   Q.   You mentioned peer review.  What is that in

20       your organization?

21   A.   Peer review is a system whereby we have -- we

22          have peers review the work of an individual and

23          then form an opinion about whether or not

117

```
 1            there's discrepancies or problems with that
 2            individual.
 3    Q.      And do you do that with all physicians that you
 4            hire?
 5    A.      Yes.
 6    Q.      And is that documented in your personnel file
 7            of Dr. Ahmed.
 8    A.      No.
 9    Q.      Why not?
10    A.      Because the only time that you document that is
11            if you're having severe problems, then you
12            would document that until you had to relieve
13            the physician or remove him or whatever.  But
14            if everything is going well, we don't keep
15            those records.
16    Q.      Do you have any evaluations of his performance?
17    A.      The same answer.  We do evaluations of his
18            performance.  But if everything's going well,
19            we don't keep those records.  We only keep them
20            if there are problems that need to be
21            addressed.
```

22    Q.    Who participated in peer review of Dr. Ahmed?

23    A.    I would have done quite a few of them by

118

1        actually going around to the site, sitting

2        reading the charts, talking to the nurses and

3        doing things like that.

4   Q.   Who else?

5   A.   I think that's the answer.

6   Q.   So you're the person who peer reviews --

7   A.   Yes.

8   Q.   -- him?

9   A.   For him, yes.

10   Q.   And that's the only person that you're aware

11        of?

12   A.   Yes.

13   Q.   Are you the only person who peer reviews other

14        doctors?

15   A.   Well, I was at one time.  But that changed when

16        Dr. Ahmed was moved to the title of medical

17        director.  So he does that now.

18   Q.   And this is medical director for the entire

19        organization?

20   A.   Yes.

21   Q.   And you're going to provide us with some

22          documentation as to when that occurred?

23     A.   I'm sorry?

119

1    Q.   You were going to provide us some documentation

2         to establish when that occurred?

3    A.   Oh, yes.  Yes.

4              THE WITNESS:  You want to take some notes

5         so I don't screw this up?

6              MR. GROTH:  Uh-huh.

7    BY MR. GROTH:

8    Q.   Do you know whether or not Dr. Ahmed was

9         familiar with the Indiana jail rules?

10   A.   I can't speak to that issue.

11   Q.   Do you know whether any of your physicians are

12        required to be familiar with the Indiana jail

13        rules?  I'm sorry, of the jail rules for the

14        particular states that they visit.

15   A.   Well, I'd be -- You're asking me to guess on

16        that and I cannot do that.  So I'll have to say

17        that I don't know the answer to that.

18   Q.   Now you spoke earlier that you do some peer

19        review of Dr. -- you did some peer review of

20        Dr. Ahmed.  Tell me how you did that.

21   A.   What I do is to go in and at random pull a

22          number of charts, usually in the range of about

23          ten charts on the site.

120

1         I then look at the charts from two

2      standpoints; one, completeness of the record.

3      That's fairly simple and straightforward, it

4      has to do with things like did he sign the

5      record.  Simple things like that.

6         The other one has to do with practice.

7      Does the practice make sense, does the note

8      make sense, does the note talk about pain in

9      the head and then the medicine is for pain in

10     the foot.  That does not make sense.  So I look

11     at it from the standpoint of does the chart

12     flow properly, does the -- does the sick call

13     seem to make sense and was the treatment

14     appropriate for the person.

15        That's how we look at it, we look at it

16     from those two standpoints.

17  Q.  You changed the pronoun from I to we.  How did

18     you do this for Dr. Ahmed?  And when?

19        You say you went and randomly pulled ten

20     files at a site.

21  A.  Yes.

22    Q.    When did you do that for Dr. Ahmed?

23    A.    I don't have a date, but I do it about every

121

1          four months.  Something like that.

2   Q.   Well, how would we document that you did that

3          for Dr. Ahmed or for anyone?

4   A.   I don't know that you could.

5   Q.   So you do this evaluation and yet there's no

6          documentation to find that you can identify or

7          show us to that would prove that you did it or

8          that his performance was satisfactory?

9   A.   That is correct.  It -- we would only know if

10         it wasn't satisfactory because we would keep

11         that documentation.

12  Q.   Would it surprise you that Dr. Ahmed in his

13         deposition said that he saw none of the

14         protocols of Dr. -- of Mr. Wallace's until

15         after he was dead?

16  A.   I suspect he would be talking about the

17         individual protocols that were filled out.  I

18         don't know what he was talking about.

19  Q.   That's what he was talking about, the

20         individual protocols.  Would that surprise you?

21  A.   I'm not sure what he was referring to because

22          he -- he knows what the protocols are.

23     Q.   Is he supposed to look at those protocols when

122

1       he visits?

2    A.   I have to ask you to rephrase that because are

3       you asking me does he sit and read the book,

4       the protocol book every time?  Is that what

5       you're asking me?  I apologize, I'm not

6       understanding the question.

7    Q.   I'll be glad to rephrase it, Dr. Johnson.  Were

8       you aware that Dr. Ahmed had not seen the

9       specific protocols that were completed as you

10      require --

11   A.   That's --

12   Q.   -- the jail staff to do?

13   A.   -- the documentation.

14   Q.   It's called protocol.  According to the book,

15      it says Protocol right on the outside, that's

16      the documentation.  Would it surprise you that

17      he had not seen any of those protocols until

18      after Mr. Wallace's death?

19   A.   I don't know because I don't know what the flow

20      of that paperwork was at the time that he died.

21      I just cannot speak to that issue.

22    Q.   What do you think it should be?

23              You had a contract with the county, you

123

1       provided a medical doctor.  What do you think

2       the procedure should be if a doctor is

3       contacted for chest pain, as your protocol

4       suggests, what do you think it should be?

5    A.  Ordinarily, the doctor reviews the results of

6       that when he come comes in.

7    Q.  And what would be the exception when he would

8       not?

9    A.  If the chart had been pulled for some other

10      reason, if the chart was maybe not in medical,

11      maybe it was somewhere else, somebody else was

12      reviewing it, the chart was not available for

13      some reason.

14   Q.  Wouldn't he ask for it?

15   A.  If he -- I suppose if he happened to think

16      about it.

17   Q.  So it's just that casual?  If he happens to

18      think about it, he asks for it, and if he

19      doesn't happen to think about it after visiting

20      twenty jails?  Is that what you're suggesting?

21          That's a question.  Is that what you're

22          suggesting?

23     A.   I'm suggesting that -- that he would review the

124

1       record if the record was available to him.   He

2       comes in and he takes care of the work that is

3       presented to him and he handles that.

4   Q.   Did you personally negotiate the contract

5       agreement between your company and Jackson

6       County?

7   A.   I would have been involved in establishing the

8       price and that sort of thing.

9   Q.   Did you?

10  A.   I may not have necessarily.   I can't speak to

11      whether I was personally involved with the

12      presentation to the commissioners because I

13      frankly don't remember.   But I would have come

14      up with the price.

15  Q.   So you don't remember whether you even went

16      down there to speak to the commissioners

17      personally?

18  A.   I don't remember.

19  Q.   Is that something you typically do?

20  A.   I frequently do it.   But to tell you the truth,

21      the marketing department does the vast majority

22          of it.

23      Q.   All right.

125

1    A.    There are times that I will do it.

2    Q.    Now you described a process in which you

3          believe that you were contacted by the sheriff

4          or somebody in the sheriff's department.  They

5          hear about you and then you respond to their

6          concerns.

7                Do you have any specific recollection of

8          you being involved in that sort of discussion?

9    A.    Well, would have been involved after he would

10         have contacted us.  After the sheriff would

11         have contacted us, they would have sent out an

12         information gathering sheet, that would have

13         been filled out, then they would bring that

14         data in to me to discuss what we could do to

15         try to help them.

16   Q.    And where is that data information sheet or

17         information?

18   A.    It's virtually all financial information.  It

19         is -- it's in the office.  But it was financial

20         information.

21   Q.    So it's information regarding how much they are

22          expending each, say, fiscal year for medical

23          services?

126

1    A.    Yes.

2    Q.    And that's the only information they provide?

3    A.    No, it's broken down into various categories

4          and various things like that.  And then they

5          provide other things, as I mentioned before,

6          that may be concerning them.  It may be lack of

7          certain policies and procedures, it may be

8          training issues, there may be a lot of things

9          that they might want us to address if we come

10         on board.

11   Q.    I understand.  I thought you said your first

12         responsibility is primarily financial data,

13         so --

14   A.    Well, we --

15   Q.    -- Let me finish the question -- where would we

16         find this information that they sent to you and

17         filling out a questionnaire giving you the

18         information that you, I guess, would utilize in

19         developing a plan or a proposal?

20   A.    We have a sheet that includes all the financial

21         data, but it also includes other areas of

22          concern that the jail may have.  And they

23          relate that all to us and then we take that

127

1          data and those concerns and then we try to

2          craft a program that works well for them.

3     Q.   Where would that document be?

4     A.   It's in our -- it's in our office.

5     Q.   Okay.  Can we have that produced?

6     A.   Okay, this has sensitive financial information.

7          Is that really necessary?

8               MR. GROTH:  Well, this is -- let me state

9          for the record this is the subject that I was

10         talking to you about on the phone before this

11         deposition where I said there's financial

12         information that they use to calculate their

13         prices and you told me that that information

14         was not necessary to you.  So --

15              MR. SUTHERLIN:  Here's the question I

16         asked him.  I said I'd like to have the

17         questionnaire that the sheriff's department

18         completed and sent to him.  That's what I'm

19         asking for.

20              MR. GROTH:  I understand.  Can we --

21              MR. SUTHERLIN:  That's not financial

22          sensitive information.  That is a public

23          record.  It is a public record, that's what it

128

1       is.  So can we have that?

2   A.  Let me do this.  Let me supply it to our

3       attorneys and then you two can decide what you

4       want to do it with it.  I will supply it to our

5       attorneys and then you two can decide, you

6       know, what you want to do with it.

7           MR. GROTH:  That sounds like work.

8   BY MR. SUTHERLIN:

9   Q.  All right, I'll hand you back what is marked as

10      Plaintiff's Deposition Exhibit #5, which you

11      have previously identified, and it's dated by

12      you December the 28th '05, and signed by the

13      Jackson County sheriff and the county

14      commissioners of Jackson County on December the

15      20th of '05.  And I believe you have that

16      there.

17  A.  Yes.

18  Q.  I'd like to go through this.  Is this a

19      document which is identical to or in any way

20      varies from the contracts that you have with

21      these other counties except for the statement

22          where it says Jackson County Inmates you might

23          put down Monroe County in there?

129

1   A.   The contracts will be different based upon the

2        services that are required by the sheriff.  For

3        example, one may require nursing care, this one

4        did not, that sort of thing, so that there's

5        different levels of obligation that we have at

6        different sites.

7   Q.   Okay.  Turning to page 2 of the ten-page

8        document where it says 1.1.2, is that a

9        standard phrase or condition that you impose on

10       every county or just this one?

11  A.   No, it was negotiated.  Every county is

12       somewhat different.  This is fairly generic

13       though I will have to tell you, for example,

14       the exclusions are fairly common.

15  Q.   Okay.  I skipped over 1.1.1 where medical

16       director physician is provided, is that fairly

17       standard twenty-four hours per day --

18  A.   Yes.

19  Q.   -- seven days a week availability?

20  A.   Yes.

21  Q.   Section 1.1.3, is that provision fairly

22          standard or did that become specific to Jackson

23          County?

130

1    A.   This is specific to Jackson County.

2    Q.   The reference to Section 1.1.4 limiting the

3         Advanced Correctional Healthcare financial

4         responsibility to $5,000.00 per month, was that

5         specific to Jackson County?

6    A.   Yes.  Each county may be different.

7    Q.   So if there's -- as I understand that language

8         here, correct me if I'm wrong, if there are

9         off-site services, such as emergency room care

10        or in-hospitalization, you would accept

11        responsibility -- financial responsibility up

12        to $5,000.00?

13   A.   Right, we pay all bills.  And then if they run

14        over 5,000, then we usually bill the county for

15        that in the next month or the next quarter,

16        however it's arranged in the contract.

17   Q.   Okay.  1.2 Conference of Strategic Plans,

18        Policies, Protocols, Peer Review and so forth,

19        is that standard language or is that specific

20        to Jackson County?

21   A.   It's specific.  This is the general way it's

22          done, but we do have some counties that don't

23          want all of this.

131

```
 1    Q.   Okay.  It talks about peer review.  You've

 2         already talked about that.  Did you do any peer

 3         review of Dr. Ahmed's performance in Jackson

 4         County?

 5    A.   The answer would be yes.  Because of the length

 6         of time that he was there, the answer would be

 7         yes.

 8    Q.   Do you recall when you did that?

 9    A.   No.  It would have been within the first year

10         of the contract.

11    Q.   Is there any way for us to verify that?

12    A.   No, because I would not have kept any records

13         from that because there were no issues or

14         problems.

15    Q.   Referring to 1.3 Staffing, is that generic or

16         is that specifically tailored to Jackson

17         County?

18    A.   That is specifically tailored to Jackson

19         County.

20    Q.   All right.  Would you explain then what your

21         obligations were under the contract under the
```

22          provisions of 1.3.1 and 1.3.2.

23     A.   The physician/nurse practitioner shall visit

132

1          the facility once a week or as otherwise agreed

2          to by the sheriff and ACH.  The physician shall

3          serve as the facility's site medical director

4          and be available by telephone to facility and

5          medical staff on on-call basis, seven days a

6          week twenty-four hours a day.  I think that's

7          fairly self-explanatory.

8               And the second one, 1.3.2, has to do with

9          nursing.  The county employs the nurse.  And

10         the nursing staff then shall remain county

11         employees.  So we did not pay their salary.

12    Q.   Does the nurse have to respond to the doctor's

13         directives and orders?

14    A.   Yes.

15    Q.   Would you distinguish between Medical

16         Director/Physician?

17    A.   In large sites, for example, Kansas City,

18         Missouri, there might be multiple physician

19         physicians.  One of them will be the director,

20         the others are simply site physicians.  In a

21         small site, we only have one doctor, that is

22          the site doctor and medical director.

23     Q.   So at the time this contract was executed --

133

```
1              this language looks generic to me since it has

2              a director/physician -- what were you

3              providing.

4     A.       In this site we were providing one doctor to

5              come in once a week on an as-needed basis and

6              provide the care plus 24/7 on-call, telephone

7              call.

8     Q.       So you were providing a physician --

9     A.       Yes.

10    Q.       -- under the terms of this contract?

11    A.       Yes.

12    Q.       On 1.4.3 HEALTH EDUCATION.  ACH shall provide

13             health education materials to the sheriff for

14             inmate education.  What did you provide?

15    A.       Those were handouts and I -- I can't tell you

16             at this point, but generally what they are is

17             if you come in and you have anxiety, we will

18             evaluate you and then we may give you some --

19             an anxiety information sheet to help you deal

20             with that.  Insomnia, that sort of thing.

21    Q.       When you say "we," obviously you're not on
```

22        station, so who's "we"?

23    A.   That would be the health care team in the jail.

134

1    Q.   Jail staff?

2    A.   Yes, it would be the nurse and the -- or the

3         doctor, either one.

4    Q.   Okay.  Are there other materials that you can

5         think of other than anxiety?

6    A.   I think there's information on headaches.  I

7         would have to get a list of them, there's quite

8         a list actually.

9    Q.   And those are provided routinely --

10   A.   Yes.

11   Q.   -- to each of the jails?

12   A.   Yes.

13   Q.   Can I have a copy of those handouts?

14   A.   Yes.

15   Q.   Thank you.  Then on 1.4.4 CARE REPORTS, what's

16        the obligation under the contract of ACH?

17   A.   We are to schedule on CQI meetings.

18   Q.   CQI, and those stand for?

19   A.   Continuing quality improvement.

20   Q.   Okay.

21   A.   We are to schedule those meetings, we are to

22          create healthcare reports and supply those to

23          the sheriff.  That's basically what that's all

135

1       about.

2   Q.   Okay.  And on page 4, 1.4.6.  Is that having to

3       do with records?  Is that a standard

4       requirement or is that has been tailored for

5       Jackson County?

6   A.   This is a standard requirement, I believe.

7       Yes, I'm pretty sure this is a standard

8       requirement.

9   Q.   On provision 1.4.7 SHERIFF'S POLICIES AND

10      PROCEDURES.  ACH shall operate within the

11      requirements of the SHERIFF's Policies and

12      Procedures which directly relate to the

13      provision of medical services and other

14      Policies and Procedures of the Sheriff and so

15      on, which procedures are you referring to?

16   A.   These would be the medical unit policies and

17      procedures that the sheriff has outlined.  And

18      so we need to follow his policies and

19      procedures.

20   Q.   Okay.  Did you provide a templet or set of

21      procedures for the sheriff to review and

```
22        consider?

23    A.   Yes.
```

136

1    Q.   Okay, and did you develop those procedures

2         yourself?

3    A.   Not myself.

4    Q.   Your corporation?

5    A.   Yes.

6    Q.   Okay, and are they the same procedures templet

7         procedures that you provide to the other

8         counties?

9    A.   Yes.

10   Q.   Do you know whether or not those procedures

11        took into account any standards of care, such

12        as the Indiana jail policies and procedures?

13   A.   They take into account the NCCHC standards,

14        which are superior to the Indiana jail

15        standards.

16   Q.   Referring to Page 5, Section 2.2, do you recall

17        ever visiting the sheriff's facility?

18   A.   Well, I was certainly there the day I started

19        the project.

20   Q.   Okay.  Do you recall the medical section of the

21        jail?

22    A.    I cannot picture it in my mind at the moment.

23    Q.    Is there anything that you can recall that

137

1          would come to mind or any documents you can

2          direct us to which would suggest that the

3          medical area that they had created to provide

4          healthcare services was inadequate in any way?

5     A.   We usually review the areas that we feel are

6          inadequate.  And then those areas that we feel

7          should be improved we usually include that in

8          our strategic plan.  If that was not

9          specifically listed in the strategic plan, we

10         probably would not have added that.

11    Q.   Was there any equipment or materials which your

12         corporation provided to Jackson County?

13    A.   As a general rule, we do not provide equipment.

14    Q.   Is it fair to say -- and I sort of skipped over

15         that, but is it fair to say that in Jackson

16         County and all other counties medical records

17         are kept on-site?

18    A.   Yes.

19    Q.   And that Dr. Ahmed or any other physician would

20         not have what I would refer to as sort of

21         formal records off-site?

22    A.    That's right.

23    Q.    They may have a note or two they made from a

138

1          phone call but that would be it?

2     A.   Right.

3     Q.   He may or may not keep those?

4     A.   That is correct.

5     Q.   Okay.  This section on compensation and

6          adjustments, I don't need to know the method

7          but this was the amount you negotiated and

8          agreed upon to charge Jackson County --

9     A.   Yes.

10    Q.   -- Sheriff's Department?  Is that correct?

11    A.   Yes.

12    Q.   If you would go down to Section 3.2.1, would

13         you read that and explain what that means when

14         it says that you're charging $1.72 per inmate

15         per day.

16    A.   Yes.  Let me first of all explain the principle

17         behind it and then I'll read it.

18    Q.   Please.

19    A.   The principle is that the risk of a contract,

20         financial risk of contract, is directly related

21         to the number of bodies that you're covering,

22          the number of lives, the number of souls that

23          you're covering.  And so when you start a

139

1          project, you always try to ascertain what the

2          census is going to be.  And that comes from the

3          sheriff, the sheriff is the one that tells us

4          that.

5              The number that he gave us was 142.  Based

6          upon that number, if they start to run 143 or

7          153 or 163, that would be increased expense and

8          they would need to compensate us for that.

9          I'll read this now.

10    Q.   Sure.

11    A.   And please stop me if you have any questions.

12    Q.   Sure.

13    A.   ADJUSTMENT FOR EXCESS AVERAGE DAILY POPULATION.

14          The average daily population for a given

15          quarter -- in other words, this is averaged out

16          over a three-month period -- shall be

17          determined from jail census records.  So the

18          records are supplied to us by the sheriff.  For

19          billings purposes, the average daily population

20          shall be based upon an average population of

21          142.

22                When the average daily population exceeds

23          the base rate in any calendar quarter, the

140

1        additional compensation due shall be figured on

2        the average number of Jackson County inmates

3        above the base level for the quarter multiplied

4        by the per diem rate of $1.72 per inmate per

5        day.

6             For example, an average daily population

7        for Q2 2006 is 164, additional compensation due

8        would be calculated as follows:  22 X $1.72 X

9        91.  It is understood that non-county inmates

10       are not included in the average daily inmate

11       population.

12   Q.  Would you tell me the significance of the

13       factor 22 and the factor 91.

14   A.  Well, 22 is the number that our example 164 was

15       above the 142, it's 22 inmates more.

16   Q.  Okay.

17   A.  91 was the number of days that was in that

18       quarter.

19   Q.  Okay, and when you would then refer to the

20       next -- to the last sentence there, non-county

21       inmates are not included, what does that mean?

```
22    A.    Well, for example, if, let's say, the Indiana

23          Department of Corrections had ten patients in
```

141

1          there.  Really, the jail is not responsible for

2          the expense of those as a general rule.  And so

3          because of that we don't include those in our

4          count and we don't charge them for those

5          patients.

6               We take care of them but -- but their

7          medicines, for example, are paid for by the

8          state, if they go to the hospital, it's paid

9          for by the state.  And so it's really not a

10         financial responsibility, but we do take care

11         of them.

12    Q.   Okay.  In terms of the agreement, it would

13         appear that it began January 1, 2006, and

14         continues through December 31, 2006.  Is that

15         correct?

16    A.   Yes.

17    Q.   When did you conduct your training?

18    A.   Can I refer to my --

19    Q.   Anything you want to.

20    A.   -- notes on that?

21    Q.   Sure.

22    A.    December 27th, 2005.

23    Q.    Right after Christmas?

142

1    A.    Yes.

2    Q.    Is this contract then negotiated --

3          renegotiated at the end of its term?

4    A.    Yes, it's -- what it has is a -- May I turn to

5          that clause and look it up myself here?

6    Q.    It may be the last page.  ANNUAL RATE OF

7          INCREASE.

8    A.    What page is that on?

9    Q.    It's the last page of my copy.

10   A.    What clause do you have?

11   Q.    This is a copy we made of your exhibit.  So --

12         MS. HARRIS:  It's at the end of the

13         proposal, not the end of the contract.

14         MR. GROTH:  At the end of the attachment.

15         THE WITNESS:  Oh, at the end of the

16         attachment.  Back here?

17         MR. GROTH:  Yes.

18   A.    Well, yes, this -- see, this was -- this was

19         proposal information here.  Out of this then

20         comes the actual contract.  Now this was made

21         an attachment to it, so we would still live up

22          to this.

23                  The annual rate of increase, as this is

143

1        stated, is not to exceed 7 percent.  I don't

2        think we were ever anywhere close that though.

3        But I don't really remember.  I think the last

4        one, we have a letter here it says in 2008, it

5        only went up 2 percent.  But I don't remember

6        about the other ones.  There should be

7        something in the contract though.  Let me keep

8        looking here.

9              Oh, here it is.  Here it is, 3.1.1

10       ANNUALIZED AMOUNT UPON RENEWAL.  Upon each

11       renewal of this agreement, the annualized

12       amount of increase shall not exceed 7 percent,

13       unless agreed to by both parties in advance of

14       the renewal date.

15   Q.  Okay.

16   A.  So that's what it was and it simply puts a cap

17       on how much we can raise the amount.

18   Q.  Okay.  Referring to page 8, it states that

19       5.3.1 is the entire agreement.  And yet what I

20       was handed today, and I believe what I was

21       given earlier in response to the request for

22          production, was the attachment as Health Care

23          Program.  Is that part of the contract?

144

1    A.    It says this agreement with the attached Health

2          Care Program and Cost Proposal constitutes the

3          entire agreement.   That's what it says.

4    Q.    Okay, so that is part of the agreement?

5    A.    Yes.

6    Q.    All right, and then 5.3.2 HOLD HARMLESS, would

7          you read that and explain what it means.

8    A.    ACH shall hold harmless the county, sheriff,

9          and any and all of their agents and employees

10         against any loss or damage, including

11         reasonable attorney fees and other costs of

12         litigation caused or necessitated by the sole

13         negligence of ACH, its agents, employees or

14         vendors related to medical treatment or the

15         care provided by ACH.

16   Q.    And what does that mean?

17   A.    I would think my interpretation of this is that

18         if we have a very specific thing in which we

19         have been completely at fault for this and the

20         sheriff is sued for it for some reason, that we

21         would stand behind that.   That would be my --

22          my guess --

23    Q.    Okay.

145

```
 1    A.    -- about what that means.

 2    Q.    So if there's any -- any question about the

 3          sheriff being sued --

 4                MR. SUTHERLIN:  And Mr. Groth, I'm not

 5          asking for a medical -- I'm sorry -- a legal

 6          opinion, I'm just trying to get a general

 7          opinion here.

 8    BY MR. SUTHERLIN:

 9    Q.    If the sheriff is sued, then your company or

10          your insurance carrier would then indemnify if

11          it was determined that you were the sole person

12          or your agent were the sole person responsible?

13    A.    Well, indemnify is a legal term and I'm not

14          necessarily familiar with that term, so I don't

15          want to use the word "indemnify" because I'm

16          not certain what it means.

17                But for example, if -- if the -- if it was

18          determined that there was an incident and both

19          the sheriff's department and our people were at

20          fault, then I would think it would fall to both

21          of us.  If it was just our people that were at
```

```
22          fault, I would think it would fall to us.

23     Q.   And looking on -- it's not numbered but it
```

146

```
 1              talks about on-site and off-site services.
 2     A.   Page, please.
 3     Q.   Of the attachment, it's the first page after
 4              the signature page.
 5     A.   Okay.
 6     Q.   As I understand this, and correct me if I'm
 7              wrong, your company will not pay for any
 8              medications or prescriptions that have to do
 9              with HIV or AIDS, hepatitis, rabies,
10              musculosclerosis, cancer or court-ordered
11              medications.
12     A.   That's correct.
13     Q.   It does indicate, following that same section,
14              that HCH will provide disposable medical
15              supplies; is that correct?
16     A.   Yes.
17     Q.   How is that done?
18     A.   Well, the nurse keeps track of the supplies and
19              then she orders supplies from our suppliers and
20              we pay the bill.  They bill us direct for that.
21     Q.   Okay.  And then at the bottom of that page it
```

22          says MANAGEMENT SERVICES Risk Management, Site

23          Specific Policies NCCHC standards.

147

1    A.    Yes.

2    Q.    What does that refer to?

3    A.    That refers to this generic set that we

4          recommend that they look at and that they

5          would -- they would modify their existing

6          policies to meet NCCHC recommendations.

7    Q.    Okay, and so for the record, what does NCCHC

8          stand for?

9    A.    The National Commission of Correctional Health

10         Care.

11   Q.    Okay.  All right, and those were the -- those

12         were the documents -- that standard was the

13         document that constituted the Tab 2 COUNTY JAIL

14         POLICIES AND PROCEDURES that you provided to

15         the Jackson County jail for their

16         consideration?

17   A.    Yes.

18   Q.    Want me to show it to you?

19   A.    Yeah, let me take a quick look -- sometimes

20         they'll mix their own policies in there --

21         since I haven't seen what you were given there.

22          Yes, this is our format.

23    Q.    Okay, that's your format.   You took it off the

148

1          NCCHC?

2     A.   Yes.

3     Q.   And did you make any changes to that national

4          standard?

5     A.   For Jackson County?

6     Q.   No, for the thing -- for this document that you

7          presented to them.

8     A.   Well, the way this is done is there is a book

9          that's put out by the NCCHC, but they don't

10         write it this way.  So what we have to do is

11         take those standards and then put them into

12         written format.  So we put them in written

13         format so that they're in policy format and

14         then that's what we supply to them.

15              But if you look at the numbers at the top,

16         it will have like J, you know, H16 or some such

17         odd number as that.  Those numbers will

18         correlate to the book for that particular thing

19         that they are recommending that you have a

20         policy.

21    Q.   Sure.  And then, at least on some of the pages,

22          it -- it said it was reviewed and revised --

23          yeah, revised 5 of -- which would have been May

149

1         of 2005.

2              Did you make -- Is that your revision?

3    A.   That would have been -- Is that all policies or

4         this particular policy?  I think that

5         particular policy was revised at that time.

6    Q.   Okay.

7    A.   That's probably what that means --

8    Q.   Okay.

9    A.   -- most likely.

10   Q.   That would have been just that particular

11        policy that was revised by your organization?

12   A.   No, it would be -- remember, these belong to

13        the sheriff, everything belongs to the sheriff.

14   Q.   No, this one here is the one I just asked you

15        was the templet.

16   A.   Oh, okay, if that's the templet, then that

17        would be a generic revision that we would have

18        made.

19   Q.   That you would have made?

20   A.   Yes.

21   Q.   Not the NCCHC?

22    A.   We would have got it from them.   They -- see,

23         they change things all the time.

150

1   Q.   Okay.

2   A.   And then we come back and revise things and

3        that sort of thing.

4             We attend -- as a general rule of thumb,

5        there's two national meetings a year that we

6        attend.

7   Q.   So that the record's clear, I'm referring to

8        the documents provided by defendants under Tab

9        2 to our first request for production.

10            Then tab number 3 becomes the Jackson

11       County Jail Policies again provided by your

12       organization?

13  A.   We wouldn't have had those.  They had to come

14       from the jail, if they are the Jackson County,

15       I would think.

16  Q.   I don't know where they came from originally,

17       but your attorney provided them.  So take a

18       look at that, please.  This is tab number 3.

19       Would you look at that, please --

20  A.   Okay.

21  Q.   -- just in general.

22    A.    Okay.

23    Q.    Thank you, Doctor.  Did you review their

151

1          policies and procedures to ensure, or did

2          anybody on your staff to ensure, that they

3          complied with your standards, state standards,

4          and the NCC standards?

5     A.   The way that the practice works is that we

6          supply the sheriff with the generic ones as

7          these are our basic recommendations of things

8          that you need to consider.

9               From that point on, it's entirely up to

10         the sheriff, we have no further input into it.

11         Now we will advise them.  Sometimes sheriffs

12         don't understand why you need a particular

13         policy, we will work with them on that to try

14         to explain why we think this is important.  But

15         in the end, it comes down to what the

16         sheriff wants to run his department.  So this

17         becomes entirely the sheriff's document, not

18         ours.

19    Q.   What's the date on that one?

20    A.   This one says February of '07.

21    Q.   All right.  I don't think I brought the other

22          one, but there is a -- maybe I did.

23              This would have been Plaintiff's Exhibit

152

1       #1 in the deposition of Marc Lahrman.  Would

2       you look at that, please.  Would you read

3       through those, Dr. Johnson.

4           Do you find your signature on the

5       documents that they have used for the policies

6       and procedures for Jackson County Jail for

7       2006?

8   A.  This is not a policy and procedure manual.

9   Q.  What is it?

10  A.  It's a protocol manual.

11  Q.  Are those protocols that you provided?

12  A.  Yes.

13  Q.  So the protocols that you provided are then

14      incorporated by the sheriff or accepted by the

15      sheriff as the protocols that you require them

16      to follow?

17  A.  Well, these are general guidelines because

18      physicians are different and physicians may or

19      may not follow the protocols, they may have

20      another way of how they approach that.  This is

21      to just help with the standardization of

22          information and that sort of thing.  In the

23          end, the physician is finally responsible for

153

```
1              the way things are taken care of.

2    Q.        Well, in this particular case, you employed the

3              physician.

4    A.        Yes.

5    Q.        My question to you is, do you require the

6              physicians to follow these protocols?

7    A.        No.

8    Q.        Do you require them to field test these

9              protocols?

10   A.        We advise that they use the protocols to help

11             them gather data and for documentation.

12   Q.        So these documents which are referred to as

13             jail protocols, they were signed you and

14             revised in September 01 of '05; is that

15             correct?

16   A.        Yes, I believe that was the date on them.

17   Q.        Okay, and when did you provide these jail

18             protocols to Jackson County?

19   A.        It would have been at the time that we started

20             the project, which I believe was on my initial

21             visit, which would have been the 27th of
```

```
22        December.

23   Q.   Okay.  All right, so your organization is the
```

154

1      sole author of these general protocols?

2   A.   Yes.

3   Q.   When you went to Jackson County, were you --

4      was the first time you went there, was that to

5      make the presentation, the training

6      presentation?

7   A.   Yes.

8   Q.   Did anyone else go with you?

9   A.   I think the answer is yes, but I don't know if

10     I can tell you who it was.  I -- I can't tell

11     you right now who it was, but I'm sure that I

12     had someone else with me at the time, usually a

13     nurse.

14   Q.   And you said earlier that it was -- that it was

15     approximately a two-hour presentation?

16   A.   Yes, they run from an hour and forty-five to

17     two and a half to three hours, depending upon

18     the number of questions and all that kind of

19     stuff.

20   Q.   And what is presented during those two hours or

21     so?

22    A.    I present a general overview of introduction to

23          correctional healthcare because the standards

155

```
 1          in correctional healthcare are set by, as you

 2          know, the 14th Amendment and that's different

 3          from what the standard practicing doctors are

 4          used to.

 5               So what we want to do when the sheriff

 6          asks us to put in a correctional healthcare

 7          program, when the sheriff has made a decision

 8          to put in a correctional healthcare program, we

 9          want to make sure that his officers understand

10          why we're doing things in the way that we're

11          doing it and help them understand their

12          responsibilities from a legal standpoint in

13          that kind of environment.

14     Q.   Do you cover the protocols that I just showed

15          you that were -- that had your signature on

16          them?

17     A.   We talk about them but we do not cover them.

18          That's done by the nurses, nurse training, and

19          it's usually done with the medical staff.

20               So, for example, they would go in great

21          depths over the protocols with the nurses and
```

22          then they would spend extra time talking to the

23          officers, possibly explaining how to use them

156

1           and so on and so forth.

2                I do spend some amount of time talking

3           about how to do documentation using those, so

4           that is part of my talk.  And I actually bring

5           the book in and I say, Look at this.  Now

6           here's the situation where an inmate was

7           bitten.  This is what you do, you pull this

8           out, you copy this, you fill this out.  This is

9           what you do, you call the doctor.  And that's

10          how we go through that.

11    Q.    Where is it required in your contract that the

12          nurse provide this training, this more specific

13          training on protocols?

14    A.    It's not -- It's in the contract that we need

15          to assist, I believe, with the ongoing training

16          of the staff in general and we just

17          automatically think that we could help the

18          officers by helping with training there too.

19          So we put some of our corporate nurses in there

20          to assist with that.

21    Q.    Well, who would that be?

22    A.   There's been a couple of them.  Initially, it

23         was whoever went down there with me.  It may

157

1           have been Karen Stokes.  But following that, we

2           know that Shannon McCord was in there, we were

3           aware of that.  It looks like Shannon has been

4           the principal nurse that has -- regional nurse

5           that has been in there working with the medical

6           community.

7    Q.     When you say the medical community, really

8           that's only one person, Nurse Robinson?

9    A.     Well, but it's bigger than that because she's

10          only there during the day, you know, and

11          there's other people that have to kind of pick

12          up the ball and so they need to at least have

13          some nodding acquaintance with where's the med

14          cards, you know, how do I find the drugs in the

15          middle of the night and all those kinds of

16          things.  So there's a little bit more to it

17          than that.

18   Q.     Oh, I agree.  But I'm just asking you

19          specifically did either of those people that

20          you just identified have any interaction with

21          any of the other, quote, "medical folks,"

22        whoever they might be, other than Nurse

23        Robinson when they came down there?

158

1   A.   Yes.

2   Q.   Who?

3   A.   It would be whoever went with me.

4   Q.   No, I'm talking about -- Let me make this

5        clear.  We've done the depositions of all the

6        jail officers that interacted with --

7   A.   Uh-huh.

8   Q.   -- Mr. Wallace, we've looked at their personnel

9        files for purposes of training.  There were --

10       there were groups -- I'm sorry, there were some

11       of the jail officers that had not received the

12       two-hour training that you referred to, none of

13       them said that they had any other training

14       except for the two-hour training that you gave.

15            When I asked Dr. Ahmed, he first said it

16       was sort of on-the-job training and I asked him

17       specifically what that was and he responded,

18       Well, if anybody had a question, I was willing

19       to answer them.

20            Is that your idea of on-the-job training?

21  A.   No, it's more formalized than that.

22    Q.   Well, what was this more formalized training

23         other than the two hours that you gave?

159

1    A.   May I refer to the record?

2    Q.   You may refer to anything.

3         While you're doing that, can we take a

4    bathroom break.

5         MR. GROTH:  Yes.

6              (Whereupon a short recess was

7              taken and proceedings resumed as

8              follows.)

9         MR. SUTHERLIN:  Can you read back the last

10   question.

11        THE REPORTER:  "Well, what was this more

12   formalized training other than the two hours

13   that you gave?"

14   A.   I was prepared to answer that.  Okay?

15   Q.   Go ahead.

16   A.   On December 28th, the day after my initial

17   two-hour, whatever it was, presentation, I

18   wrote a letter back to the sheriff and in that

19   letter, the last paragraph, I noted:

20        The nurse is very knowledgeable and

21   further training will be continued in January

22          2006 by our State Manager, Nurse Rose.   We

23          believe -- or I believe we will be able to

160

1      assess all of the other aspects of the program

2      to be sure that everything is working well.

3           So at that point we know that we had

4      scheduled further training.  The way that we

5      follow up on that then is to look at the

6      strategic plans and see what items were

7      included in there to be sure everything is

8      done.

9           As we review the action items, I see that

10     item 10 is an in-service on medication

11     administration for the correctional officers.

12     The time frame was as soon as possible,

13     probably within the next day or two, and the

14     person responsible was Nurse Missy.

15          Now, then we have to decide whether that

16     was in fact even done.  So we'd have to go to

17     the first minutes of the CQI and the

18     corresponding letter to see if that was

19     complete.

20          That meeting was held on May 24th and the

21     corresponding letter that went with that says,

22          It was nice to -- This came from Shannon

23          McCord, Regional Manager:

161

1           It was nice to meet you at our first CQI

2      meeting on May 24th, 2006.  According to the

3      strategic plan developed for your facility, all

4      action items have been completed and instituted

5      as required except one, changing the policies

6      and procedures to reflect the exact medical

7      operations of the facility.

8           So we would have to assume that all that

9      training was done at that time.  Now since

10     then, there's been evidence that we've had

11     other ongoing training and that's reflected in

12     the letters that have gone back to the sheriff.

13  Q.  Okay, let's take sort of this because there may

14     be some false assumptions there, let's refer to

15     Plaintiffs Exhibit #6, which is the letters

16     that you talked about.

17          The first letter that you referred to in

18     Plaintiff's Exhibit #6 is dated December 28th?

19  A.  Yes.

20  Q.  Okay.  And you identified certain things that

21     you hope will happen in January of '06.  Does

22          it not say that?

23    A.    Yes.

162

```
 1   Q.   Did it happen?

 2   A.   We believe it did because all items were taken

 3        care of, everything was taken care of.

 4   Q.   So then did your folks come down there in

 5        January of '06?

 6   A.   I have no reason to believe that didn't happen.

 7   Q.   Well, let me -- This is what it says, The nurse

 8        is very knowledgeable and further training will

 9        be continued in January 2006 by our State

10        Manager, Nurse Rose.

11   A.   Yes.

12   Q.   Did Nurse Rose go down there in January?

13   A.   I have no reason to believe it didn't.

14   Q.   Well, look at your minutes.  Did she ever come

15        in there?  Does she indicate that?  She says

16        the very first time she's coming there in May.

17             Where's your record that she came down

18        there in January, Doctor?

19   A.   It's a different nurse.

20   Q.   Where's your record that anybody came down

21        there?
```

22    A.    The record is that all of that was taken care

23          of.

163

1   Q.   No, there is no record of such a thing.  There

2        is no record of any such thing.  That's your

3        assumption.

4   A.   We will have to disagree then.

5   Q.   I guess we will.  So you do not have a paper

6        document to demonstrate that anybody from your

7        office came down there in January?

8   A.   I have a paper document that says that

9        everything had been completed as of that

10       meeting on the 24th of May.

11  Q.   Okay.  And what your record says is that -- I

12       believe you said that Nurse Rose, Indiana State

13       Manager --

14  A.   Yes.

15  Q.   -- and Nurse McCord were in attendance;

16       correct?  Looking at Plaintiff's Deposition

17       Exhibit #7.

18  A.   Looking at the minutes from the CQI, yes.

19  Q.   Okay, and in attendance is Sheriff Hounshel

20       Marc Lahrman, Missy Robinson -- that's Nurse

21       Robinson, not Nurse Missy, but we'll let that

22        go -- and Linda Brown and Nurse McCord and

23        Nurse Rose.

164

```
 1              Those are the people in attendance;

 2         correct?

 3    A.   Yes.

 4    Q.   Is there any evidence in here and can you glean

 5         from any information in here that there was any

 6         further training taking place when your group

 7         came down on May 24th with the rest of the

 8         staff?

 9    A.   We know that all of the action items were taken

10         care of and one of them was to get training

11         done in January so we have to assume it was

12         taken care of in January as outlined.

13    Q.   Please listen to my English language completely

14         and correctly.  Is there any indication in this

15         document on this day that other staff members

16         were involved in any training on that day?

17    A.   Not in this document.

18    Q.   Let's go to that page 3 of 3.

19              Are you there?

20    A.   I apologize, I was just reading down here.

21         Just a moment here.
```

22              Okay, I'm on 3 of 3.

23    Q.   Do you understand the significance of item

165

1      number N?

2   A.   Yes.

3   Q.   Would you tell me what each of those mean?

4   A.   Well, as a general rule, jails run pretty

5        quietly, there's not a lot of excitement in a

6        jail for unusual cases.  So anytime there's an

7        unusual case, we'd want to at least think about

8        it, listen to what had happened, try to decide

9        if there's anything that was unusual about it.

10           The two cases that they reported on, one

11       was a detainee in jail for two years and had

12       not had tooth cleaning and he complained to the

13       ACLU and the county paid $275.00 for that

14       cleaning.

15           The second one was a detainee who died in

16       the emergency room after coding in the jail and

17       the comment was detainee was non-compliant,

18       refusing to take medications or have blood

19       pressure taken.

20   Q.   Do you know that to be true?

21   A.   That's just the report.  I was not on-site at

22          the time.

23     Q.    Did you do any peer review on this particular

166

1          incident since it involved a death?

2     A.   We -- First of all, the death report would have

3          been reviewed or analyzed by the site physician

4          and then, following that, I looked at the case

5          records and that sort of thing.

6     Q.   What constitutes case records?

7     A.   Well, this is the same discussion we had

8          before.   These -- this is the medical record of

9          that particular patient.

10    Q.   And when did you do that site review on this

11         particular death?

12    A.   This probably would have been done within

13         thirty days following that death, I would

14         think.

15    Q.   Did you have formal discussion with Dr. Ahmed?

16    A.   Not formal.   We discussed the case informally

17         but I didn't -- I don't recall a formal

18         discussion with him.

19    Q.   Somebody dies and you can't even have a formal

20         discussion about the circumstances?

21    A.   Well, define formal.

22    Q.   Where you sit down, you look at all the

23         documents in front of you available to you and

167

1          you actually make a determination whether or

2          not your physician acted appropriately or

3          whether or not any of the jail staff acted

4          appropriately.

5               That's what I would -- that at least

6          requires to have a meaningful discussion and

7          reach a meaningful conclusion about that.

8     A.   We did.

9     Q.   Would it surprise you that Dr. Ahmed in his

10         deposition said just the opposite?

11    A.   Okay.

12    Q.   It doesn't surprise you?

13    A.   Well, we certainly talked about it.  Did we sit

14         in the same room?  No, we didn't sit in the

15         same room.  Did we talk about this by

16         telephone?  Absolutely, we did.

17    Q.   So it's more of a casual conversation?  Is that

18         what you --  Is that what it is?

19    A.   No, it's more of a conference call.

20    Q.   Conference call, but no documents in front of

21         you.  Is that right?

22   A.   No.

23   Q.   Did you have documents in front of you --

168

1    A.    Yes.

2    Q.    -- when you had the conference call?

3    A.    Yes.

4    Q.    What did you have?

5    A.    I had the medical record.

6    Q.    When did you have that conference call?

7    A.    As I said, this would have been probably within

8          thirty days of the death.

9    Q.    Are you relying then on Nurse Robinson and the

10         jail staff to have follow-up training in a

11         supplement to the two hours you gave in

12         December?

13   A.    I believe we talked about Shannon McCord, we

14         talked about Nurse Rose giving training.  Is

15         that what you're referring to?

16   Q.    I'd just like to know where the training is

17         documented.  I see this meeting that you had

18         with the jail --

19   A.    Uh-huh.

20   Q.    -- supervisors.  I don't see any documentation

21         of anybody giving the rest of the jail staff --

22    A.    Okay.

23    Q.    -- explanations of the protocols, the

169

```
 1        policies --
 2   A.   Okay.
 3   Q.   -- policies or anything like that.  My question
 4        to you was, are you relying then on Nurse
 5        Robinson or the jail administrators to ensure
 6        further training after your two-hour
 7        presentation?
 8   A.   I think the need for training is identified by
 9        a lot of people, including probably those
10        people, the nurse, possibly a regional person,
11        anybody that identifies with the training would
12        be involved in the decision process.
13   Q.   So you expect the jail then to understand the
14        hundred plus protocols without any specific
15        training coming from your agency or your
16        corporation?
17   A.   Why do you say there was no specific training?
18        I've already explained the training that we've
19        gone through.
20   Q.   I asked you very specifically.  I'll refresh
21        your memory.  You said you spent two hours and
```

22          you referred to some of the protocols.

23              My now question to you is very clear.  Are

170

```
 1          you saying that in those two hours you covered
 2          all the protocols and trained all the jail's
 3          staff on the use of the protocols, that they
 4          comprehended how to use them?
 5    A.    I trained them on the use of the protocols.  We
 6          didn't go through every single one and say, Now
 7          this is one is different from this one because
 8          they aren't.
 9              The procedure is the same.  You ask these
10          questions, you do this exam, you call the
11          doctor.  That's always the same.
12    Q.    Do you have any testing to determine whether or
13          not they understand and comprehend this
14          two-hour presentation?
15    A.    The -- What you do is you can look at the
16          results that you get out of it; in other words,
17          how are they behaving, are they doing a good
18          job.
19    Q.    Is the answer no, there is no testing?
20    A.    The answer is yes, you follow this, you read
21          these on an ongoing basis.  That's how you test
```

```
22        it.

23    Q.   All right.  Did you ever take a medical exam
```

171

1          when you went through medical school?

2    A.    Yeah.

3    Q.    And did you sign it?  And was it a graded exam?

4    A.    That's a different type of a test.  That's not

5          a --

6    Q.    Well, let me --

7    A.    Let's define medical testing.

8    Q.    -- clarify it?  Here's the question --

9    A.    Yes, great.

10   Q.    Here's the question I'm asking you.  Because

11         you're playing games with me and I told I don't

12         like to do that.

13   A.    All right.

14   Q.    I don't like my witnesses to do that.

15              I asked you did you test those individuals

16         that you were training to see whether or not

17         they had comprehended the information you were

18         giving them.

19   A.    If the only kind of a test that you understand

20         is a written test with signature, the answer is

21         no.  If, however, continuing peer review and

22          observing what's happening is a form of

23          testing, which it clearly is in clinical work,

172

| 1 | | then the answer is yes. |
|---|---|---|

1            then the answer is yes.

2     Q.    Referring to Exhibit #6, a letter dated

3            September 25th, 2006, signed by Shannon McCord.

4     A.    Okay.

5     Q.    The last paragraph on that first page indicates

6            that there's a need for additional training.

7            Did you see that?

8     A.    Yes.

9     Q.    Do you know what that was referring to?

10    A.    "We feel it would be beneficial to the officers

11           to be formally trained in medication

12           administration and to have some additional

13           knowledge about addictions and withdrawal."

14    Q.    Was there any sort of event or any sort of

15           discussion that you could refer to that would

16           suggest that your staff person believed after

17           discussing this with Ms. Robinson that there

18           was additional training needed?

19    A.    Well, you're asking me to guess about this

20           because I wasn't on the site there.  I can tell

21           how it evolves, but it would be a guess.

22    Q.    Did you leave any other training materials

23          behind for use by the sheriff or Ms. Robinson?

173

1    A.    There is a packet of paperwork that is left

2          that includes various documents, various kinds

3          of things that we would recommend.  So there

4          would have been other materials, just as a

5          general start-up, that we would recommend.

6    Q.    Okay.  I think one of the things that I asked

7          was for to you bring along with you all the

8          materials you used in training.

9    A.    Yes.

10   Q.    Are there things that you didn't bring with you

11         then?

12   A.    No.  You asked for the things that I used for

13         training.  I brought everything that I used in

14         training.  The nurses have other things that

15         they go through for nursing stuff, but I

16         thought you wanted what I specifically did, so

17         I brought that.

18   Q.    Okay.  Are you saying then that when you came

19         you just presented your program here,

20         INTRODUCTION TO CORRECTIONAL HEALTHCARE, and

21         then left without leaving anything else?

```
22    A.    The way it works is the nurse, which in this

23          case it looks like it was probably Nurse Rose,
```

174

1        I'm going to guess here, and I go into a

2        facility and the nurse then works with the

3        nursing team and I begin to review various

4        things.

5            We then all come into the same room, I

6        give my two-hour lecture.  Then we break out

7        and I will go back and generally sit with the

8        sheriff and go over details of what I think is

9        important.

10           The nurse breaks out and goes and works

11       with the nurse and various officers, head

12       officers and people like that and continues the

13       training.

14  Q.  My recollection is that Sheriff Hounshel did

15       not attend the training session from his

16       deposition.  Do you have a different

17       recollection?

18  A.  My letter to him says, It was good to meet you

19       at the initial meeting at the Jackson County on

20       December 27th of -- that looks like he was

21       there.

22    Q.    He may have been there, I don't know.  I'm just

23          saying my recollection from his deposition is

175

```
 1           he did not attend the training session.
 2      A.   Well, he was there.  Maybe he was in and out.
 3           This is a room, there was a lot of people in
 4           there, he may have had to get up and leave
 5           during certain portions.  I don't know.
 6      Q.   Can we have retained the other training
 7           materials which were utilized by other members
 8           of your staff and left behind?
 9      A.   Okay.
10      Q.   Going back to Exhibit #7, the CQI minutes.
11           Okay, I'm looking at the May 24th, 2006,
12           meeting again.  And would we agree that this is
13           the first CQI --
14      A.   Yes.
15      Q.   -- meeting that occurred at the Jackson County
16           Jail?
17      A.   Yes.
18      Q.   Can you walk me through this document so I
19           understand it?
20      A.   Certainly.
21      Q.   Basically, it's a meeting that occurred on that
```

```
22        date and began at 11:05?

23   A.   Yes.
```

176

1   Q.   People in attendance are listed?

2   A.   Yes.

3   Q.   Do you know who Linda Brown is?

4   A.   I do not.

5   Q.   Previous Action Items:  Strategic Plan and

6        Policies and Procedures?

7   A.   Yes.  The action items off the strategic plan,

8        all twenty of those were reviewed at that time

9        and, specifically, the one as was noted in the

10       letter relating to that date was that they

11       still needed to continue to focus on policies

12       and procedures.

13  Q.   Okay.

14  A.   We then move into Health Care Activity.  This

15       is a general listing of the activity based

16       upon, for example, how many patients does the

17       physician see, how many patients does the nurse

18       see and sick call.

19            This does not include every time a nurse

20       talks to a patient because in a small jail like

21       this where they're running up and down the hall

22        and they may run into a patient three times a

23        day, you know, How are you doing?  that sort of

177

1    thing, those are very informal.

2      So this only lists the formal sick call

3    visits that have written documentation that

4    there was need for medical intervention and

5    then there needs to be documentation that that

6    intervention was somehow supplied.

7  Q. Now, when I'm looking at January, February,

8    March and April, 15 means that Dr. Ahmed saw 15

9    patients?

10  A. 15 patients in that month.

11  Q. In that month, okay.  And it says physician

12    physicals were not given?

13  A. That's correct.

14  Q. Physician emergency visits on-site, what does

15    that mean?

16  A. He happened to be in the area, they called him,

17    he drove right in.

18  Q. Okay.  Going to the next section, Nursing.

19  A. Nursing visits, the first line is nursing

20    visits for tuberculosis.  The sheriff did not

21    require those at this time and so -- that's

22          where you put a skin test on for tuberculosis,

23          none were done.

178

1    Q.    And that's because the sheriff didn't provide

2          that?

3    A.    Yes.

4    Q.    And that was his call?

5    A.    Yes.

6    Q.    Number of nursing sick calls.

7    A.    Yes, these are nursing sick calls that relate

8          to specific written sick call slips that come

9          from inmates.  They do not count the number of,

10         say, ACCU tests that they would do on diabetics

11         or the number of times that she would have done

12         blood pressure checks or, you know, that sort

13         of thing.  You know, or even follow ups on

14         various things, they wouldn't count those.

15         This is specifically the number of sick calls

16         that she saw and addressed in her notes.

17   Q.    Okay.  And this would be in response to the

18         inmate filling out his sick call --

19   A.    Yes.

20   Q.    -- request?

21   A.    Yes.

22    Q.    And you're sure they were utilized --

23    A.    Yes.

179

1    Q.    -- by them?

2    A.    Yes.

3    Q.    Okay.

4    A.    Moving on down --

5    Q.    Before we do that --

6    A.    I'm sorry.

7    Q.    -- does the nurse then determine whether or not

8          it's a physician necessary visit or not?

9    A.    What they do at the end of the day is they will

10         call and say, Well, I saw four patients today,

11         this is what I saw.

12              And they go down the list together.  And

13         then if the doctor thinks he needs to see them,

14         the doctor makes the decision.  If the nurse

15         thinks they need to see him, the nurse makes

16         the decision, but anyway either one of them.

17         Anybody who thinks that they need to see him,

18         that's put on the doctor's call list.

19   Q.    And that's left up to the nurse?  Or you're

20         saying that the person insists on seeing the

21         doctor, it's not up to the nurse?

22    A.   No, the patient can't bypass the nurse.  They

23         can't, otherwise everybody would automatically

180

```
 1        want to see the doctor, nobody would see the

 2        nurse.

 3             So the practice in all jails is they need

 4        to be triaged by the nurse.  That's the

 5        standard of care.

 6   Q.   Okay.  And then the next section is dental?

 7   A.   Dental.  It looks like there was -- Well, I

 8        think it's fairly explanatory.  Number 3 is the

 9        number of complaints they had, number 1 is the

10        number that were actually seen by medical, and

11        number 2 is the number that we referred

12        outside.

13             So what most of these dental complaints

14        must have been -- You usually see this when

15        there's dental infections in people that are

16        short-term, they start on the antibiotics and

17        then they're released from jail so they never

18        actually get out to see the dentist.

19   Q.   Under your contract, are your -- is your

20        physician required to at least determine

21        whether or not there's any medical intervention
```

22          or medical treatment appropriate for dental

23          complaints?

181

```
 1    A.    Yes.

 2    Q.    And this is the one in which the ACLU got

 3          involved?  This is the category?

 4    A.    Well, this is -- that particular -- Yes, the

 5          answer is yes.  And that particular case was

 6          evidently in which the patient must have been

 7          in for two years, this must have been well

 8          prior to us, and wanted his teeth cleaned.

 9              As a general rule in a jail, most jails

10          don't provide teeth cleaning as a general rule.

11          But evidently this particular case they must

12          have decided to go ahead and have that done.

13    Q.    It would look as if there were the same number

14          of complaints.  I'm not sure what that means.

15          Is that like a dental complaint?

16    A.    They put a sick call slip in and then whether

17          or not they were actually seen -- so those

18          numbers should be the same.  Once in a while

19          they'll be different because they're unable to

20          put a sick call slip in and they'll be released

21          from jail the next day and not seen.
```

22    Q.    Psychiatric.

23    A.    Psychiatric is the number of detainees that are

182

1          on psychotropic drugs.

2     Q.   Okay.  And then the number psychiatric

3          evaluations.  Who does the evaluation?

4     A.   I would imagine this was somebody that was sent

5          off-site.  I don't know for sure, but that

6          would be my guess.  Probably sent out to see a

7          psychiatrist or something like that.

8     Q.   Did you ever review what the jail policies and

9          procedures were for taking a medical history

10         and doing symptom identification of inmates

11         that are brought in?

12    A.   I don't know if I know exactly what you're

13         asking me.  In the policy and procedures per

14         se?

15    Q.   When you evaluated at Jackson County Jail, do

16         you recall whether or not you looked at their

17         procedures or policies for taking medical

18         history and also for, I guess, either having

19         the knowledge that their staff were trained in

20         symptom identification for purposes of

21         identifying psychiatric problems or chronic

22          problems or contagious disease problems or

23          anything like that?

183

1    A.    Um, that work is specific to medical people.

2          You can't expect the officers to have that kind

3          of knowledge.  So what we do is we spend the

4          time with the nurse.  Now this is a trained

5          nurse, so she has a pretty good feeling for

6          that sort of thing.  However, we do have

7          documents that we recommend that she use when

8          she does detailed evaluations like that and it

9          helps to focus her in that sort of thing.

10   Q.    Do you know whether or not your evaluation --

11         we don't have that question here with us -- but

12         whether the evaluation of their operation and

13         their policies also focused on the intake

14         process where history is taken, psychiatric

15         profile is observed, that kind of thing?

16   A.    I'm going to have to guess on this.  Can I give

17         you an answer?  Because I believe it to be

18         true.

19              Virtually all jails and I'm sure this one

20         also focuses on the psychiatric history at

21         intake.  This is at book-in.  And during that,

22        questions about suicidality and things like

23        that are asked.  So there is that initial

184

1        screening when they come through the door.

2            Is that what you're referring to?

3   Q.   We hope, and my question is did you evaluate

4        whether in fact it is done?

5   A.   We -- what we do is we review the

6        questionnaire, we don't stand out there and

7        observe the officers while they're doing this,

8        but we evaluate the questionnaire to insure

9        that the questioning is adequate.

10  Q.   Pharmacy.  Would you goes through what that

11       means?

12  A.   Yes.  The first one is after hours calls placed

13      to pharmacy.  Now this would be possibly

14      emergency.  There's always a backup pharmacy.

15         Frankly, I don't I don't remember who the

16      pharmacy was in this particular case, but

17      generally we use a national pharmacy and then

18      they'll use a local pharmacy for backup.  Night

19      calls generally go to the local pharmacy.

20        So it looks like in February and in March

21      it was necessary to send somebody to the local

22          pharmacy to pick up a prescription.

23     Q.   Okay.  Then it says Amount charged for

185

1       Medical/RX to inmate accounts, that's left

2       blank.

3  A.  Well, I think, and once again I'm guessing, but

4       what I remember is that there was no co-pay

5       system at this time.  I believe eventually a

6       co-pay system was developed but I don't think

7       there was initially.  This would reflect

8       co-pay.  And any moneys that would be collected

9       there would go to the sheriff.

10  Q.  The next part of that says percentage of

11      detainees on general medication.

12  A.  Yes, for every hundred inmates in the facility

13      in February, eighteen of them would have been

14      on some type of general medication, at least

15      three of them would have been on a psychotropic

16      medication.

17  Q.  And the jail's responsible for that data, I

18      take it?

19  A.  No.  Well, the nurse is responsible, the nurse

20      gathers that.  Sometimes we can get it from a

21      pharmacy but the problem is the pharmacy

22          doesn't know what the average data census is

23          and that's where the problem is.

186

1    Q.    Next category is Pharmacy Errors.

2    A.    Yes.

3    Q.    And it has three categories, Nursing,

4          Correctional Officers and Pharmacy?

5    A.    Right.

6    Q.    What does that mean?

7    A.    It appears that -- Well, sometimes they're

8          simple human errors, sometimes there's nursing

9          errors, they write the wrong drug down or the

10         wrong thing.  It appears that the pharmacy had

11         one error in the month of March.  It's not

12         listed what the error was, it must not have

13         been specific, otherwise there would have been

14         a note about that.

15             We believe our pharmacy should be pretty

16         perfect and so we always note every single

17         error.  Sometimes they'll send them in, they'll

18         have a misspelling of the patient's name, we've

19         seen that occur, or they will have the wrong

20         birth date on a patient.  We know it's the

21         right patient, but it's the wrong birth date.

22          And so those are considered to be errors.

23    Q.   When we refer to the pharmacy then, we're

187

```
 1          talking about the jail pharmacy that's
 2          supervised by the visiting physician?
 3     A.   We're talking about medicine handling in
 4          general, yes.
 5     Q.   Okay.
 6     A.   So everything to do with health and how the
 7          medicines are handled.
 8     Q.   Going to the next category, Laboratory, Lab
 9          Test ordered, Total Lab Tests Ordered?
10     A.   Yes.
11     Q.   Does your contract pay for those?
12     A.   Can I refer to the contract, please?
13     Q.   You may.
14     A.   We pay for on-site laboratory testing,
15          including fingerstick blood sugar, urine
16          dipstick for pregnancy and/or infection.
17               I'm sorry, I want to check one other
18          clause here because I suspect that the off-site
19          labs may be included in the -- in the monthly
20          amount, so I'm just checking to see how that
21          was handled.
```

22                    Well, there's 1.1.3.  OFF-SITE AND/OR

23              MOBILE SERVICES, states:  When off-site and/or

188

```
 1          mobile services care are required for medical

 2          reasons, ACH shall arrange and be financially

 3          responsible for the cost of inpatient hospital

 4          services, outpatient hospital services, mobile

 5          services, speciality services, dental care,

 6          laboratory and diagnostic testing, and it goes

 7          on about that.

 8               So the answer would be yes, we'd be

 9          responsible for the expense of that, but it

10          comes out of two different pockets.  The

11          off/site, the ones that are sent off-site

12          coming out of this -- this small amount that we

13          act like third party administrator for --

14     Q.   The 5000?

15     A.   -- the 5000, the in-house stuff comes out of

16          medical supplies and we pay for that regardless

17          of what it is.

18               Do you want me to continue?

19     Q.   Yes, Radiology.

20     A.   Okay.

21     Q.   Is that one off-site?
```

22    A.    Radiology is one of those off-site things.

23          There was none done during this period.

1          Nutritional services, this has to do with

2      special diets ordered, special snacks,

3      sometimes we need snacks because of pregnancy,

4      diabetes or some such odd thing.  That lists

5      the number of those.

6   Q.  Respiratory Therapy.  Number of procedures

7      provided by medical staff.

8   A.  Yes, this has to do with special treatments,

9      special inhaler treatments that might be

10     necessary.  None were required during this

11     period.

12  Q.  That's like for asthma?

13  A.  Yes, that sort of thing.

14  Q.  Emergency Medical Services Off-Site.

15  A.  Yes, this records the number of people that had

16     to be transferred to the emergency room for one

17     reason or another.  These had been ordered by

18     doctor, by whoever the doctor was at the time.

19     And you can see how many are generally sent

20     off-site.

21  Q.  And those can only occur if the doctor approves

22          them under your contract?

23     A.   Well, there is a common sense thing here that

190

1          occurs.  So if a patient falls down and rips

2          their leg off, they're probably going to

3          transfer first and call the doctor later.  You

4          know, there is that sort of thing.  But for the

5          most part they try to let the doctor make the

6          decisions.

7     Q.   Okay.  Chronic Disease Status.

8     A.   Yes.  Chronic Disease Status was a new program

9          that we initiated at the jail.  Prior to our

10         coming on board, they did not have this.

11              When a patient has an illness, let's say

12         he has diabetes in the past, if he didn't cause

13         any problems and he had no complaints, so his

14         blood sugar was always fine, it's -- it's

15         possible that he could be there a year and

16         never be seen by the doctor.

17              Our opinion and the opinion of the NCCHC

18         is that that -- that's not a good standard.  So

19         we recommend that they set up visits with the

20         doctor no less than every four months

21         routinely, whether they ask for it or not, and

22          that those visits then involve laboratory work

23          when necessary, like hemoglobin A1C for

191

1          diabetes, and then the doctor sees the patient,

2          reviews the lab work, reviews the medicines,

3          discusses the patient's illness and decides

4          whether everything is fine or whether any

5          changes or corrections need to be made.

6     Q.   Let me ask you about Hepatitis C.  Does your

7          contract cover treatment for Hepatitis C?

8     A.   The answer is yes, but we don't pay for it, but

9          we -- we purchase it, we treat the patient as

10         needed and that is a carve-out so that would

11         then be billed to the jail.

12    Q.   Communicable Disease.

13    A.   Yes.

14    Q.   Is TB a carve-out?  Is TB one of those

15         communicable chronic diseases that is carved

16         out?

17    A.   No.

18    Q.   Going to the last page it says Review Policies

19         and Procedures.  0 comments.  I don't know what

20         that means.  Do you know what that means?

21    A.   Well, the comments say that the policies and

22          procedures were not entirely reviewed and

23          completed at that point.  The nurse, in this

192

 1          case it would have been Shannon McCord,

 2          stressed the importance of completion and spent

 3          two hours after the meeting to help complete

 4          and arrangements were made for another meeting

 5          to go finish them.

 6    Q.    So the policies and procedures of the Jackson

 7          County jail in May of 2006 were not completed?

 8    A.    No, they have policies and procedures.  We

 9          recommend improvements in the policies and

10          procedures and that's what wasn't done.

11    Q.    How would we know which changes occurred then?

12    A.    I think you'd have to look at the policies and

13          procedures from '05 and compare them with the

14          policies and procedures that occurred in '06

15          after they were signed.  I think that would

16          tell you what improvements were made.

17    Q.    Has Dr. Ahmed been sued, to your knowledge,

18          while he's been employed by Advanced

19          Correctional Health Services other than this

20          case?

21    A.    I believe so.

22    Q.   Can you tell me about those other cases?

23    A.   I cannot, but I can supply a report to you.

193

1    Q.   Okay.  Referring to Exhibit #8, Jackson County

2         Indiana Strategic Plan.

3              Okay, this looks as if this went out under

4         your signature or over your signature.  Is that

5         correct?

6    A.   Yes.

7    Q.   And did you have other people assist you in

8         developing this document?

9    A.   Probably not.

10   Q.   Probably not?

11   A.   Probably not.  I probably did this one myself.

12   Q.   Is it part of the Jackson County Strategic Plan

13        and the strategic plan of Advanced Correctional

14        Healthcare to provide the lowest overall cost

15        by developing contract with outside vendors and

16        suppliers?

17   A.   Yes, we do that.  It's not listed in the

18        strategic -- Well, I shouldn't say that.  It

19        may be, let me look.

20   Q.   In the very first paragraph --

21   A.   Okay.

22    Q.   -- the last sentence.

23    A.   Yes.

194

```
 1   Q.   That's your staff program that says physician
 2        training.  What does that mean?
 3   A.   There is a discussion of that on page 2 in
 4        which we describe the major problem that we see
 5        in jails is that staff physicians are not in
 6        fact trained to work in jails, it's a very
 7        difficult and very specific specialty, and so
 8        we just briefly discuss what the problem is and
 9        then we move to the solution.
10   Q.   Now it indicates here that Dr. Ahmed is the
11        medical director of Randolph, Switzerland,
12        Dearborn, Ripley, Brown and Delaware Counties?
13   A.   Yes.
14   Q.   Is that the title that you give him when he
15        goes into these various counties?
16   A.   Well, as I mentioned before, when you have just
17        one doctor in a facility, they become not only
18        the site physician but also the medical
19        director.  So the answer would be yes.
20   Q.   Let's go through this then.  I guess I'm not
21        sure what I'm looking at there.  When you say
```

22          physician training, does that suggest that your

23          Dr. Faisal Ahmed is now a properly trained

195

1        physician to deal with medical problems

2        occurring in the Jackson County Jail?

3    A.  Yes.

4    Q.  By education and training, in-service program

5        for correctional officers, medical officer

6        training, colleague developments.  What does

7        all that mean?

8    A.  Well, first of all, in-service training for

9        correctional officers.  The discussion is this,

10       and this is in regard to how to work with a

11       medical vendor because they never had one

12       before.

13            So the document indicates that in any new

14       program where the jail has been managing the

15       total healthcare program and making all of the

16       decisions, it's important for the correctional

17       officers to understand how the managed program

18       works and how it is to their advantage to work

19       with the caregivers.  It must be made very

20       clear that the correctional officers should not

21       take any responsibility for medical decisions.

22          And so that's part of what we try to do.

23              The solution then -- here it's Karen

196

```
 1          Stocke, it wasn't Nurse Rose, I misspoke --
 2          Karen Stocke was the nurse that went with me.
 3          Karen Stocke and I met with medical staff on
 4          December 27th, 2005, at 6:00 p.m. to begin the
 5          orientation process, to begin the -- looks like
 6          we retyped that -- to begin the orientation
 7          process for the Jackson County Jail.  All
 8          questions were answered and I believe we had a
 9          good response.
10              So that's how we got the program started
11          and that was our initial introduction to it.
12     Q.   Okay.  When you say medical staff, you seem to
13          use that term "medical staff" and "medical
14          team" interchangeably.
15              Could you explain or clarify who you mean
16          by medical staff?
17     A.   Medical staff would be professionally licensed
18          people, like the nurse, Karen Stocke, for
19          example, Dr. Ahmed, that's the medical staff.
20          Medical team includes all of those people plus
21          could include correctional officers that are
```

22          passing medications, officers that might be

23          responsible for calling the doctor on third

```
 1           shift, all of those sorts of things.

 2    Q.     When you're talking about solution which is on

 3           page 3, the medical staff is really just one

 4           person.  As far as you know, that's Nurse

 5           Robinson?

 6    A.     Nurse Robinson, it would be Shannon McCord, it

 7           would be Faisal Ahmed, so on and so forth.

 8    Q.     Well, on the 27th it says medical staff down.

 9           We already know Dr. Faisal Ahmed wasn't there

10           as far as I know.

11    A.     Okay.

12    Q.     So that would just be Nurse Robinson; correct?

13    A.     You're at --

14    Q.     First page.

15    A.     -- Medical Training.

16    Q.     First at the very top, I met with the medical

17           staff.

18    A.     Yes, that's who it would be.

19    Q.     All right.  Okay, then the next part it says:

20           Medical Training.  All medical team members

21           must be trained in the specific issues related
```

22        to each new project.

23            Would you define medical team members to

198

1      me?

2   A.   Well, I think I just did.  It's every --

3      everybody that's on the medical staff plus, in

4      addition, any officers that may be involved.

5   Q.   So that's all the jail staff that work at the

6      jail?

7   A.   That are responsible for medical care.

8   Q.   Okay.  This is -- this is the problem we're

9      having, Dr. Johnson.  Maybe you don't know it,

10     but everybody at the jail is supposed to be

11     able to respond to a request --

12  A.   Okay.

13  Q.   -- and make some evaluations.  One of the

14     people had never been trained, one of the

15     people, according to his deposition, had no

16     idea how to use that medical form had made a

17     medical decision.

18       So that's when you say the medical team, I

19     need to have you clarify what you mean.

20  A.   Okay.  I think I have, but I'll do it again.

21     The medical team would be anybody involved with

22          the health care of the patient.  If that

23          includes every single officer in the facility,

199

1       then that's what it would be.  The sheriff

2       decides those things, who's on the team and who

3       does which job.

4   Q.  All right.  Solution, after Medical Training,

5       it says, During the initial interview of the

6       program, the medical officers -- now we have a

7       new term -- medical officers appear to be very

8       positive.  Who would that be?

9   A.  I'm sorry, which one are we looking at?

10  Q.  Solution under B.

11  A.  During the initial review of this program, the

12      medical officers appear to be very positive and

13      willing to work with the program.  That would

14      be the officers that were in my two-hour

15      meeting.

16  Q.  Those would be the jail officers?

17  A.  Yes.

18  Q.  Now they're referred to as medical officers; is

19      that right?

20  A.  Yes.

21  Q.  You've elevated them to medical officers.

22    A.    Well, anybody who's taking care of a patient,

23          by definition becomes a medical officer.

200

1    Q.    By your definition?

2    A.    Yes.

3    Q.    Okay.  Then it says Nurse Missy -- I don't know

4          why you keep calling her Nurse Missy.

5    A.    Well, that's what they called her in the

6          facility.

7    Q.    -- will continue the training process for the

8          medical staff and monitor this project.

9    A.    I think I might have just misspoke the word

10         "staff".  It should have been "team".

11   Q.    Okay.  So are you indicating that she then is

12         responsible for the continued training of the

13         medical team?

14   A.    Well, if you recall, yes, she is responsible

15         for that.  But also Nurse Rose was going to

16         come in and did get work in January, Shannon

17         McCord came in later.  So there's a number of

18         nurses that do the training on an ongoing

19         basis.

20   Q.    Okay.  Colleague Development.  Are you aware of

21         any off-site meetings that were arranged by

22          your organization or reported on to your

23          organization in dealing with this colleague

201

```
 1         development issue?

 2    A.   We, up through last year, I guess up through

 3         2006, were giving annual retreats and this was

 4         a combination of medical education and

 5         colleague development meetings in which we

 6         would bring in all of our clients and we would

 7         get to know them a little bit better socially

 8         but also we would have educational meetings

 9         during that period.

10              And I can't tell you right now of whether

11         this particular sheriff participated in that.

12         I believe in '06, I think we held it in Peoria,

13         in '05 we held it at Brown County, Indiana.  We

14         have since stopped doing that.

15    Q.   You have stopped doing that?

16    A.   Yes.

17    Q.   So you don't know if anybody from Jackson

18         County participated in this off-site?

19    A.   No.  The marketing team and the operations team

20         occasionally will take people to lunch and

21         things like that while there that's never
```

22          documented, it's never written down, but

23          occasionally that happens.

202

1   Q.   Next category is Cost Containment Program

2        Contract with Pharmacy.

3             Do you find that?

4   A.   Yes.

5   Q.   It is important in any jail project to obtain

6        medications at the lowest possible price.  As a

7        general rule, we obtain these prices through

8        the use of a national pharmacy.  However, at

9        this time the county board members have

10       approved the Family Drug Pharmacy.

11            Would you explain that?

12  A.   What we do is we will present the differences

13       in cost to a county and then the county can

14       make a decision.  For example, it's possible,

15       although I don't remember the details, that it

16       may have been one or two percent more expensive

17       to use the local pharmacy for whatever reason,

18       probably because of volume, but frequently the

19       commissioners will say, you know, for one

20       percent, I'd rather use local people.  So

21       that's why they do that.

22    Q.   B.  Utilization.  The heart of any cost

23         containment program is utilization.  While most

203

1       companies do a retrospective utilization with

2       denials, we feel this approach causes trouble

3       and is unfair to the vendor or hospital

4       supplying the service.  Because of this, we

5       have developed a training program for the

6       doctor and medical officers so cases are sent

7       off-site only if necessary.  This approach

8       results in lower costs with no denials and no

9       conflict between the vendors and the jail.

10       Would you explain that, please.

11   A.   Well, the most common way that any insurance,

12       not only -- I mean we're not insurance but

13       whether it's an HMO or anything else is -- to

14       handle their costs is to look in retrospect to

15       decide whether a procedure was in fact

16       indicated.  They then will deny that or

17       sometimes even require the requesting physician

18       to fill paperwork out and send it in for

19       approval before sending the patient out.

20       We don't do that.  We feel that once we've

21       gone through our training that people will only

22          send out the important things and if they feel

23          it's important, then we pay the bill and that's

204

1           the end of it.

2    Q.     In the Solution section you ask Ms. Robinson,

3           Nurse Robinson, to monitor cost containment

4           on-site and was trained in monitoring use and

5           supplies.  What does that mean?

6    A.     It says:  Nurse Missy will monitor cost

7           containment on-site and has been trained in

8           monitoring the use of supplies and medications.

9                  These are the local supplies.  For

10          example, you can have an ACCU CHEK machine that

11          has strips that cost a dollar every time you do

12          the test or you can have one that the strips

13          cost 36 cents.  So we would ask her to simply

14          look at all of those costs and think about

15          those things before she orders.

16   Q.     Page 5.  In addition, we have identified a

17          number of areas that will have to be addressed

18          by you to reduce the utilization of medical

19          services.

20                 Is it part of your strategic plans to

21          reduce the medical services to the inmates?

22    A.    Medical costs basically is what it amounts to.

23    Q.    It says services.

205

1   A.   I know.  I know, but I've misspoke on staff

2        too.

3   Q.   It is important to be sure that there is a

4        system for charging for the medical staff's

5        sick calls continues to be followed.  This

6        would be -- this would include the nurse sick

7        calls and the medical officer's sick calls when

8        the nurse is not on-site.

9             What do you understand that to mean?

10  A.   This is what we're recommending as a co-pay

11       system.  In any jail that does not have a

12       co-pay system, there is massive

13       over-utilization of the nurse because it

14       doesn't cost anything to get out and talk to a

15       nurse.  So you just put in as many calls as you

16       can think of and you get out and talk to her

17       every day.

18            If you start to charge even a nominal

19       amount, the studies indicate that that number

20       drops way down.  And so it does really reduce

21       the utilization of unnecessary medical

22          services, that is true.

23    Q.   Also reduces the use of necessary medical

206

1        services?

2   A.   There's no evidence of that.

3   Q.   Are you sure of that?

4   A.   Yes.

5   Q.   You should probably listen to your presidential

6        candidates across the country.  It's just the

7        opposite.

8   A.   We don't want to get into that.

9   Q.   Okay, number 3.  Would you explain number 3 for

10       me, please.

11  A.   Expanded commissary.  In every jail it is

12       important that inmates be allowed to treat

13       common things that you and I would simply --

14       wouldn't go to a doctor for, we'd simply go to

15       a pharmacy for.  And the classic that we talked

16       about is dandruff.  It's an irritant, it's not

17       a serious illness as defined by the 8th

18       Amendment but it's sure an irritant and they

19       need to have a way to treat those things.

20            And so we would recommend that the

21       pharmacy have a few basic little things that

22          they could use to help with comfort problems.

23    Q.    Does that include aspirin, Tylenol, Advil?

1    A.    Yes.

2    Q.    Does that include Tums?

3    A.    Yes.

4    Q.    And other anti-acids?

5    A.    Yes.

6    Q.    Do they charge for those?

7    A.    The jail will have a commissary list and they

8          will have the price list.  It's different in

9          every jail.

10   Q.    All right.  At this time on number 4, Special

11         diets regarding diabetic, allergic and

12         pregnancy will be recommended.

13               What do you mean?  What would you take

14         that to mean?  Would you interpret that?

15   A.    If a doctor feels that a diabetic diet or an

16         allergy diet, for example if a patient is

17         allergic to peanuts or something like that,

18         then they will order a special diet for the

19         patient.

20   Q.    So this is controlled by the doctor?

21   A.    Yes.

22    Q.    So if a person comes in and says he's a

23          diabetic, he doesn't get to be a diabetic until

208

1          a doctor shows up.

2     A.   If a person comes in and says he's a diabetic,

3          the nurse reviews his intake, call the doctor

4          if necessary and start him on the diet.

5     Q.   Let's go to Excessive Medication Utilization,

6          number 6.  It says:  A thorough review of

7          present medication, description and type of

8          drugs, was conducted on December 27th, 2005.

9     A.   I'm sorry.  We're on page 6.

10    Q.   Yes, 6.

11    A.   Okay, I've got it.

12    Q.   Excessive Medication Utilization.

13    A.   Uh-huh.

14    Q.   Who did that?

15    A.   That would have been me.

16    Q.   Okay, and did you go through each and every

17         chart?

18    A.   Yes.

19    Q.   And it was your decision to reduce these

20         medications?

21    A.   What we do when we do that is we talk the case

22          over with the nurse.  The nurse knows these

23          people very clearly.  Some of the patients may

209

```
1          need to be seen prior to this.  Some of them

2          it's very clear that these are simply comfort

3          drugs and they are not necessary.  Sleeping

4          pills fall into that category very commonly.

5    Q.    So if a person comes in with a medication

6          that's been prescribed by his family physician

7          for anxiety, depression, difficulty in

8          sleeping, you unilaterally make that decision

9          without consulting his physician?

10   A.    The best medical authority is the jail

11         physician in this case and we have generally

12         more information than the family physician from

13         the standpoint of things like addiction and

14         things like that.  So, consequently, there are

15         times that we may be in a better position.

16              Do we occasionally call the doctors?

17         Absolutely.

18   Q.    Solution.  We have reviewed all medications --

19         and this is dated on the 27th -- We have

20         reviewed all medications and started to reduce

21         the numb of unnecessary narcotics.
```

22                    Are you suggesting to me that you

23          consulted with physicians on the 27th, the day

210

1       you arrived?

2   A.   No.  I'm suggesting to you that I, as a

3       licensed physician, reviewed these cases,

4       talked to the nurse and made those decisions at

5       that time.

6   Q.   Did you actually talk to the patient?

7   A.   There may have been times.  I can't tell you

8       for sure, but I probably saw some patients that

9       day.  I generally do.

10  Q.   Are you just guessing?

11  A.   No.  I just don't know how many and I don't

12      have the records of that day.

13  Q.   My recollection is that the doctor makes a

14      medical record every time he sees a patient.

15      Is that correct?

16  A.   Yes.

17  Q.   So if you saw those patients and they had

18      medical needs requiring prescription

19      medication, you would have made a medical entry

20      in each of those folders of medical records

21      justifying the reduction of those medications?

22   A.   No.  What I would have done is I would have put

23        notes in relative to the patients that I saw

1          that day.  We start out by reducing his

2          medicines.

3              Now remember, doctors order over the phone

4          all the time.  So this is the same as a

5          telephone order or any other kind of an order.

6          We review the record and we make decisions.

7     Q.   Do you have a recollection specifically of

8          seeing patients on the 27th when you visited

9          there --

10    A.   I would be guessing.

11    Q.   -- and --

12              MR. GROTH:  Let him finish the question.

13              THE WITNESS:  Yeah.

14    BY MR. SUTHERLIN:

15    Q.   -- and reviewing their medical records and

16         actually talking to the patients before making

17         a decision to reduce their medications?

18    A.   On each and everybody person?

19    Q.   On each and every person that you reduced the

20         medication of, yeah.

21    A.   I did not talk to each and every one of them.

22    Q.    Did you talk to anybody on the 27th?

23    A.    I would need to review the records of the 27th.

212

```
 1   Q.   Communication.  That's 24/7 Network.  Tell me

 2        how that works.

 3   A.   Well, the key to this is to be sure that

 4        there's a doctor available to answer any

 5        questions that may be emergent, that the staff

 6        does not feel that they can wait for a

 7        telephone call back.  And so because of that, I

 8        believe we had three doctors that were

 9        available that could be called.

10             As a general rule of thumb, when the

11        officer calls, if it's something that's not

12        emergent, he will call and leave a message on

13        the cell phone.  If he doesn't get a call back

14        in a timely manner, he may try again or he may

15        simply go to the next doctor on the list.

16   Q.   Page 8, Policy & Procedure Changes.  I believe

17        you've addressed part of this.  You indicate

18        that you give the jail administration a generic

19        set of policies and procedures based upon the

20        National Commission of Correctional Healthcare

21        and then you let them use that as a basis for
```

22          developing their own policies and procedures.

23    A.    Yes.

213

1   Q.   And then you review them and correct them as

2        needed, is that correct?

3   A.   We -- we will take the secretarial act of

4        making the changes that they want.  We simply

5        type it out for them, we don't make any changes

6        that the sheriff doesn't want.

7   Q.   The sheriff and a healthcare authority and

8        responsible -- and responsible physician will

9        then sign the policies.  Was that done in this

10       case?

11  A.   I would have to look at the sheriff's copy of

12       that to see if that was done.

13  Q.   Who would have been the appropriate medical

14       professionals reviewing this and approve?  Who

15       would that be?

16  A.   That could have been me or it could have been

17       Dr. Ahmed.

18            MS. HARRIS:  We did produce to you, I

19       think it was in response to your first request,

20       signed copies of the Jackson County policy

21       portion of the materials and those are signed

22          by Dr. Ahmed, as well as Sheriff Hounshel and

23          Marc Lahrman.

214

```
 1            MR. SUTHERLIN:  Those were the ones after

 2       Mark Lahrman became sheriff.

 3            MS. HARRIS:  No, these are the ones that

 4       were signed at the beginning when Sheriff

 5       Hounshel was sheriff.

 6            I actually meant to shorten things, not

 7       make them longer.  I guess I should have kept

 8       my mouth shut.

 9            MR. SUTHERLIN:  Stacy, I think you're

10       probably right, but the one that was produced

11       by the defendant?

12            MS. HARRIS:  Right, I think they did not

13       have a signed one.  It was not a signed one.

14       BY MR. SUTHERLIN:

15  Q.   Do you know if there's been a dental policy

16       that's been signed off on?

17  A.   Well, the sheriff would have those policies.

18  Q.   Reading on further, on page 8 where it talks

19       about solutions.  After those policies and

20       procedures had been approved, reading on it

21       says, After this is done, all of the
```

22          correctional officers will need to be

23          in-serviced in the exact medical policies and

215

1      procedures as you have outlined and when any

2      changes to the policies and procedures are

3      made, you need to retain the old policies for

4      your records.

5          When do you believe that the correctional

6      officers were trained in the use of the

7      policies and procedures?

8   A.   Well, that would be whoever the training

9      officer in the jail is.  And so I really don't

10     have any idea.  It would have to be after they

11     were completed, I presume.

12   Q.   That's not something you were responsible for?

13   A.   No.

14   Q.   Looking at page 9, 10 and 11, and it talks

15     about actions and responsibilities.  I don't

16     see any indication in these documents, Dr.

17     Johnson, that anybody came back in January

18     within a month to do anything.  But I could be

19     missing it.  Do you see anything?

20   A.   No.  All we have is the report from May.

21        MR. SUTHERLIN:  Okay, let's take a break.

22          I'm close to being done, but give me a few

23          minutes.

```
1                        (Whereupon a short recess was

2                        taken and proceedings resumed as

3                        follows.)

4           MR. SUTHERLIN:  Okay, back on the record.

5       BY MR. SUTHERLIN:

6    Q.  There's an item 18 which I don't understand

7        either.  It says, Trusty policy - no detainees

8        are to work as a trusty due to risk management.

9             Is that your call?  Was that your

10       evaluation?

11   A.  My recommendation that may -- may have been put

12       in there.  That was just my recommendation.  If

13       you notice, it says upon approval, so the

14       sheriff may have decided not to approve that.

15   Q.  Item 8.  Commissary increased.  What does that

16       mean?

17   A.  Well, as we talked about before, we recommended

18       an increase in the commissary list so that the

19       inmates would have access to what medications

20       that they might need without going through an

21       entire sick call and delay and all that kind of
```

22      stuff.

23    Q.    11.   Medication setup fee to be instituted

217

1              instead a co-pay for prescriptions.  What does

2              that mean?

3        A.    Well, the terminology is important in this

4              business.  It depends who owns the medicines

5              based upon how you charge for your medicines.

6              If you charge a co-pay, frequently the inmate

7              may decide that he has paid two dollars for

8              this thousand dollar drug and now he owns them.

9                    So our advice to the sheriff is what

10             you're charging for really is -- that two or

11             three dollars is for the setup fee.  It doesn't

12             have anything to do with owning the drug or the

13             cost of the drug.  The drugs belong to the

14             sheriff.

15                   MR. SUTHERLIN:  Stacy, do you have any

16             exhibits?

17                   MS. HARRIS:  I have this.

18                   MR. SUTHERLIN:  Mark those, please.

19                              (Whereupon Deposition Exhibits

20                              #11 and 12 were marked and for

21                              the record.)

22      BY MR. SUTHERLIN:

23    Q.   I'm going to hand you what was previously used

218

1           as an exhibit in an earlier deposition but now

2           it's marked Plaintiff's Deposition Exhibit #12

3           I'll ask you to look at that.

4                               (Whereupon Deposition Exhibit

5                               #12 was identified for the

6                               record.)

7      BY MR. SUTHERLIN:

8      Q.   Have you ever seen that before?

9      A.   I cannot say with certainty that I have.

10     Q.   What do you call that document?

11     A.   This is the documentation that the officer

12          would have used with the encounter with the

13          patient.

14     Q.   And who provided that document to the Jackson

15          County Jail?

16     A.   The blank document was provided by our company.

17     Q.   Okay, and what do you refer to that document as

18          then?  What is it called?

19     A.   This is one of the protocols.

20     Q.   So it is a protocol?

21     A.   Yes.

22    Q.   All right, and this is the protocol which was

23         in use as soon as you signed the contract with

219

1       the Jackson County Jail and they would utilize

2       in dealing with inmates, is that correct?

3   A.  Yes, I believe it was approved by the sheriff

4       and put into action right away.

5   Q.  And did you personally design these protocols?

6   A.  These protocols were put together with a number

7       of physicians.  I cannot speak to this one

8       specifically.

9   Q.  And I think you said earlier that you couldn't

10      even identify who the other physicians were?

11  A.  Well, let me -- let me be a little more

12      specific here.

13          In this particular case, I -- I've listed

14      myself as the source.  Now, I think I could

15      probably say that I would have been responsible

16      for this --

17  Q.  Okay.

18  A.  -- yes.  It also lists the Sanford Guide, so

19      it's quite possible I would have been

20      responsible for that.

21  Q.  So we're looking at the same thing, you are the

22          medical director you signed off on it, it was

23          revised 9/1/05?

220

```
 1    A.   Yes.

 2    Q.   And the source of this document is yourself and

 3         The Sanford Guide 2003?

 4    A.   Yes.

 5    Q.   What is that?

 6    A.   Well, the Sanford Guide is a medication

 7         recommendation guide and so what we evidently

 8         did was we looked up some medications in there

 9         and that was added to the list here somehow.

10    Q.   Okay.  And as you answered those questions

11         asked of the detainee, would you read the

12         question and then read out the answer?

13    A.   Ask the detainee:

14         How old is the detainee" 41

15         How does the -- or does the detainee have a

16         history of heart disease?  No

17         How long has he or she had these symptoms?  30

18         minutes

19         Is the pain crushing chest pain or pressure:

20         It was pressure

21         Is the detainee having nausea or vomiting?  No
```

22          Does the detainee have indigestion or history

23          of peptic ulcer disease?   No

221

1         Is the detainee short of breath?   Yes

2         Is the pain radiating pain?   No

3    Q.   The next set of questions, Examine the

4         Detainee.

5    A.   Examine the Detainee:

6         Vitals - temperature, pulse and respiration,

7         that's what that stands for, Blood Pressure.

8         The temperature was 96.8, the blood pressure

9         was listed at 177/119.

10   Q.   And the pulse?   Is there a pulse?

11   A.   There was no pulse listed here.

12   Q.   Okay.   Now how do you rate that blood pressure?

13   A.   I would say it's high.

14   Q.   And is it -- is there a category that you would

15        list it in?

16            I mean I've seen these sort of blood

17        pressure machines that have ranges?

18   A.   Uh-huh.

19   Q.   Would that range generally prompt somebody to

20        seek medical advice on that pressure?

21   A.   As a general rule, the physician is called for

22          this.

23    Q.    What's the next question after that?

222

```
 1   A.   Treatment.

 2   Q.   Well, I mean what goes under that --

 3   A.   I'm sorry.

 4   Q.   -- General Appearance.

 5   A.   General appearance  Pale.

 6        Shortness of breath  Yes

 7        Sweating  No  The diaphoresis is sweating  No.

 8   Q.   All right, the next thing says what?

 9   A.   Check for medication allergy.

10   Q.   Okay.  Then what's the next line say?

11   A.   This may be an emergency situation -- Call the

12        physician immediately.

13   Q.   All right, and what would you have done in this

14        situation based upon that information?

15   A.   You mean if I was called on this?

16   Q.   Yes, you're filling it out.

17   A.   Oh.

18   Q.   You've got Mr. Wallace's in front of you.  What

19        would you have done?

20   A.   Well, based on this protocol, I would have

21        called the physician.
```

22    Q.   And was a physician called?

23    A.   I don't have any documentation on this exhibit

223

1        that that happened.

2   Q.   Okay.  All right, what happens to the form once

3        it's completed by the jail officer?

4   A.   My understanding is that this thing goes to

5        Medical for the nurse to review and the medical

6        staff to review.

7   Q.   And the medical staff again?

8   A.   Would be the nurse.

9   Q.   The nurse?

10   A.   Yes.

11   Q.   Okay.  Was this supposed to be brought to the

12        attention of the doctor when he comes in?

13   A.   Then that would be up to the nurse to call the

14        doctor to discuss what happened and the two of

15        them would make a decision on any further

16        treatment that might be necessary.

17                      (Whereupon Deposition Exhibit

18                      #11 was identified for the

19                      record.)

20        BY MR. SUTHERLIN:

21   Q.   Okay.  This is Exhibit #11 which was previously

22          introduced in a previous deposition.  Have you

23          ever seen that?

224

1    A.    No.

2    Q.    Okay.

3    A.    No.

4    Q.    Would you then go through the questions and

5          answers again for the record?

6    A.    Okay.  The DATE is 4/2/06, TIME is 0400.

7          INMATE NAME is William Wallace, TYPE:  County.

8          INMATE LOG EVENT --

9              MS. HARRIS:  You're on different pages.

10         This second one has a cover sheet to it or part

11         of it.

12             MR. GROTH:  You want him to read the cover

13         sheet?

14         BY MR. SUTHERLIN:

15   Q.    Let me ask you, have you ever seen that form

16         used?

17   A.    No.

18   Q.    Do you know what its purpose is?

19   A.    It says it's an emergency medical call log.

20   Q.    Okay.  What do you take that to mean?

21   A.    That this -- they would fill this out if they

22          were going to make a medical call of some kind.

23     Q.   Okay, but that's not a form that you provided

225

1          to the Sheriff's Department?

2     A.   I don't believe so.

3     Q.   Okay.  Why don't you go to the next page then,

4          the protocol.

5     A.   Okay.  How old is the detainee?  41.

6          Does the detainee have a history of heart

7          disease?  No

8          How long has he or she been having these

9          symptoms?  2 weeks

10         Is the pain crushing pain or pressure?

11         Crushing

12         Is the detainee having nausea or vomiting?  No

13         Does the detainee have indigestion or history

14         of peptic ulcer?  No

15         Is the detainee short of breath?  Yes

16         Is the pain radiating?  Yes

17              And then there's vitals.  The temperature

18         is 97.1, the blood pressure is listed at

19         236/165, pulse is 100.

20         General appearance is pale

21         Shortness of breath  Yes

22        Sweating is Yes.

23    Q.    Now, you've got the earlier one which was dated

226

```
 1          3/25/06.  You said that if you were doing this,
 2          you would have called a physician.
 3    A.    Yes.
 4    Q.    Would you have ordered the person to go to the
 5          emergency room on March 25th of '06?
 6    A.    As a physician?
 7    Q.    As a physician.
 8    A.    It would depend on other factors.
 9    Q.    Like what?
10    A.    What the patient looked like, how much distress
11          they were in, a number of other things.
12    Q.    Well, how are you going to get that information
13          over the phone if that is what you have here?
14    A.    You're talking to the officer.
15    Q.    So you talk to the officer?
16    A.    Yes.
17    Q.    And then you might or might not make the
18          decision to send to ER?
19    A.    Yes.
20    Q.    What other information would you ask that
21          person?  Because it doesn't -- it doesn't
```

22          suggest on here that there's supposed to be any

23          prompts.

227

1   A.   Yeah, this is simply to assist a lay person,

2        this is not to educate them in the nuances of

3        the disease; they're supposed to take the

4        history and then simply call the doctor.

5   Q.   Okay.

6   A.   That's where it goes from there.

7   Q.   So in this case, on March 25th you may or may

8        not have referred the person to the emergency

9        room based upon the information that -- Well,

10       let well me put it this way.  You wouldn't have

11       sent him based on the information, you'd have

12       to have additional formation?

13  A.   Well, I would talk to the officer.

14  Q.   And you would ask him what again?  His

15       appearance?

16  A.   How's he looking?  What's he look like?  How's

17       he behaving.

18  Q.   Isn't that sort of in your category of

19       questions to ask the detainee?

20  A.   No.  They're curled up in a ball on the floor.

21       That's quite different from standing up,

22        walking around and joking.  There's a lot of

23        differences.

228

```
 1   Q.   Do you send somebody to the emergency room when
 2        you suspect there's a heart attack?
 3   A.   Yes.
 4   Q.   Is the chest pain protocol attempting to help
 5        the jail officer identify the symptoms which
 6        may indicate a cardiac event?
 7   A.   No, they're helping him gather data so that he
 8        can discuss it with the doctor.
 9   Q.   He didn't call the doctor on this one?  He made
10        a medical decision, he didn't call the doctor
11        on March 25th?
12             Do you know that?
13   A.   No, I don't know that.
14   Q.   All right, based upon -- Continue with the
15        examination of the patient there talking about
16        vitals.
17   A.   Temperature was 97.1, blood pressure was
18        236/165, pulse was 100, general appearance was
19        pale.  Shortness of breath yes, and sweating
20        yes.
21   Q.   Based upon those symptoms, would you have sent
```

22          the person to the emergency room?

23     A.   Once again, I would have talked to the -- the

229

1      officer.

2    Q.   What additional information would you need?

3    A.   I might have had him maybe take the blood

4      pressure again, depending upon how the patient

5      was behaving again.  That sort of thing.

6    Q.   How would you rate that blood pressure

7      rating -- that blood pressure?

8    A.   This blood pressure is extremely high, high

9      enough it would make me wonder if it was

10      accurate.

11    Q.   So your concern is accuracy and not the

12      patient's health?  Is that what I'm hearing you

13      say?

14    A.   You heard the wrong thing.  Ask another

15      question.

16    Q.   Why do you think it's inaccurate?

17    A.   Because it's quite high.  And generally when

18      you see something of that -- that's that high,

19      it's not uncommon that in fact that's not an

20      accurate record, so I would ask them to take

21      the blood pressure a second time.

22    Q.    In view of all these other symptoms,

23          depression, chest pain, the radiating pain, you

230

1        don't think that all indicates a cardiac event?

2   A.   It's very justified to gather more data.

3   Q.   In the meantime, time passes, doesn't it?

4   A.   (No response)

5   Q.   Are you -- do you have any knowledge of whether

6        or not the doctor was contacted on that event

7        of April the 2nd?

8   A.   I believe he was.

9   Q.   Do you know what information he was given?

10   A.   I did have a chance to read the transcripts.  I

11        didn't bring them with me, but I did read them

12        at some time in the past.

13   Q.   Okay.  Did Dr. Ahmed ask any questions in that

14        transcript?

15   A.   I do not recall any.

16   Q.   Did Dr. Ahmed see the individual?

17   A.   I do not know.

18   Q.   Does your protocol indicate, Dr. Johnson, that

19        this has been the second visit to the nurse

20        with high blood pressure and chest pains within

21        a week?  Does it give any -- any place there

22          for this individual to have reviewed the prior

23          medical history?

231

1    A.   As a general rule, the officers do not go down

2         and read through the medical records to see

3         what has happened in the past.  So generally we

4         don't make them go do that.

5    Q.   So he's assessing this individual, calling --

6         may be calling the doctor and has no knowledge

7         whether there's been a prior cardiac event or

8         prior incident similar to this one and that's

9         the protocol?

10   A.   Yes.

11   Q.   In reviewing the documents that you did review

12        and based upon your recollection today, do you

13        know whether or not Mr. Wallace's was actually

14        examined by Nurse Robinson?

15   A.   I cannot speak with clarify on that.

16   Q.   Should she have seen him and examined him based

17        upon that event?

18   A.   She should have seen him the next day, if he

19        would have allowed it, and taken the blood

20        pressure and followed up at that time.

21   Q.   And why do you say if he would have allowed it?

22          What makes you think he didn't allow it?

23     A.   It was my understanding that this was a

232

1      noncompliant patient.

2  Q.  I know you say that, Dr. Johnson.  I disbelieve

3      you.  I'm telling you, what are you basing that

4      on?  Are you giving me any information to

5      convey that he's a noncompliant patient?

6  A.  I got it out of the CQI.

7  Q.  I know you got it out of there.  Do you know

8      why he didn't see Nurse Robinson and have a

9      follow-up examination?

10  A.  I do not.

11  Q.  Okay.  According to information provided by the

12      defendants, Jackson County Sheriff, we

13      attempted to verify Dr. Ahmed's appearance at

14      that jail.  And while I can't say that this is

15      conclusive, it would appear as if he came on

16      March the 9th and stayed 50 minutes, he came

17      April the 13th and stayed 40 minutes, came May

18      4th and stayed 10 minutes, came May 25th and

19      stayed 23 minutes.  Does that sound like he's

20      coming weekly?

21  A.  I don't know what that document is.

22    Q.    Okay.  Do you intend to -- Well, strike that.

23          Have you ever testified as an expert before?  I

233

1         think you said you had once.

2    A.   I'll tell you, it seems like I did but it would

3         have been decades ago.

4    Q.   Okay.  And in connection with any litigation,

5         have you ever testified as an expert?

6    A.   I've never testified in court.

7    Q.   Never?

8    A.   Not in court.  I'm sorry, you used the word

9         "testified" and I'm thinking deposition.  I

10        apologize for that.  I have never testified in

11        court as an expert.

12   Q.   Okay.  You do actually testify in a deposition

13        under oath.

14             You mentioned a number of lawsuits that

15        you were involved in with your prior

16        organization and this organization.  Have you

17        ever testified as an expert either under oath

18        in a deposition or in court?

19   A.   I have given depositions when I was in private

20        practice, but not relating to the correctional

21        work.

22    Q.   Okay.

23    A.   I've done that.

234

1    Q.   Okay.  Well, I understand that, but I'm asking

2         you as an expert.  You've been identified by

3         your counsel as an expert.

4    A.   I think I was considered an expert at that time

5         for whatever that deposition was, as I recall.

6         Because I don't think I was involved in it, I

7         think they came to get my opinion about it or

8         something like that.

9    Q.   Okay.  Do you have any training in

10        cardiovascular diseases?

11   A.   The standard training that an internist who's

12        board certified would have.

13   Q.   When was the last time you treated a patient

14        for any cardiac disease?

15   A.   Well, we would have define the word

16        "treatment".  Treatment may be prescribing a

17        medication.  If that's the definition, then

18        probably within the last month.

19             If you're talking about going to the

20        hospital and working in the ICU, that would

21        have been years ago.

22      Q.    I'm talking about something other than just

23            prescribing medication over the phone.  Have

235

```
 1          you ever examined or treated an individual for

 2          any cardiac conditions?

 3     A.   Yes.

 4     Q.   And when was that?  When did you do that last?

 5     A.   I would not be able to give you a specific date

 6          or time.  But chest pains are fairly common

 7          things in jails and so we're always looking at

 8          the inmates to be sure that it's not cardiac

 9          origin and so it's not uncommon when you're in

10          a jail that you'll run into that.

11     Q.   I'm trying to get a clear answer, Doctor.

12     A.   I'm sorry.

13     Q.   I understand that you're an administrator and

14          this is your corporation.

15     A.   All right.

16     Q.   But I'm looking for a doctor/patient

17          relationship in which you have examined

18          somebody, much the way these jail officers did,

19          and treated that person for some sort of

20          coronary or cardiac event.

21     A.   Event being a heart attack you mean?
```

22     Q.   Could be anything related to --

23     A.   Well, if we think somebody's having a heart

236

```
 1              attack, we send them to the hospital, we don't

 2              treat them on-site for that.

 3    Q.        I understand, but you would at least assess

 4              them on-site --

 5    A.        Yes.

 6    Q.        -- before you send them --

 7    A.        Yes, and then send them off-site.

 8    Q.        What do you understand then would be the test

 9              given to somebody who you suspected of having a

10              heart attack?

11    A.        Well, the only tests we have on-site is our

12              stethoscope; we don't have EKG's, we don't have

13              those sort of things.

14                   So if we feel someone may be having a

15              heart attack, we send them off-site.

16    Q.        What sort of tests would they conduct off-site?

17    A.        It would depend upon the findings at the time.

18              They would usually start with a cardiogram,

19              there would be blood work that would be done

20              and then, based upon those findings and coupled

21              with the physical exam at that moment, then a
```

22          decision to contact a cardiologist would be

23          made.  Based upon the cardiologist's

237

1        evaluation, then it could get into cardiac

2        catheterization or it could go on to many other

3        things.

4   Q.   On April the 2nd, if you looked at the

5        telephone transcript, you would have learned

6        that there was another patient with an elevated

7        blood pressure that was sent to the ER.

8             Do you recall reading that?

9   A.   Yes.

10  Q.   Okay.  Was his blood pressure higher or lower?

11  A.   I think it was lower.

12  Q.   Okay.  Did you question -- Would you have

13       questioned that reading?

14  A.   My guess was that there was something in the

15       conversation between the two of them that

16       indicated that that one needed to go off.  I

17       didn't really know.

18  Q.   Do you intend to provide a written opinion of

19       any kind if it's allowed by the court in this

20       case?

21  A.   If it is asked for, I would do that.

22            MR. SUTHERLIN:   Okay.   I think that's all

23        I have.

238

1          Based upon what I believe are some

2      outstanding items that need to be produced, we

3      may have to continue the deposition or we may

4      try to answer -- get these things answered by

5      interrogatories.

6          But in any event, I will write Mr. Groth a

7      letter of the things that I think I heard from

8      this deposition that he has agreed to provide

9      and then we'll just take it from there.  But

10     that's all the questions I have.

11         MS. HARRIS:  I do have one question.

12     Sorry if I said I wouldn't.

13         THE WITNESS:  Okay.

14

15     EXAMINATION BY MS. HARRIS:

16  Q.  Could you look at Exhibit 11 again?

17  A.  Which one is that?

18  Q.  It's --

19  A.  Oh, it's this one here.  Okay.

20  Q.  On the second page.

21  A.  This page.

22    Q.   Well, the second page.   That one.

23    A.   Okay.

239

1   Q.   If you were -- Assuming you were the doctor

2        that was being called in regard to this inmate

3        and you were given the information regarding

4        that pulse and that blood pressure and also

5        that the inmate had had chest pain that had

6        woken him up, what questions would you have

7        asked the officer?

8   A.   As I mentioned, I probably would have asked him

9        to repeat the blood pressure, first of all, to

10       ensure that there was an accurate blood

11       pressure.

12            I would want to give his general view of

13       how the patient was behaving.  As I mentioned

14       before, is he standing up, walking around

15       joking, or is this guy really in serious

16       straits.  And I think probably based upon that

17       and if this number was fairly close to the

18       number that he had already recorded, that's

19       probably what I would do.

20            MS. HARRIS:  That's all I that have.

21

22          EXAMINATION BY MR. SUTHERLIN:

23     Q.   And then, if you had that information, you

240

```
 1         would then make the decision to send him to the

 2         ER?

 3    A.   It's likely that I would.

 4    Q.   Just likely?

 5    A.   Well, it depends on what the findings are

 6         exactly.  It's really hard to second guess

 7         these things but -- so you have to -- to make

 8         little -- see, there's no black and white --

 9    Q.   I understand that, but I thought you err on the

10         side of caution and send somebody to the ER so

11         they don't die.

12    A.   You do, but you have to be sure that you're not

13         being gamed at the same time.

14              MR. SUTHERLIN:  That's all I have to

15         follow-up.

16              MR. GROTH:  We'll show signature reserved.

17

18              FURTHER DEPONENT SAYETH NOT

19

20

21
```

22

23

241

```
 1        STATE OF ILLINOIS      )

 2                               )

 3        COUNTY OF _____   )

 4

 5             I, NORMAN R. JOHNSON, M.D., do hereby

 6        certify that I have read the foregoing

 7        transcript, consisting of pages numbered 1

 8        through 240, inclusive, and that the same is

 9        true and correct, except as may be noted on the

10        attached sheet(s).

11             Dated at_____, Illinois this _____

12        day of _____, 2008.

13

14

15        _____

16

17

18        Sworn to before me this_____

19        day of _____ 2008.

20

21        _____
```

22          Notary Public

23

242

1                          CORRECTIONS

2       Page  Line _____

3            _____

4            _____

5            _____

6            _____

7            _____

8            _____

9            _____

10           _____

11           _____

12           _____

13           _____

14           _____

15           _____

16           _____

17           _____

18           _____

19           _____

20           _____

21           _____

22  _____

23  _____

243

1                           CORRECTIONS

2          Page  Line  _____

3                _____

4                _____

5                _____

6                _____

7                _____

8                _____

9                _____

10               _____

11               _____

12               _____

13               _____

14               _____

15               _____

16               _____

17               _____

18               _____

19               _____

20               _____

21               _____

22   _____

23   _____

244

1                              CORRECTIONS

2          Page   Line  _____

3                        _____

4                        _____

5                        _____

6                        _____

7                        _____

8                        _____

9                        _____

10                       _____

11                       _____

12                       _____

13                       _____

14                       _____

15                       _____

16                       _____

17                       _____

18                       _____

19                       _____

20                       _____

21                       _____

22  _____

23  _____

245

1      STATE OF ILLINOIS )

2                 )SS

3      COUNTY OF PEORIA  )

4            C E R T I F I C A T E

5          I, Grace Cafaro, CSR-RPR-CP, License

6      #084-000702, a Notary Public duly commissioned

7      and qualified in and for the County of Peoria

8      and State of Illinois, DO HEREBY CERTIFY that,

9      pursuant to notice, there came before me on the

10     20th day of March, A.D. 2008, at 415 Hamilton

11     Boulevard, Peoria, Illinois, the following

12     named person, to wit:

13          NORMAN R. JOHNSON, M.D.,,

14     an expert witness, called by the plaintiff who

15     was by me first duly sworn to testify to the

16     truth and nothing but the truth of his

17     knowledge touching and concerning the matters

18     in controversy in this cause and that he was

19     thereupon carefully examined upon his oath, and

20     his examination immediately reduced to

21     shorthand by means of stenotype by me.

22                   I ALSO CERTIFY that the deposition is a

23          true record of the testimony given by the

246

1      witness, that the reading and signing of the

2      deposition by the said witness were expressly

3      waived.

4           I FURTHER CERTIFY that I am neither

5      attorney or counsel for, nor related to or

6      employed by, any of the parties to the action

7      in which this deposition is taken, and,

8      further, that I am not a relative or employee

9      of any attorney or counsel employed by the

10     parties hereto, or financially interested in

11     the action.

12          IN WITNESS WHEREOF, I have hereunto set my

13     hand at Peoria, Illinois, this 14th day of

14     April, A.D. 2008.

15

16                              CSR-RPR-CP
                            My commission expires
17                                 5-31-09

18

19

20

21

22

23