**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **CECELIA WALLACE, individually and** | ) |
| **as the executor of the ESTATE OF WILLIAM** | ) |
| **M. WALLACE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **CAUSE NO.  1:06-cv-1560-WTL-TAB** |
| | ) |
| **JERRY HOUNSHEL, in his individual capacity,** | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**ENTRY ON MOTIONS FOR SUMMARY JUDGMENT**

All of the parties in this case have moved for summary judgment.  The various motions

are now fully briefed, and the Court, being duly advised, **DENIES** the Plaintiff's motion and

**GRANTS IN PART AND DENIES IN PART** the Defendants' motions to the extent and for

the reasons set forth below.

**Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Of particular importance in a case such as

this one, in which many of the relevant facts are highly contested, is the fact that in ruling on a

motion for summary judgment the admissible evidence presented by the non-moving party must

be believed and all reasonable inferences must be drawn in the non-movant's favor.  *Hemsworth*

*v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582,

584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and

draw all reasonable inferences in that party's favor.").[1]  However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Id.*  Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment."  *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## Factual Background[2]

In December 2005, Jackson County, Indiana, contracted with Advanced Correctional Healthcare, Inc. ("ACH") to provide medical services at its jail.  ACH offered 24-hour access to a physician via telephone; the physician also visited the jail once a week, if needed, to see inmates.  The jail also employed a full-time nurse who worked five days a week.  ACH provided the jail with a set of protocol sheets which addressed various medical complaints or symptoms that were to be used by the nurse and jail officers in responding to inmates' medical complaints.

---

[1]All of the Defendants have moved for summary judgment, and the Plaintiff has as well. Because the Court determines that the Plaintiff is not entitled to summary judgment even considering the facts in the light most favorable to her, the Plaintiff is treated as the non-moving party throughout this Entry.

[2]The Court notes that the parties disagree with regard to numerous material facts and the inferences to be drawn from them.  As previously noted, for purposes of this ruling the Court has considered the facts in the light most favorable to the Plaintiff and has drawn all reasonable inferences from the evidence of record in favor of the Plaintiff.  Therefore, the facts set forth both in this section and in the discussion section below do not reflect the considerable evidence submitted by the Defendants to the extent that that evidence contradicts the Plaintiff's evidence. In other words, the facts as described in this Entry do not necessarily reflect the record as a whole; rather, they reflect the record as viewed in the light most favorable to the Plaintiff, as required by Federal Rule of Civil Procedure 56.

William Wallace ("Wallace"), the son of Plaintiff Cecelia Wallace, was booked into the Jackson County Jail on February 10, 2006.  During the booking process, Wallace was asked about his medical history; he informed the booking officer that he had diabetes and had previously undergone back surgery.

Wallace was generally well-liked by the officers at the jail, and his incarceration apparently was uneventful until March 25, 2006.  On that day, Wallace was awakened at approximately 3:00 a.m. by severe chest pain.  He contacted jail officers by intercom and told them he thought he was having a heart attack.  He was escorted from the F-pod[3] to the book-in area of the jail by Officer Tina Benton, to whom he reported that he had pain in his chest and the top of his arm.  When Officer Benton asked him if he had done anything that would aggravate his chest or arms, Wallace told her that he had done 250 push-ups.  None of the jail officers had  seen Wallace do any push-ups or other calisthenics on that day or on any other.  Officer Benton left Wallace in the book-in area with Defendant Officer Joshua Teipen, whom Wallace informed he was having chest pains.  Pursuant to the jail's policy, Officer Teipen retrieved the protocol sheet for "chest pain-cardiac" (hereinafter "Chest Pain Protocol"), asked Wallace the series of questions listed on the sheet and recorded his answers as follows:

- Age?  41
- History of heart disease?  No
- Duration of symptoms?  30 minutes
- Crushing pain or pressure?  Pressure
- Any nausea or vomiting?  No
- History of indigestion or peptic ulcer disease?  No
- Short of breath?  Yes
- Is pain radiating?  No

Pursuant to the instructions on the Chest Pain Protocol, Officer Teipen also examined Wallace

---

[3]Inmates at the jail are housed in "pods," or big rooms that each house approximately 32 people.  Each pod is referred to by a letter; Wallace was assigned to the F-pod.

3

and recorded the following information:

- Vitals – T.P.R. [temperature] – Blood Pressure:  96.8°; 117/119
- General appearance:  Pale
- Shortness of breath:  Yes
- Sweating-Diaphoresis:  No

The form then contained the following language:

<u>This may be an Emergency Situation – Call physician immediately</u>

<u>Immediate action if detainee is unresponsive, no pulse or no respiration:</u>
Start oxygen – 2L nasal canal (if available)
Call ambulance and paramedic if detainee unresponsive
Give A.S.A. 81 mgs. or 325 mgs., 1 tablet STAT
Nitroglycerine SL

<u>When no Physician referral</u>:
For chest pain related to injury/muscle strain:
Ice to affected area x 24 hours.
Limit activity x 3 days.

<u>Refer to Physician</u>:
All cardiac-chest pain
Pain related to injury or strain that is moderately persistent and has not responded to protocols.

<u>Medication of Choice</u>:
Tylenol Extra Strength 2 tabs four times a day as needed for three days
Ice to affected area x 24 hours
Limit activity x 3 days.

Inform the detainee to notify medical if the symptoms are not resolved or become worse.

Pl. Ex. 31.

Officer Teipen did not recall receiving any training on how to use the protocol sheets

prior to the evening in question.  Teipen Dep. at 22.[4]  He did not know what a normal blood

---

[4]Officer Teipen has submitted an affidavit in which he states that he "learned how to use the protocol sheets from other Jail Officers on my shift who received training from the people at ACH" and that "[i]n March of 2006 I felt like I had a good understanding of how to use the protocols and that I knew what to do if an inmate had a medical complaint."  Teipen Aff. at ¶ 8. This affidavit is inconsistent–although perhaps not irreconcilably so–with his deposition

pressure reading was. *Id.* at 24. After completing the sheet with Wallace, Officer Teipen did

not contact the jail's on-call physician, Dr. Faisal Ahmed, because he believed that the protocol

sheet required him to do so only if the detainee was unconscious or unresponsive. *Id.* at 31.

Officer Teipen also does not believe that he gave Wallace ice or Tylenol, because he did not

record doing so on the "inmate medical event" form he completed at the time. *Id.* at 33.

Apparently, Officer Teipen simply escorted Wallace back to the F-pod. He placed a copy of the

completed protocol sheet in Wallace's file and another copy of it in the jail nurse's box; he also

completed a jail log of his interaction with Wallace which read as follows:

> At this time Inmate William Wallace came to book-in complaining of chest pain.
> I then pulled the Medical SOP on Chest Pain and followed the necessary
> procedures. William advised his left shoulder and chest had been hurting for
> about the last 30 minutes. It advised to give him 2 Tylenol Extra Strength tablets
> four times a day as needed for 3 days. Ice to affected [sic.] area x 24 hours and
> limited activity x 3 days. I then walked inmate Wallace back to F-pod and he
> stated that he did do 125 push-ups early this morning.

Pl. Ex. 47. Defendant Missy Robinson, the jail's nurse, testified that she never received the

protocol sheet and theorized that perhaps Officer Teipen had put it in the wrong box, a frequent

mistake by jail officers. Robinson Dep. at 51-52. In any event, no one followed up with

Wallace regarding his complaint of chest pain.

Wallace himself followed up, however, by speaking to Officer Joshua Clark the

following afternoon about his experience early that morning. Wallace was not experiencing

chest pains at that time and was not otherwise in distress. Wallace told Officer Clark that he

would like to go to the emergency room to have his chest pains checked out. Officer Clark told

---

testimony that he did not recall receiving any training with regard to using the protocol sheets.
For summary judgment purposes, the Court considers the evidence in the light most favorable to
the Plaintiff, which is that Teipen had not received any training.

him that the procedure would be for him to see the jail's physician; however, Wallace indicated

to Officer Clark that he did not want to be seen by Dr. Ahmed.  Clark Dep. at 20.  Officer Clark

testified that he passed along that information to Jail Commander Marc Lahrman and jail nurse

Missy Robinson.  *Id.*[5]  Officer Clark also made the following note in the jail's record log

regarding his conversation with Wallace:

> On today's date William Wallace advised me that he had some chest pains the
> night before and the sheet that was filled on him ordered Tylenol and light
> movement and a check up with the doctor.  Wallace then stated that if he had to
> see that sand nigger[6] that he didn't need to see anyone unless he was going to the
> hospital.  I advised him he didn't have a choice who he sees and he said it was
> against his religion and that the doctor doesn't like Americans or criminals for
> that matter and walked off.

Pl. Ex. 48 (spelling and punctuation corrected by the Court[7]).  There is conflicting evidence with

regard to when Dr. Ahmed next visited the jail, but there is no dispute that Wallace was not

placed on the schedule to see him.

At approximately 4:00 a.m. on April 2, 2006, Wallace was again awakened by severe

chest pains.  Wallace was taken to see Defendant Sergeant David Ridlen, who took Wallace to

the medical room near the book-in area and went through the Chest Pain Protocol with him.

This time Wallace's blood pressure was an extraordinarily high 236/165, his pulse was 100, and

he was pale, short of breath, and experiencing crushing chest pain that was radiating throughout

his chest.  Pl. Dep. at 32.  After completing the Chest Pain Protocol, Sergeant Ridlen called Dr.

--------

[5]The nurse testified that she was unaware of Wallace's chest pain complaints until
several days later when he had his second attack of chest pain.  Robinson Dep. at 29.

[6]This racial slur apparently is a reference to Dr. Ahmed's race and/or national origin.

[7]The jail's log clearly is intended to document information in an abbreviated fashion; it
is understandable, then, that the log entries are not models of grammatical perfection.

Ahmed and reported  that he had "another inmate[8] with chest pains so bad they woke him up. He has a blood pressure of 236 over 165, his pulse is 100." Pl. Ex. 27 (transcript of telephone conversation).  Before Sergeant Ridlen could relay any additional information, Dr. Ahmed interrupted him and asked what medications Wallace was taking.  When he was told that Wallace took none, Dr. Ahmed prescribed two hypertension medications.  The conversation then ended.

One of the medications prescribed by Dr. Ahmed was "HCTZ."  Sergeant Ridlen was unsure what that acronym referred to, but instead of calling Dr. Ahmed again to seek clarification, he called Nurse Robinson at home to ask her.  Nurse Robinson gave him the full name of the medication and told him where he could find it at the jail, and Sergeant Ridlen located both medications, gave them to Wallace, and returned him to the F-pod.  Sergeant Ridlen did not inform Nurse Robinson of Wallace's blood pressure reading, in spite of the fact that it was significantly higher than another inmate's and during the same conversation Nurse Robinson had reacted to his report of that inmate's reading with obvious surprise, remarking "Wow!"  Pl. Ex. at 28 (transcript of telephone conversation).

The next day she was scheduled to work at the jail, Nurse Robinson reviewed the Chest Pain Protocol Sergeant Ridlen had completed with Wallace.  She did not schedule Wallace to be seen by Dr. Ahmed or otherwise follow up on Wallace's condition, except for a casual conversation she had when she happened to see Wallace, during which she told him she would re-check his blood pressure in a week.  She did not do so.  Dr. Ahmed also did nothing to follow

---

[8]Sergeant Ridlen had called Dr. Ahmed earlier that night regarding another inmate who was experiencing chest pains; Dr. Ahmed had told Sergeant Ridlen to send that inmate to the emergency room.

up on the phone call regarding Wallace's chest pain or to determine whether the hypertension medication he had prescribed was working, even though he was at the jail seeing another patient a few days later, on April 6th.

On the morning of April 11, 2006, shortly after breakfast, an inmate from the F-pod contacted officers over the intercom and reported that Wallace was having a seizure. In fact, he was having a heart attack. Nurse Robinson and several officers responded; when they arrived, Wallace did not have a pulse. Nurse Robinson and the officers attempted to revive Wallace by administering CPR and using an automatic defibrillator, but their efforts were unsuccessful. Wallace was taken to a hospital by ambulance and was pronounced dead.

## Discussion

The Plaintiff, as the executor of Wallace's estate,[9] brings this action pursuant to 42 U.S.C. § 1983, alleging that the Defendants violated Wallace's constitutional rights by failing to provide him with adequate medical care when he reported having chest pains at the jail. The Plaintiff also asserts a pendent state law claim for wrongful death pursuant to Ind. Code §§ 34-23-1-1 & 34-23-1-2.

### § 1983 Claim

In order to prevail on her § 1983 claim against a particular defendant, the Plaintiff must prove that the defendant violated the Eighth Amendment's proscription against cruel and unusual punishment by displaying deliberate indifference to Wallace's serious medical needs.

---

[9] The amended complaint lists the plaintiff as Cecelia Wallace "individually and as the executor of the estate of William M. Wallace." The Plaintiff concedes that "[a] parent has no constitutional right under 42 U.S.C. §1983 to recover for the loss of society and companionship of an adult child as a result of state action," *see Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005), and therefore her § 1983 claim is based solely on her status as the executor of Wallace's estate.

8

*Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).  The claim has both an objective and a subjective component.  The objective component requires a showing that Wallace's medical condition was objectively serious; the Defendants do not dispute that Wallace's heart condition–which was ultimately fatal–constituted a serious medical condition. The Defendants argue, however, that none of them had the requisite state of mind to support a finding of deliberate indifference.

> To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a sufficiently culpable state of mind. . . . The officials must know of and disregard an excessive risk to inmate health; indeed they must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and must also draw the inference.  This is not to say that a prisoner must establish that officials intended or desired the harm that transpired. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk.  Additionally, a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Hayes*, 546 F.3d at 522 (citations and internal quotation marks omitted).  With that standard in mind, the issues raised in the parties' motions for summary judgment will be addressed, in turn, below as they pertain to each defendant.

*Officer Josh Teipen*

As noted above, Officer Teipen was on duty in the book-in area in the early morning of March 25, 2006, when Wallace was brought there from his pod by another officer after complaining of chest pains.  Officer Teipen followed the jail policy of choosing the applicable protocol sheet and following the instructions on it.  He correctly chose the Chest Pain Protocol and recorded the requisite information.  However, Officer Teipen testified at his deposition that his reading of the Chest Pain Protocol was that he was not supposed to call a physician unless the inmate was unresponsive, and therefore he simply sent Wallace back to his pod.  Teipen

9

Dep. at 31.[10]  The issue is whether in so doing Officer Teipen was deliberately indifferent to Wallace's need for medical attention.

The Plaintiff has submitted expert witness testimony from which a jury could conclude that the symptoms Wallace described to Officer Teipen were very obviously classic symptoms of a heart attack that demanded immediate medical attention, as did his "raging hypertension." *See, e.g.*, Bailey Dep. at 55, 71, 144 ("I can't emphasize enough to you how classical his presenting symptoms and signs were on those two occasions.").  While Officer Teipen asserts that he was not aware that Wallace was suffering from cardiac pain and therefore needed medical attention, "[d]eliberate indifference can be established by inference from circumstantial evidence, including evidence that the risk was so obvious that a jury may reasonably infer actual knowledge on the part of the defendants."  *Vinning-El v. Long*, 482 F.3d 923, 924-25 (7th Cir. 2007) (citations omitted).  The Chest Pain Protocol is not the model of clarity; however, viewing all of the evidence in the light most favorable to the Plaintiff, a reasonable jury could determine that Officer Teipen's purported reading of the form is so unreasonable that it is untrue and that his failure to call a physician (or an ambulance) given the circumstances constituted deliberate indifference.  Perhaps it was merely negligent, or perhaps the jury will believe that Officer Teipen acted entirely reasonably given the circumstances;[11] what is clear is

---

[10]The Court notes that Officer Teipen has submitted an affidavit in which he states that he believed that Wallace was suffering from a pulled muscle or muscle strain, not a cardiac issue, and therefore he did not believe that Wallace required attention from a physician, because the Chest Pain Protocol for non-cardiac pain called for Tylenol and ice, not calling the physician on duty.  This testimony varies substantially from Officer Teipen's deposition testimony; it will be up to the jury to determine whether the two versions of events can be reconciled and, if not, which to believe.

[11]The Court notes that the Defendants point to additional facts from which the jury could infer that Officer Teipen acted reasonably; however, for purposes of summary judgment the

that there is a question of fact that precludes summary judgment for either party on the issue of Officer Teipen's culpability.

*Nurse Missy Robinson*

The evidence viewed in the light most favorable to the Plaintiff indicates that Nurse Robinson first became aware that Wallace had a medical issue on March 25, 2006, when Officer Clark informed her and Commander Lahrman that Wallace wanted to go to the emergency room because he had suffered chest pains the previous night and that he did not want to follow up with Dr. Ahmed. The Plaintiff argues that Nurse Robinson's failure to follow-up with Wallace at that point constituted deliberate indifference. The Court disagrees. The evidence clearly indicates that all Nurse Robinson knew at that point was that whatever had been wrong with Wallace the previous night had resolved itself sufficiently that he had not asked to see her and was unwilling to see Dr. Ahmed about it. The Plaintiff points to no evidence in the record that Nurse Robinson knew at that point that Wallace had exhibited symptoms the night before that were serious enough that he required follow-up care even though he was not asking for it.

The Plaintiff also argues that Nurse Robinson was deliberately indifferent to Wallace's need for medical care when she failed to follow-up with Wallace on April 3rd, after she had been called in the middle of the night regarding the medication that Dr. Ahmed had prescribed Wallace. That is somewhat of an exaggeration, inasmuch as she did, in fact, chat with Wallace and ask him how he was doing, although the Plaintiff's point is well taken that (again viewing the evidence in the Plaintiff's favor) she did so because she happened to run into Wallace, not because she made a point of checking on him. In any event, it is undisputed that Nurse

Court must assume that the jury will draw all inferences in favor of the Plaintiff.

11

Robinson failed to recheck Wallace's blood pressure or otherwise provide any medical care to him–including scheduling him to be seen by Dr. Ahmed–between that date and the date of his death eight days later, in spite of the fact that she was aware that he had had extremely high blood pressure accompanied by chest pain and had been placed on hypertension medication by a physician who had not examined him.  A reasonable jury could find that this failure constituted deliberate indifference.  Such a finding certainly is not dictated by the evidence of record, however; it is a question of fact, and therefore neither party is entitled to summary judgment with regard to Nurse Robinson's liability.

*Sergeant Ridlen*

The Plaintiff's argument with regard to Sergeant Ridlen is that he should have been more assertive with Dr. Ahmed when Dr. Ahmed cut him off as he was describing Wallace's symptoms.  In other words, the Plaintiff argues that the fact that Sergeant Ridlen did not make Dr. Ahmed listen to all of the information from the Chest Pain Protocol before he prescribed medication and ended the call evidences Sergeant Ridlen's deliberate indifference to Wallace's need for medical care.  The Court disagrees.  A jail officer is entitled to defer to the judgment of a medical professional with regard to the appropriate way to treat an inmate.  *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).

> If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.  Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

12

*Id.* at 1011 n.9 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004)).

The Plaintiff argues that this case falls under an exception to the general rule because it is one of the "unusual case[s] where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment" and therefore it is unreasonable for prison officials to "rely on the judgment of medical professionals." *Bond v. Aguinaldo*, 228 F. Supp.2d 918, 920 (N.D. Ill. 2002) (*quoted in Johnson*, 433 F.3d at 1010).   However, while it may have been evident to a layperson that someone with Wallace's symptoms needed the attention of a physician, Sergeant Ridlen did, in fact, procure that attention for Wallace.  Dr. Ahmed did not refuse to treat Wallace, and whether prescribing medication was the correct course of action was a medical judgment; regardless of the soundness of that judgment from a medical perspective, it was certainly not so obviously inadequate from a layperson's standpoint that the constitution required Sergeant Ridlen to second guess it.  The same holds true for the fact that Sergeant Ridlen did not insist that Dr. Ahmed listen to all of the symptoms listed on the Chest Pain Protocol before deciding how to treat him; Sergeant Ridlen reasonably relied on the judgment of Dr. Ahmed to determine what information he needed to make an informed medical decision.  Therefore, Sergeant Ridlen's motion for summary judgment on Wallace's § 1983 claim against him is granted.

### Dr. Ahmed

The Plaintiff has presented ample evidence from which a reasonable jury could conclude that Dr. Ahmed was deliberately indifferent to Wallace's medical needs.  Dr. Ahmed's argument to the contrary relies on the fact that deliberate indifference is a fairly difficult standard for a Plaintiff to satisfy when medical treatment is involved.  As Dr. Ahmed points out,

it is clearly established that "[a] doctor might be careless in not appreciating the need to investigate several possible explanations for a particular prisoner's symptoms, and this carelessness may constitute malpractice[, b]ut malpractice alone is not enough to meet the constitutional standard." *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000). Instead, "[t]o infer deliberate indifference on the basis of physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). In this case, the Court determines that a reasonable jury could conclude just that with regard to Dr. Ahmed's treatment of Wallace's complaints of chest pain. The Plaintiff's medical expert testified that Wallace presented with the classic symptoms of acute myocardial infarction and that those symptoms required immediate treatment in an emergency room. *See, e.g.,* Bailey Dep. at 103. Dr. Ahmed essentially agrees with this conclusion, inasmuch as he testified that he based his treatment decision on the information that he had, and that had Sergeant Ridlen given him all of the information on the Chest Pain Protocol he would have sent Wallace to the emergency room for treatment. Ahmed Dep. at 131-32 ("If I was to be contacted by an officer who says he's got an offender who has got crushing chest pain, who is short of breath with pain radiating, high blood pressure, high pulse rate, appears pale, short of breath and is diaphoretic, I would send him to the emergency room."). In essence, then, Dr. Ahmed blames Sergeant Ridlen for failing to give him all of the relevant information. Frankly, that argument borders on ridiculous. Dr. Ahmed admittedly knew that there were readily observable symptoms beyond the two (pulse and blood pressure) that Sergeant Ridlen had given him that would change his course of treatment from prescribing medication to a trip to the hospital. He failed to ask

14

Sergeant Ridlen about those symptoms; indeed, viewing the evidence most favorable to the

Plaintiff, he cut Sergeant Ridlen off and did not give him the opportunity to report those

symptoms.  Whether doing so constituted deliberate indifference is a question for the jury;

therefore, neither party is entitled to summary judgment with regard to Dr. Ahmed's liability.

*Jackson County*

The Plaintiff has named as a defendant in this case Marc Lahrman in his official

capacity as the current Sheriff of Jackson County and as the Jail Commander of the Jackson

County Jail at the time of Wallace's death.  Such official capacity claims are treated as claims

against Jackson County itself.  *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008).

Counties and other governmental entities may not be held liable for the unconstitutional acts

under a *respondeat superior* theory, but rather are liable for those acts only if they were carried

out pursuant to an official custom or policy.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694

(1978); *see also Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (citation omitted)

("Misbehaving employees are responsible for their own conduct, units of local government are

responsible only for their policies rather than misconduct by their workers.").  "In order to

survive summary judgment on a § 1983 official-capacity claim, the plaintiff must present

evidence demonstrating the existence of an official policy, widespread custom, or deliberate act

of a county decision-maker of the municipality or department." *Grieveson*, 538 F.3d at 771

(citations and internal quotation marks omitted).  In addition, the plaintiff must show that the

official policy or custom was the cause of the alleged constitutional violation-the "moving

force" behind it.  *Id.*

The Plaintiff's claims against Jackson County are two-fold.  She alleges that the county

15

"adopted policies and practices that constituted deliberate indifference to the serious medical needs of prisoners" and that it also failed to properly train employees to deal with inmates' serious medical needs.  Plaintiff's Brief at 29-30.  With regard to the first claim, the Plaintiff articulates it in her initial brief as follows:

> [T]he specific medical policies adopted by these defendants were aimed at undercutting inmates' constitutional rights.  The medical policies embraced by ACH and Jackson County were contained within specific medical protocols which were to be used by the jail staff before calling the doctor.  The protocols were often times no more than a single sheet of questions that the jail officer was supposed to ask an inmate that was suffering from a health problem.  The jail officer was then supposed to follow the treatment that was dictated by the medical protocol sheet.

*Id.* at 33.  This policy, the Plaintiff argues, was motivated by the county's desire to save money on healthcare costs by not sending inmates to the emergency room for medical care.  In other words, the Plaintiff alleges that the county and ACH devised a money-saving system which resulted in jail officers without adequate medical training making decisions regarding inmates' need for medical care.

The Plaintiff has presented ample evidence in support of her assertion that containing costs was a motivating factor behind the county's decision to contract with ACH to provide the medical service at the jail and that ACH took measures to reduce the county's medical costs.[12] However, there is nothing inherently suspect–and certainly nothing inherently

---

[12]For example, Plaintiff notes that as a cost-saving measure, ACH reduced or eliminated some inmates' prescription medications, such as sleeping pills, on the ground that they were "simply comfort drugs" and therefore not necessary; while the inmates' charts were reviewed by a physician, no medical care provider actually met with the inmates personally before changing or eliminating their prescriptions.  In addition, inmates were charged a co-payment for each sick call and on ACH's recommendation the jail began charging inmates for non-prescription medications such as Tylenol. None of these cost-saving measures had anything to do with what happened to Wallace, however.

unconstitutional–about a governmental entity wishing to save money.  The relevant question is

whether the county adopted cost-saving measures that were deliberately indifferent to its

inmates' constitutional right to adequate medical care and whether those measures deprived

Wallace of that right.

The Plaintiff points to a variety of facts in support of her claim against Jackson County.

First, she points out that prior to making the decision to contract with ACH, Sheriff Jerry

Hounshel sent surveys to approximately twelve jails who were using ACH to find out what their

experience had been with the company; however, Sheriff Hounshel testified at his deposition

that he was not sure who created the survey and did not recall how many responses he received.

He did recall that ACH provided him with a list of customers to whom he could send a survey.

Other than the surveys, no background check was done on ACH by the county and Sheriff

Hounshel did not shop around and compare other alternatives before choosing ACH.  While

these facts–drawing all inferences in favor of the Plaintiff–might indicate that Sheriff Hounshel

failed to exercise due diligence before contracting with ACH, the Plaintiff has not shown that

this failure constituted any more than simple negligence.  There is simply no evidence that

Sheriff Hounshel knew that hiring ACH posed a substantial risk to his inmates.  Further, there is

no evidence that this lack of comparison shopping or vetting of ACH caused any constitutional

deprivation to Wallace or anyone else, inasmuch as the Plaintiff has not pointed to any evidence

to suggest that Sheriff Hounshel would have made a different decision if he had gathered more

information about ACH, or even that there was a better, feasible alternative available to Jackson

County.

The Plaintiff next points to the fact that the ACH physician assigned to the jail, Dr.

Ahmed, did not have an office, but rather worked out of his car and took his calls on his cell

17

phone.  He also did not have the ability to receive faxes from the jail.   Sheriff Hounshel was

unaware of those facts, and also did not know that Dr. Ahmed was assigned to visit up to twenty

other jails located in three states.  However, the Plaintiff has presented no evidence that either

Dr. Ahmed's lack of an office or his workload precluded him from providing constitutionally

adequate medical care at the jail.  Indeed, it is unclear why Dr. Ahmed would have needed an

office, inasmuch as his days were spent traveling around to various jails to see inmates, and

there is no evidence that his cell phone was not a reliable means of communication with regard

to Wallace or any other inmate.

Next, the Plaintiff makes much of the fact that ACH's "Strategic Plan" for the jail had as

a stated goal sending inmates off-site for treatment "only if necessary." Pl. Ex. 44 at 4.  While

the Plaintiff characterizes this as "a cost containment program that advocated against sending

inmates off-site," Plaintiff's Brief at 9, the plain language of the Strategic Plan states that

inmates should be sent off-site "only if necessary," and the Plaintiff has presented no evidence

that this language meant anything other than what it says.  There is certainly no constitutional

right to unnecessary visits to the emergency room, and the Plaintiff points to no evidence that

suggests that anyone at the jail or ACH were ever encouraged to save money by keeping

inmates from visiting the emergency room when medically indicated.

Finally, the Plaintiff argues that two additional statements contained in the slides

accompanying the training presentation given by ACH to jail staff demonstrate deliberate

indifference to the inmates' health.  One slide reads as follows:

> What is _your_ responsibility for the standard of healthcare in the correctional setting?
>
> •    **Do not let** the inmate's health **deteriorate**.

18

> • The inmate must be able to **function** within the environment.

Pl. Ex. 40 (emphasis in original).  The other reads, in relevant part:

> How to reduce lawsuit risk in the correctional setting
>
> • Take No Medical responsibility
>   – Determine Medical Authority
>   – Hire a physician trained in correctional medicine
>   – Ask for documentation of correctional malpractice insurance from your physician
>   – Correctional officers to refer to medical authority

Based upon these slides, the Plaintiff makes the following argument:

> Keeping inmates at the level of merely being able to "function," and specifically adopting as a practice and policy the goal of taking "no medical responsibility" is clearly below the standard of care required under the Eighth Amendment, and evidence the deliberate indifference of ACH and Jackson County to inmates' constitutional rights.

Plaintiff's Brief at 34.  In spite of its rhetorical appeal, this argument is without merit.  When considered in context, the slides in question simply cannot be read as the Plaintiff urges. It is unclear what the Plaintiff's objection is to the idea expressed in the first slide–that an inmate's health must be kept at a level that allows him to "function"–especially when coupled with the admonition that the inmate's health must not be permitted to deteriorate.  The alternative–an inmate who is alive but unable to function–clearly is not preferable.  As for the second slide, far from instructing jail employees to abdicate their responsibilities to the inmates, as the Plaintiff suggests, it instead expresses the uncontroversial idea that they should leave medical decisions to the medical professionals at their disposal.  In fact, while the Plaintiff argues that the county's policy "entrusts a jail official, an untrained, non-medical officer, with the duty of diagnosing an inmate and determining the severity of a medical situation," Plaintiff's Response at 39, this slide

19

suggests that the policy was just the opposite–that such decisions were to be deferred to a

medical professional.

In response to the Defendants' motions for summary judgment, the Plaintiff articulates

her claim against Jackson County in a slightly different way:

> ACH's cost containment plan is achieved by having a jail officer diagnose an
> inmate with the assistance of a page of questions, referred to as protocols. The
> jail officer then has the option and discretion of calling a doctor to determine if
> anything further needs to be done. The protocol sheets are ambiguous as to
> whether a jail officer must call the doctor. If the jail officer did decide to call the
> doctor, then it was up to the doctor whether the inmate should be sent to the
> emergency room. At first blush this policy may seem harmless, however, a
> closer  look reveals the magnitude of the indifference to inmate welfare. This
> policy literally entrusts a jail officer, an untrained, non-medical officer, with the
> duty of diagnosing an inmate and determining the severity of a medical situation.
> . . . By instituting a policy that requires jail officers to fill the shoes of a doctor
> with nothing more than a page of questions to guide them, Jackson County has
> exhibited deliberate indifference to the medical needs of its inmates.

Plaintiff's Response at 38-39. To the extent that the Plaintiff argues that the constitution is

infringed simply because a policy gives non-medical jail personnel discretion to determine

whether medical care is needed in a given situation, that argument is without merit. *See City of*

*Canton, Ohio v. Harris*, 489 U.S. 378, 386-87 (1989) (finding clearly constitutional a policy

that required a city jailer to "have [a person needing medical care] taken to a hospital for

medical treatment, with permission of his supervisor [a non-medical jail commander]"). 

However, giving jail officers such discretion without also giving them sufficient training so that

they can exercise that discretion in a manner that protects inmates' right to adequate medical

care can, under certain circumstances, violate the constitution. *Id.*

Thus, the Plaintiff also argues that Jackson County is liable for failing to train the jail

officers with regard to how to use the protocol sheets. The Supreme Court recognized the

viability of a § 1983 failure to train claim in *City of Canton*. In so doing, the Court noted the

following:

> *Monell's* rule that a city is not liable under § 1983 unless a municipal policy
> causes a constitutional deprivation will not be satisfied by merely alleging that
> the existing training program for a class of employees, such as police officers,
> represents a policy for which the city is responsible. That much may be true. The
> issue in a case like this one, however, is whether that training program is
> adequate; and if it is not, the question becomes whether such inadequate training
> can justifiably be said to represent "city policy." It may seem contrary to
> common sense to assert that a municipality will actually have a policy of not
> taking reasonable steps to train its employees. But it may happen that in light of
> the duties assigned to specific officers or employees the need for more or
> different training is so obvious, and the inadequacy so likely to result in the
> violation of constitutional rights, that the policymakers of the city can reasonably
> be said to have been deliberately indifferent to the need.   In that event, the
> failure to provide proper training may fairly be said to represent a policy for
> which the city is responsible, and for which the city may be held liable if it
> actually causes injury.

*Id.* at 389-90.  The Court further noted that the fact that "a particular officer may be

unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's

shortcomings may have resulted from factors other than a faulty training program"; for

example, it may be that "an otherwise sound program has occasionally been negligently

administered."  *Id.* at 390-91.

Viewed in the light most favorable to the Plaintiff, the evidence of record in this case

supports the Plaintiff's argument that Jackson County did not have a sound training program for

its jail officers regarding handling inmate medical issues.  It appears that none of the jail

officers received any specific training regarding the proper use of the Chest Pain Protocol or

any other specific protocol; rather, the training that they received from ACH only gave them

general instructions regarding the use of the protocols.  That general training may well have

been adequate if the protocols were self-explanatory and did not require the exercise of any

medical discretion.  The Chest Pain Protocol did require the exercise of discretion, however, in

21

that it required the officer to determine whether an inmate was experiencing cardiac chest pain, which required a physician referral, or chest pain related to an injury or muscle strain, which did not.  There is simply no evidence of record that the jail had a policy in place that required its officers to be trained on how to make that type of determination.[13]  The record also suggests that the County did not keep track of which of its officers received ACH's training regarding the general use of the protocols and that none of the officers on duty at the time of Wallace's first chest pain episode had attended that training.  A reasonable jury could find that the need to train jail officers with regard to handling an inmate's complaints of chest pain was obvious and that the County disregarded that obvious need in deliberate indifference to a substantial risk to its inmates.

The Plaintiff has submitted sufficient evidence to call into question the adequacy of the County's training of its officers with regard to handling inmate's medical issues. It remains for the jury to determine whether it was, in fact, inadequate and whether that inadequacy amounted to deliberate indifferent on the part of the County.

*Advanced Correctional Healthcare, Inc.*

A private corporation such as ACH which is acting under the color of state law is treated as if it were a municipal entity for § 1983 purposes.  *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002).  Thus, like Jackson County, ACH cannot be held liable for the actions of its employees under a *respondeat superior* theory, but can be liable for its own practices or policies that result in a constitutional deprivation.

---

[13]The County points to the fact that its officers all attended the Indiana Law Enforcement Academy's 40-hour jail officer training course, which included "several hours of training on medical issues."  However, the record is devoid of any evidence regarding what was included in this training.

The Plaintiff essentially lumps Jackson County and ACH together and assumes that both of them were responsible for the policies she alleges were unconstitutional.  With regard to the general policy of using the protocols, the Court will assume, without deciding, that the Plaintiff is correct, inasmuch as the adoption of that policy did not violate the constitution in any event.  With regard to the Plaintiff's failure to train claim, the Plaintiff has presented no evidence that ACH assumed the duty of ensuring that the jail's employees were properly trained.  ACH provided some general training regarding the use of its protocols; however, absent evidence to the contrary, the Court finds that the county, not ACH, was responsible for any failure in the training of its jail officers.  Accordingly, ACH is entitled to summary judgment with regard to the Plaintiff's § 1983 claim against it.

*Jerry Hounshel*

Jerry Hounshel was the Jackson County Sheriff at the time of Wallace's incarceration and death.  As sheriff, Hounshel was responsible for the jail; however, as the Plaintiff recognizes, he cannot be held liable pursuant to § 1983 simply because of his supervisory status.  Rather, "[s]ince a section 1983 cause of action is against a 'person,' in order to recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right. To be personally responsible, an official must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Johnson v. Snyder*, 444 F.3d 579, 583-84 (7th Cir. 2006) (citations and internal quotation marks omitted).

The Plaintiff argues that the evidence of record supports a finding that Hounshel was aware that Wallace's medical needs were not being met and failed to remedy the situation.  Specifically, the Plaintiff points to the testimony of Andrew Rumph, who was the county coroner at the time of Wallace's death, that Hounshel told him as they drove together to notify

23

the Plaintiff of Wallace's death that Wallace had complained of chest pains twice and the jail

had "basically done nothing for him." Rumph Dep. at 22. As the Defendants point out, Rumph

did not know when or from whom Wallace obtained this information, and therefore Rumph's

testimony alone does not support a finding that Hounshel was ever in a position to intervene

with regard to Wallace's medical care. To fill this gap, the Plaintiff points to Hounshel's own

deposition testimony. Hounshel testified that he was called when Wallace was taken to the

hospital and that he then went to the hospital and saw Nurse Robinson and Commander

Lahrman, who told him that Wallace had died. Hounshel Dep. at 86. He then testified as

follows:

> Q:   Okay. Did they give you any details?
>
> A:   No. Not that I can recall.
>
> Q:   At that time, were you aware of any prior medical events, any questions of chest pains?
>
> A:   No. I didn't know, really, William Wallace's medical condition. We had him out a few days prior to that being a jail trustee, but I didn't know his medical condition.
>
> Q:   Did either Marc Lahrman or Ms. Robinson inform you of any prior medical history during that meeting?
>
> A:   No, not while I was standing there talking with them, no.
>
> Q:   And what did you do after you left that, that site?
>
> A:   I'm not sure.
>
> Q:   At some point did you go see Ms. Cecelia Wallace?
>
> A:   Yes. . . . [T]he county coroner Andy Rumph and myself, we hooked up a telephone conversation and we met somewhere, I'm not sure if he come to the jail or whatever, and we – I drove out there and we went to Cecelia's house. . . .
>
> Q:   Did you receive any additional information by radio on your way to Ms. Wallace

24

before you got there?

A:    I'm not sure.

Q:    Okay.  Pertaining to this case?

A:    I'm not sure.

Hounshel Dep. at 86-87.  The Plaintiff argues that this testimony, coupled with that of Rumph, proves that Hounshel was lying when he testified that he had no prior knowledge of Wallace's complaints of chest pain and the jail's failure to provide proper treatment for it.  The Court disagrees.  Hounshel stated both in his deposition and his affidavit that he had no such prior knowledge, and his testimony was not that he did not receive any such information after his conversation with Robinson and Lahrman at the hospital; his testimony is only that he could not recall if he did or did not.  There is nothing inconsistent, then, about his testimony, and there is simply no evidence in the record to contradict his unequivocal testimony that he did not know anything about Wallace's medical condition prior to his death.  Therefore, Hounshel's motion for summary judgment is granted with regard to the Plaintiff's § 1983 claim against him individually.

*Marc Lahrman*

In addition to naming Marc Lahrman in his official capacity, the Plaintiff also has named him in his individual capacity.  The Plaintiff's claim against Officer Lahrman is two-fold.  First, she argues that he failed to appropriately respond to the information passed on to him by Officer Clark; however, that failure does not lead to § 1983 liability against Officer Lahrman for the same reason as it does not lead to liability against Nurse Robinson.  The Plaintiff also argues that Officer Lahrman is liable for failing to properly supervise Nurse Robinson.  However, while the Plaintiff correctly articulates the standard for such a claim, she

25

makes no attempt to apply that standard to the facts of this case.  As noted above, a supervisor may be liable under § 1983 for the actions of a subordinate only if he knows about the conduct and facilitates, approves, condones, or turns a blind eye to it.   The Plaintiff identifies no evidence that would support a supervisory liability claim against Officer Lahrman; she merely makes the unsupported, conclusory statement that Lahrman "knew Nurse Robinson's history and yet did nothing."[14]  Plaintiff's Response at 31.  Accordingly, Lahrman's motion for summary judgment on the Plaintiff's § 1983 claims against him in his individual capacity is granted.

### Punitive Damages

The Defendants make a separate argument that they are entitled to summary judgment on the Plaintiff's request for punitive damages with regard to her § 1983 claim.  Because the standard for awarding punitive damages in a § 1983 claim is synonymous with the standard for liability for failure to provide adequate medical care, *see Woodward v. Correctional Medical Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004), those Defendants who are not entitled to summary judgment on the merits of the Plaintiff's § 1983 also are not entitled to summary judgment on her request for punitive damages.  The exception to this is Jackson County, inasmuch as governmental entity defendants are not subject to punitive damages awards under § 1983.  *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981).

### Qualified Immunity

The Defendants all pay lip service to the argument that they are entitled to qualified

---

[14]While the Plaintiff does not explain this statement, the Court assumes the "history" to which she refers is the fact that Nurse Robinson had been disciplined for tardiness, for not wearing a proper uniform, and for neglecting her duty to visit the county's juvenile detention center.  None of these disciplinary issues have any connection to Wallace's death.

immunity from the Plaintiff's § 1983 claim; however, none of them has developed the argument sufficiently to warrant the Court's attention to it.  Perhaps that is because they recognize that an inmate's constitutional right to adequate medical care has long been recognized, and therefore the law is that

> a plaintiff claiming an Eighth Amendment violation must show the defendant's actual knowledge of the threat to the plaintiff's health or safety, the defendant's failure to take reasonable measures, and the defendant's subjective intent to harm or deliberate indifference. If there are genuine issues of fact concerning those elements, a defendant may not avoid trial on the grounds of qualified immunity.

*Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (citation omitted).  Therefore, those defendants in this case who are not entitled to summary judgment on the merits have not, for the same reasons, established that they are entitled to qualified immunity; for those who are entitled to summary judgment, the issue of qualified immunity is irrelevant.

### State Tort Claim

The amended complaint asserts a pendent state law claim for wrongful death pursuant to Ind. Code 34-23-1-1 & 34-23-1-2.  The Defendants argue, and the Plaintiff impliedly concedes, that she cannot pursue a claim pursuant to Ind. Code 34-23-1-1 because it does not apply to claims arising out of the deaths of individuals such as Wallace who were unmarried and without dependents at the time of their death.  Therefore, summary judgment is granted in favor of all of the Defendants as to the Plaintiff's claim under Ind. Code 34-23-1-1.  In addition, while the amended complaint does not differentiate between the defendants in the wrongful death claim, the Plaintiff concedes that the individual defendants cannot be held liable under the Indiana wrongful death statute because all of their actions were taken in the scope of their employment. Therefore, the Plaintiff's claim under Ind. Code 34-23-1-2 may proceed against Jackson

27

County[15] and ACH only, and summary judgment is granted in favor of all of the other defendants with regard to that claim.

The Defendants point out that the amended complaint alleges that they intentionally caused Wallace's death; therefore, they argue, the Plaintiff may not now argue that they are liable under the wrongful death statute for negligence or anything else other than intentional conduct.  While it certainly would have been preferable for the amended complaint to make clear that the wrongful death claim was not based solely on intentional conduct, the Court agrees with the Plaintiff that she should be permitted to pursue her claim based on lesser forms of culpability.  *See Rapid Test Products, Inc., v. Durham School Servs., Inc.*, 460 F.3d 859, 860 (7th Cir. 2006) ("complaints need not set out either legal theories or comprehensive factual narratives").

The Defendants also argue that the Plaintiff's relationship with her son at the time of his death was insufficient to support a wrongful death claim under Indiana law, which provides that "[a] parent or child who wishes to recover damages under this section has the burden of proving that the parent or child had a genuine, substantial, and ongoing relationship with the adult person before the parent or child may recover damages."  Because there is conflicting evidence in the record regarding the exact nature of the Plaintiff's relationship with Wallace at the time of his death, summary judgment on this issue is not appropriate.

Finally, the Defendants are correct that the Plaintiff is not entitled to recover punitive damages on her wrongful death claim.  Ind. Code 34-23-1-2(c)(2)(B).

---

[15]To the extent that the Defendants argue that the Plaintiff has not sued Jackson County, that argument clearly is without merit; as already noted, her claim against Lahrman in his official capacity is a claim against the county itself.

**Conclusion**

For the reasons set forth above, the Plaintiff's motion for summary judgment is

**DENIED** in its entirety.  With regard to the Plaintiff's § 1983 claim, summary judgment is

**GRANTED** in favor of Defendants David Ridlen, Advanced Correctional Healthcare, Inc.,

Jerry Hounshel, and Marc Lahrman in his individual capacity and **DENIED** with regard to

Defendants Josh Teipen,  Missy Robinson, Faisal Ahmed, and Marc Lahrman in his official

capacity.   With regard to the Plaintiff's wrongful death claim, summary judgment is

**GRANTED** in favor of all of the Defendants on the Plaintiff's claim pursuant to Ind. Code 34-

23-1-1; summary judgment is **GRANTED** in favor of all of the individual Defendants and

**DENIED** as to Defendant Marc Lahrman in his official capacity and Defendant Advanced

Correctional Healthcare, Inc., with regard to the Plaintiff's claim pursuant to Ind. Code 34-23-1-

2.

The Court notes that no trial date has been set in this case.  The parties shall confer

regarding a reasonable schedule for completing any pretrial matters and then shall contact the

Magistrate Judge assigned to this case to schedule a status conference to establish any necessary

deadlines and recommend a trial date.

SO ORDERED:  03/19/2009

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification